Case Case:v:0142:10N4GG Document11File Fil03/07/25/2RagePagf 154f954eeaget257: 1262

# THE APPRENTICE

## that never was

PRIVATE ATTORNEY
GENERAL ACTION

Case #:

Case Case:v:0142:10N4GG Document11File Fil03/07/25/2RagePagf 154f954eeaget257: 1262

UNITED STATES DISTRICT COURT for the
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Donna Hodge, Annette Hall, Karen Grant Williams, Alexi Arias, Albert E. Percy, Percy Jobs and Careers Corporation an IRC 501(c)(3) non-profit, as Class Representative,<br>     Plaintiff,<br>-against-<br><br>ANDREW M. CUOMO as Governor of the State of New York; STATE OF NEW YORK; ROBERTA REARDON as Commissioner of the New York State Department of Labor; NEW YORK STATE DEPARTMENT OF LABOR;<br>    Defendants from SDNY 73-cv-04279,<br><br>Linda A. Lacewell as Superintendent of Insurance of the State of New York Department of Financial Services, Martha Lees as General Counsel of the Department of Financial Services, Carolyn Robinson, Supervisor with the New York State Department of Labor, Dr. Merryl H. Tisch, Chairman of the State University of New York Board of Trustees, the State University of New York, Scott Dietrich and Peter Fountas of the Research Foundation of the State University of New York, Howard A. Zucker, M.D., as the Commissioner of the State of New York Department of Health, Basil Seggos as the present Acting Commission of the New York State Department of Environmental Conservation, Jeremy Attie, Ziv Kimmel, Vincent Licause Officers of the New York Compensation Insurance Rating Board,<br>    State Officer Defendants,<br><br><br>Allstate Administrators, LLC, d/b/a Allstate ASO; Gary Baker; Broad Coverage Services, Inc.; Christopher Buckey; Michael Camilleri; Cullen and Dykman; Dynamic Claim Services, Inc; Eagle North, LLC; Wolf Eisenbach; Grandview Brokerage; Jon Halpern; Chaim Hirsch; Ben Landa a/k/a Benjamin Landa; Lipsium Benheim; Ira Lipsius; Isaac Muller; Philipson Family Trust; Avi Philipson, Deborah Philipson; Samuel Schlesinger; Michael Schremer; Martin Schwartzman; Michael Schweimmer; Spencer Street Realty; Standard and Preferred Insurance Company; Joseph Stern; The Berkshire Group. Inc.; The Pitterman Family Trust; The Schlesinger Family Trust; Stella M. Vilardi; Israel Weber; Raphael A. Weitzner; Whiteman Osterman & Hanna, Israel Ziegelman;<br>    Party-in-Interest Defendants, | **COMPLAINT**<br>`<br><br>CASE#:<br><br><br><br><br>A PRIVATE ATTORNEY GENERAL ACTION |

2

Gabor Adler;  George Adler;  Kwame Amoafo-danquah;  Agnes Arnestein;  Anthony Bacchi;  Matthew Barbara;  Paul Barbara;  Aaron Becher;  Pola Becher;  Hershel Bedansky;  Howard Belford;  Scott Bialick;  Robert Bleier;  David Bloom;  Paula Bokow;  Joel Brach;  Natan Brach;  Barry Braunstein;  Murray Bresky;  Steven Brown;  Philip Buchsbaum;  Richard Bursek;  Richard Busell;  Colin C. Hart;  Ira Cammeyer;  Alan Chopp;  Joshua Chopp;  David Cohen;  David Crytryn;  David Dachs;  Solomon Eidlisz;  Neil Einhorn;  Scott Einiger;  Abraham Eisen;  Sam Eisen;  Steve Eisman;  Ignatius Elefant;  Philipson Family Trust;  Martin Farbeblum;  Benjamin Farbenblum;  Ed Farbenblum;  Edward Farbenblum;  Martin Farbenblum;  Michael Farbenblum;  Esther Farkovits;  Jordan Fensterman;  Lori Fensterman;  Robert Fensterman;  Staci Fensterman;  Samuel Ferrara;  Mayer Fischl;  Benjamin Fishoff;  Patrick Formato;  John Francher;  David Freid;  Moshe Freilich;  Andrew Freundlich;  Sigmund Freundlich;  Leo Friedman;  David Gast;  Louis Gellis;  William Gillick;  Rivky Goldberger;  Leon Goldenberg;  Jeffrey Goldstein;  Anne Gottlieb;  Miklows Gottlieb;  Niklos Gottlieb;  Solomon Green;  Joel Greenberg;  Eric Greenberger;  Eli Greenspan;  Steven Greenstein;  Avrumi Grossman;  Marton Guttman;  Valarie Henry;  Johanan Hirsch;  Leopold Hirsch;  Libe Hirsch;  Ruth Hirsch;  David Hoffman;  Pinchos Hoffman;  Pinchus Hoffman;  Steven J Eisman;  Anthony J. Bacchi;  Jack Janklowicz;  Leonard Janklowicz;  Jack Janklowitz;  Shorefront Jewish Geriatic Center;  David Jones;  Judith Jones;  Mendel Kaff;  Eric Kalt;  Yoel Karpen;  Miriam Karpf;  Allen Kass;  Martin Kass;  Martin Katz;  Shelley Katz;  Shelly Katz;  Manny Kaufman;  Yosef Kaufman;  Alan Kessler;  Arnold Klapper;  George Klein;  Larry Klein;  Eleanor Kluger;  Robert Kolman;  Dean Korlik;  William Korn;  Irina Kostesky;  Howard Krant;  Ephram Lahasky;  Benjamin Landa;  David Landa;  Yechiel Landa;  Nathan Landau;  James Lapolla;  Tibor Lebovich;  Morty Lehasky;  David Leifer;  Barry Leistner;  Chana Lerner;  Michael Levitan;  Rich Levitan;  Teddy Lichtscein;  Neuman Lj Partners;  Isaac Madeb;  Dovi Marc Faivish;  Sam Mayerovitz;  Girshas Minster;  Neuman Mn Partners;  Gavriel Mordechaev;  Gabriel Mordechey;  Sharyn Mukamal;  Katherine Muller;  Laurie Netzer;  Leo Oberlander;  Sander Oberlander;  Milton Ostreicher;  Susan Ostreicher;  Irwin Peckman;  Ben Philipson;  Bent Philipson;  Deborah Philipson;  Robert Pines;  Israel Pollak;  Jacob Pollak;  Natan Pollak;  Renee Pollak;  Sylvia Pollak;  Theodore Pollak;  Michael Pruzansky;  Diana R.

Koehler; Jonathan Redner; Lawrence Reichenberger; Mark Reisman; Mayer Rispler; Brian Rosenman; Kenneth Rozenberg; Berish Rubenstein; Dina Rubenstein; Rivkie Rubenstein; Ira Rubin; Malky Saffran; Boruch Schepps; Pamela Schepps; Nat Scherman; Richard Schildron; Samuel Schlesinger; Jacob Schoenberger; Michael Schwartz; Leslie Shafrank; Henry Shayovitz; Agnes Shemia; Jeff Shemia; Alexander Sherman; Israel Sherman; Leah Sherman; Nat Sherman; Samuel Sherman; Warren Sherman; Hindy Sirkis; Moshe Sirkis; Alexander Skoczlas; Joseph Skoczylas; Tali Skoczylas; Dominic Spira Md; Jonathan Steinberg; Miriam Steinberg; Ronald Stern; Mariam Sternberg; Lorraine Takesky; Mitch Teller; Kenneth Tesslar; Kenneth Tessler; Aaron Unger; Unknown; Eila Vinitzky; Yuliya Vinokurova; Jeffrey Vogel; Sherman Vogel; Peggy Weberman; Philip Weberman; Toby Weinberger; Zoltan Weinberger; Regina Weinstock; Ari Weiss; Berish Weiss; Berry Weiss; Micahel Weiss; Michael Weiss; Robyn Weiss; Shlomie Weiss; Chaya Willinger; Robert Wolf; Peyman Younesi; Mark Zaffrin; Ephraim Zagelbaum; Kenneth Zitter; David Zohler;

Owner Operator Defendants

Local 1199 of the Service Employees International Union

Union Defendant,

Oriska Insurance Company,

Carrier Defendant,

Rashbi Management, Inc.,

Trust Defendant.

Oriska Corporation derivatively to the Carrier Defendant and by Subrogation to the Class,

Derivative Defendant,

## TABLE OF CONTENTS

COMPLAINT .................................................................................................. 10

PRELUDE ..................................................................................................... 10

    Lincoln ................................................................................................... 10

    Grant and Conkling ................................................................................ 11

    Franklin Roosevelt ................................................................................. 12

    Lyndon B. Johnson ................................................................................ 13

BASIS AND SUMMARY OF CAUSES FOR ACTION .......................................... 14

PRIVATE ATTORNEY GENERAL ACTION ....................................................... 22

JURISDICTION ............................................................................................. 23

VENUE and PRIOR PROCEEDINGS ............................................................... 23

PARTIES ...................................................................................................... 24

    PLAINTIFF: ............................................................................................ 24

    DEFENDANTS: ....................................................................................... 25

    The State Officer Defendants named in their official and individual capacities are as follows: .................................................................................................... 26

    The Party-in-Interest Defendants are as follows: ..................................... 26

    Owner Operator Defendants are the owners and operators of Employers referred to as the Employer Defendants identified in a related case EDNY 21-cv-01366 as follows: .............. 28

    Carrier, Derivative, and Trust Defendants are as follows: .......................... 41

    Union Defendant .................................................................................... 42

    Parties previously named in Case SDNY 73-cv-04279 who are not named here because the Percy Class does not have a controversy with the following former defendants: ................ 42

FACTS COMMON TO ALL CAUSES OF ACTION .............................................. 43

    Precedent, Authority and Jurisdiction .................................................... 44

    DEFENDANT GOVERNOR OF THE STATE OF NEW YORK presented Executive Order 45 in an effort toward affirmative action, but it failed and has never been corrected, Percy undertakes self-help with the PERCY PROGRAM but is Stymied. ..................................... 46

NUMEROSITY ............................................................................................... 48

CLASS ACTION COMMON ISSUES OF LAW AND FACT .................................. 48

JUDICIAL ECONOMY ..................................................................................... 49

CLASS COUNSEL .......................................................................................... 49

CLASS REPRESENTATIVE ................................................................................................50

First Cause of Action against Defendant Government Agencies and State Officers for Injunctive Relief Prohibiting interference with the Alternative Employment Practice under 42 U.S.C. 1981 and 1985 in violation of 42 U.S.C. 1983 ..............50

Focusing on the current spread of infection that has occurred in nursing homes as it affects members of the Plaintiff Class employed in nursing homes, the root cause of this disaster begins with the failure of Governors Executive Order 45. We draw here from the following as evidence of the consequence: ...................................................................................................51

Findings of the New York Attorney General in Report of January 30, 2021, Attachment #1 hereto.................................................................................................................................51

Second Cause of Action against Owner Operator Defendants OF Identified Employers for Breach of ERISA Fiduciary Duties in the Diversion of $53 Million in Plan Assets ....................................................................................................................... 61

$53 Million- Embezzlement Admitted in Court Documents ................................................ 63

Third Cause of Action against Party-in-Interest Defendants to Recover Plan Assets Diverted by Parties-in-Interest in Prohibited Transactions ............................... 76

Parties-in-Interest ..................................................................................................................... 76

Fourth Cause of Action against Identified Owner Operator Defendants for Breach of ERISA Fiduciary Duties in the Diversion of $68 million in Plan Assets ............. 77

Fifth Cause of Action under 42 U.S.C. 1983 invoking 42 U.S.C. 1981 and 1985 against the Party-in-Interest Defendants and Owner Operator Defendants in Complicity with State Officer Defendants Conspiring to deprive the Class of Rights and Privileges Denying Equal Protection of the Laws under the 14th Amendment .. 85

What Happened to the Monies Expensed in Cost Reports to Fund the ERISA Plan and Program? ..........................................................................................................................86

Sixth Cause of Action under 42 U.S.C. 1983 invoking 42 U.S.C. 1981 and 1985 against the Party-in-Interest Defendants and Owner Operator Defendants conspiring with State Officers to Deprive the Class of Rights and Privileges Denying Equal Protection of the Laws under the 14th Amendment ...........................................89

Damages for an illegal employment practice ...................................................................... 92

Seventh Cause of Action Against the Governor of the State of New York and the Defendant Government Agencies for failure of Governor's Executive order 45 . 92

DEFENDANT GOVERNOR OF THE STATE OF NEW YORK OFFERED A SETTLEMENT OF PERCY V. BRENNAN IN CASE 73-CV-04279 THAT IS UNENFORCEABLE AND FAILED ....................................................................................................................................... 96

Defendant Governor and his Agencies Actively Undermine the Percy Program.................. 97

Eighth Cause of Action against Owner Operator and the Union Defendants for Illegal Employment Practices in Violation of 42 U.S.C. § 2000e-2 ................................98

ALTERNATIVE EMPLOYMENT PRACTICE  The Percy Program, referenced herein (Document #6, Attachment 21 in EDNY Case No. 21-cv-01366) ........................99

The Advocates.................................................................................................................99

The Percy Program Presented by the Advocates as an Alternative Employment Practice under 42 USC 2000 e-2(k)(1)(A)(ii) and (k)(1)(C) meets the burden of production and persuasion under Title VII of the Civil Rights Act. ................................................................................. 99

The Percy Program is a Less Discriminatory Alternative Method of Employment Practice Available to these Employers and Presented it the Defendant US Department of Labor and the Executive Branch Office of the President of the United States .....................................103

The Percy Program Presented to the NYS Empire State Development Corporation is an Available Less Discriminatory Alternative Method of Employment Practice..................... 104

The Percy Program Presented to the Port Authority of New York/New Jersey is an Available Less Discriminatory Alternative Method of Employment Practice ................................... 104

The Percy Program Presented to the Metropolitan Transportation Authority is an Available Less Discriminatory Alternative Method of Employment Practice ................................... 104

The Percy Program Presented to the New York Dormitory Authority is an Available Less Discriminatory Alternative Method of Employment Practice ............................................ 104

The Percy Program Presented to the School Construction Authority is an Available Less Discriminatory Alternative Method of Employment Practice .............................................105

The Percy Program Presented to the State University of New York is an Available Less Discriminatory Alternative Method of Employment Practice .............................................105

The Percy Program Presented to the City Of New York and its Agencies is an Available Less Discriminatory Alternative Method of Employment Practice .............................................105

Percy Class as Third-Party Beneficiaries of Contracts ......................................................105

Defendant     Owner Operators have Violated and Continue to Violate 42 U.S.C. §2000e–2(k)(1)(A)(ii) and 2(k)(1)(C) ...............................................................................107

Local 1199 of the National Health Care Workers' Union ..................................................111

Precedent and Jurisdiction to Enforce the Alternative Employment Practice ................... 112

Damages for an illegal employment practice ................................................................... 113

Ninth Cause of Action under 42 U.S.C. §1983 for Damages under 42 U.S.C. §1981 and 1985 against  State Officer Defendants Conspiring with Party-in-Interest Defendants to Violate 14th Amendment Equal Protection Constitutional Rights of the Class ...................................................................................................................113

DFS State Actions under Color of Law in Support of the Scheme ..................................... 115

NYCIRB as an Arm of Government Agency DFS ................................................................ 116

Tenth Cause of Action is brought under 42 U.S.C. §1983 to enjoin State Officers from Prohibiting Right to Assemble by the Class as Protected by the First Amendment to the United States Constitution ................................................................118

State Officer Interference with Right of Assembly of the Percy Subclass at SUNY Maritime ................................................................................................................................ 119

Replacement Training and Laboratory Facilities................................................................. 120

Eleventh Cause of Action 42 U.S.C. §1981 for Racial, or otherwise Class-based Invidious Discriminatory Animus by the Party-in-Interest and Owner Operator Defendants .................................................................................................................. 124

Twelfth Cause of Action against the Party-in-Interest Defendants and Owner/Operator Defendants conspiring with State Officers to Aid and Abet Breaches of Fiduciary Duties and Obligations ............................................................................................... 125

Thirteenth Cause of Action against Employer Defendants and Parties in Interest Prohibited Transaction Defendants for Conversion ......................................... 125

Fourteenth Cause of Action against Owner Operator Defendants and Parties in Interest Prohibited Transaction Defendants for Unjust Enrichment ............................ 126

Fifteenth Cause of Action against Owner Operator and Parties-in-Interest Defendants for Conducting and Participating in the Affairs of an Enterprise Through a Pattern of Racketeering Activity under 18 U.S.C. § 1962 .................................... 126

The Enterprise ................................................................................................................127

Embezzlement from an Employee Benefit Plan (18 U.S.C. § 664)....................................127

The Trust Fund Scheme ..................................................................................................128

In March 2013 the Trust Defendant took over as the settlor, became the administrator of a 114 Trust at IDB Bank of New York........................................................................128

The 2013 and Prior Theft of Plan Assets .........................................................................129

Renunciation of Obligation to pay for Benefits Required by their Plan. ...........................130

Investing Income from Racketeering Activity in the Enterprise ........................................ 131

S & P Insurance ............................................................................................................. 131

Judgment on this RICO Cause of Action..........................................................................132

THE PERCY PROGRAM................................................................................................. 132

History of Apprenticeship in the Percy Program ...............................................................132

Worker Assessment ........................................................................................................133

Hazards in the Workplace OSHA Application ..................................................................133

8

OSHA 10 and 30 Hour Courses..................................................................................143

OSHA 10 Confined Space Entry ...............................................................................143

OSHA Ergonomics......................................................................................................143

OSHA Excavation ......................................................................................................143

OSHA 7600 Disaster Site Worker ............................................................................143

OSHA 2225 Respiratory Protection .........................................................................144

OSHA 3110 Fall Arrest Systems ..............................................................................144

Safety and Emergency Preparedness ......................................................................144

American Heart Association First Aid, CPR with AED ..........................................144

Enforcement of smoking prohibitions .....................................................................144

Environmental Training Lead - Renovation, Repair and Painting Class...............145

Mold and Bacteria Remediation...............................................................................145

Blood Borne Pathogens .............................................................................................145

Lead Worker EPA ......................................................................................................145

Asbestos Handler.......................................................................................................145

COMPONENTS OF THE PERCY PROGRAM .................................................... 146

REGULATORY APPROVALS OF PERCY PROGRAM ...................................... 149

EXIGENT CIRCUMSTANCES............................................................................... 152

RELIEF          ............................................................................................................... 152

## COMPLAINT

The Plaintiffs, Donna Hodge, Annette Hall, Karen Grant Williams, Alexi Arias, Albert E. Percy, and Percy Jobs and Careers Corporation an IRC 501(c)(3) non-profit, as Class Representatives, by their attorney James M. Kernan, ask the indulgence of the reader, as we try to add depth to historical events, events in which we are even now continuing to be engulfed, for all of the deficiencies by this Complaint on these flat pages, we dare to bring forth so great an urgency, we state as follows:

## PRELUDE

### Lincoln

The relief sought from you, the reader, was first identified in the last speech President Abraham Lincoln, ("Lincoln"), ever made, three days before Lincoln's assassination. It was two days after the surrender of Robert E. Lee's army to Grant, ending the Civil War, to a crowd gathered outside the White House calling for President Lincoln, reporter Noah Brooks wrote, "Outside was a vast sea of faces, illuminated by the lights that burned in the festal array of the White House, and stretching far out into the misty darkness. It was a silent, intent, and perhaps surprised, multitude." "Within stood the tall, gaunt figure of the President, deeply thoughtful, intent upon the elucidation of the generous policy which should be pursued toward the South. That this was not the sort of speech which the multitude had expected is tolerably certain."

Lincoln stood at the window over the building's main north door while Brooks held a light so Lincoln could read his speech.

The Lincoln speech of April 11, 1865:

"We meet this evening, not in sorrow, but in gladness of heart . . . . . . .

This plan was, in advance, submitted to the then Cabinet, and distinctly approved by every member of it. One of them suggested that I should then, and in that connection, apply the Emancipation Proclamation to the theretofore excepted parts of Virginia and Louisiana; *that I should drop the suggestion about apprenticeship for freed-people,* and that I should omit the protest against my own power, in regard to the admission of members to Congress; but even he approved every part and parcel of the plan which has since been employed or touched by the action of Louisiana. *The new constitution of Louisiana, declaring emancipation for the whole State, practically applies the Proclamation to the part previously excepted. It does not adopt apprenticeship for freed-people*

. . . . . . .

Again, if we reject Louisiana, we also reject one vote in favor of the proposed amendment to the national Constitution.

. . . . . . . " *(emphasis added)*

10

The dilemma Lincoln was facing was how to gradually eliminate inequality. Lincoln envisioned using apprenticeship as the Union was reconstructed. Lincoln recognized that freedom without the opportunity to earn a living would be disastrous and only lead to and did lead to misery. Lincoln's proposal occurred when Louisiana wanted to return to the Union. Lincoln identified apprenticeship for the freed-people as the tool to repair and bring the freed people into the mainstream of economic opportunity. Lincoln recognized that freed persons had to be provided skills as workers through apprenticeship to assimilate them into a working, earning and thriving class, without which there would be immense suffering and damages to the freed class.

The 10-minute speech of only 1819 words introducing the complex topic of reconstruction, twice identified apprenticeship for freed-people as a means to survive and prosper, as it was viewed through the prism of the State of Louisiana. Incensed John Wilkes Booth, a member of the audience that evening on April 11, 1865, vowed, Brooks wrote "That is the last speech he will make." An acknowledged white supremacist according to Brooks, Booth made good on his threat.

The assassination of Lincoln by Booth 3 days after this speech, frustrated the proposed reconstruction opportunities: "***apprenticeship for freed-people***", a vision not spoken of again since April 11, 1865. Instead, Lincoln's nightmare of disaster and misery came true with lynching, massacres, and the anarchy of Reconstruction followed by the Jim Crow laws of separation and discrimination. Out of this cauldron of a beginning the 14th amendment grew to ensure equal opportunity to freed-people, enter Roscoe Conkling.

**Grant and Conkling**

Roscoe Conkling, was a US Congressman, and later US Senator from Utica, New York, at a time when both US Senators from New York State were from Utica New York, the other Senator being Francis Kernan. Ulysses S. Grant and Conkling enter the story. In 1865 Vice President Andrew Johnson became President and reconstruction of the south began. Conkling had previously been Lincoln's collaborator and supporter in Congress for freeing the enslaved people, and later a staunch supporter of President Grant's efforts. Conkling began work in earnest on the 13th, 14th and 15th amendments to the Constitution of the United States as a member of the Congressional drafting committee. Conkling's focus was on the 14th Amendment. Conkling understood the phrase "apprenticeship for freed-people" as a fundamental natural right to work, earn, live, and pursue happiness, full equal opportunity that should be afforded to all, including those as freed-people, natural rights of life, liberty and pursuit of happiness.

When Lincoln was assassinated, Conkling rose to the need to determine and assure that the Constitution protected these rights, which lead to the 14th amendment to

the U.S. Constitution. Conkling was instrumental to not only implementing emancipation which was granted by the 13th Amendment, but also equal protection of the laws afforded to all persons by the 14th Amendment. The 14th Amendment, drafted by committee, was ratified in 1866. Conkling was a principal contributor on the Committee drafting the 14th Amendment and its equal protection and due process clauses.

Conkling tried to pursue the Lincoln vision, but the 10 years after Lincoln's assassination, the 10 years following Lincoln's vision of apprenticeship for freed people, were 10 years of anarchy and lawlessness which brought President Ulysses S. Grant and his close friend Conkling to utter frustration. Reconstruction was failing. Conkling and Grant accomplished the Ku Klux Klan Act of 1871 which is now codified at 42 U.S.C. 1983 with its companion sections 42 U.S.C. 1981 and 42 U.S.C. 1985, to provide a remedy against abuse of government authority and to enforce the provisions of the United States Constitution.

It was then that US Senator Francis Kernan, on an Electoral Commission to settle the Presidential Election of 1876, cast a deciding vote to accomplishing the compromise of 1877 to preserve the Union, end Reconstruction, and bring the southern states behind a compromise presidential candidate - Rutherford B. Hayes. Apprenticeship for freed people was lost, the apprenticeship plank of Reconstruction was abandoned in the compromise of 1877 which ended Reconstruction. Conkling had declined a seat on the committee knowing what the outcome was sure to be – there would be an abandonment of all efforts to provide equality. Conkling later became lost as a dark figure of graft and corruption at the New York City Customs House, finally dying in the blizzard of 1888 walking from his office at Wall Street to Union Square. A sorry end, Conkling lost the fervor of his moral compass. Frederick Douglas, one of the first emerging slave to civil rights leaders, an apprentice himself mentored by Conkling, eulogized Conkling: "the country's loss is great, but let us hope that men will yet be found as true to the cause of justice, liberty and equality".

Apprenticeship did not again resurface for the benefit of freed persons until the Percy Class sued in 1973 to eliminate discrimination in economic opportunity, eliminate segregation and eliminate disparate opportunity. The Percy v. Brennan lawsuit followed as a result of the civil rights movements of the 1960s. Percy as a Class now complains that if the Class had gotten what was long ago a vision called apprenticeship, a vision not fulfilled even 154 years later, the world would be a much different place today.

**Franklin Roosevelt**

Apprenticeship was not formalized as a federally adopted structured program until the National Apprenticeship Act of 1937, and even then, was not used as an

12

opportunity to teach skills to disadvantaged persons.

In 1937, the Congress passed the National Apprenticeship Act (29 U.S.C. 50), also known as "the Fitzgerald Act." The Act established a national advisory committee whose task was to research and draft regulations to establish minimum standards for apprenticeship programs. The Act was later amended to permit the United States Department of Labor to issue regulations protecting the health, safety and general welfare of apprentices, and to encourage the use of contracts in the hiring and employment of them.

Much like FDR's Work Projects Administration (WPA), which put the unskilled to work building America's airports, schools, and highways, apprenticeship programs can once again train the unskilled to build today's infrastructure. The WPA maintained and increased working skills; and it enabled the unskilled to take their rightful places in public or in private employment.

The Fitzgerald Act is administered by the Employment and Training Administration in the Department of Labor. Regulations banning racial, ethnic, religious, age and gender discrimination in apprenticeship programs are located at Title 29, CFR Part 30, but did little to foster affirmative action for equal employment.

Unfortunately, even though apprenticeship was formalized as a federally adopted structured program under the National Apprenticeship Act of 1937, it was not used as an opportunity to teach skills to disadvantaged persons.

## Lyndon B. Johnson

President Johnson is credited with the Civil Rights Act of 1964 and LBJ's Executive Order 11246.

The term affirmative action arose from Johnson's 1965 commencement speech at predominantly black Howard University when speaking about the adoption of the Civil Rights Act of 1964, President Johnson declared that equality has to be actual equality, not equality in name, when he said:

> "You do not take a man who, for years has been hobbled by chains, liberate him, bring him to the starting line of a race, saying you are free to compete with all the others, and still justly believe you have been completely fair. Thus, it is not enough to open the gates of opportunity. All our citizens must have the ability to walk through those gates. This is the next and the more profound stage of the battle for civil rights. We seek not just freedom but opportunity--not just legal equity but human ability--not just equality as a right and a theory, but equality as a fact and a result."

Equal opportunity at its core carries the simple mandate that opportunities should be open to all on the basis of competence alone. This complaint is that the Percy Class

lacks the minimum training, skills and preparation needed to be eligible for the jobs that become available, and those who do secure work as a result of affirmative action mandates are often unable to keep their jobs and the dignity of work.

Apprenticeship is the bedrock foundation upon which our country and freedom is based. Opportunity to gain basic work skills is necessary. But equal opportunity to gain skills doesn't exist in many instances, exposing unskilled workers and the public to unmanaged risk, one example is the recent virus pandemic and its rapid spread.

Apprenticeship, identified as affirmative action, is the natural right of all peoples because "The greatest wealth results from the greatest economic liberty, freedom of all individuals to work, save, buy, and earn at their pleasure, and economic life would settle into a natural order and productivity would thrive."[1]. A natural right identified in the Declaration of Independence, the US Constitution and the 14th Amendment to the US Constitution mandating equal protection of laws that affect these rights, Apprenticeship envisioned in Abraham Lincoln's forgotten last speech, from the balcony of the White House to a crowd gathered on the White House Lawn at the end of the Civil War, twice envisioning apprenticeship for freed people to gradually reconstruct the nation, yet in the 155 years since, not only has it not occurred, it has been thwarted by the same State Government Agencies of the Governor charged with protecting equal opportunity.

## BASIS AND SUMMARY OF CAUSES FOR ACTION

1. The Class Plaintiff is a class of victims, first looted of their benefits by Owner Operator Defendants who had a fiduciary duty to protect and steward Employment Retirement Income Security Act ("ERISA") Plan assets; and second, victimized by State Officer Defendants that received Cost Reports but neglected or intentionally ignored and never examined to see if accrued and expensed costs for employee benefits were in fact expended for the benefit of the Class Plaintiff. We now know that the costs reported as expensed for employee benefits, were not used for employee benefits amounting to tens of millions of dollars diverted, converted and embezzled for years while the State Officer Defendants failed to discover this defalcation because of either gross negligence or conscious disregard so that the per bed reimbursement rate remained elevated, even while human resource costs were gutted, the net difference going to the pockets of Party-and-Interest Defendants and Employer Operator Defendants. Is there a money trail to the State Officer Defendants? It is not unreasonable and within the authority of a trier of

---

[1] The Wealth of Nations by Adam Smith, studied and emulated by Jefferson and the Franklin over two centuries ago

14

fact to make the connection between the Owner Operator Defendants and the State Officer Defendants as herein described.

2.  In March 2020, the Owner Operator Defendants were losing a significant portion of their income with residents going to hospitals with Covid 19 sickness, leaving beds un-occupied. Unoccupied beds are not paid for by Medicaid/Medicare under the reimbursement per occupied bed formula of 10 N.Y. Comp. Codes R. & Regs. § 86-2.10. Owner Operator Defendants took back Covid 19 positive patients to fill beds and increase their occupied bed count, with little, if no effort to isolate infected persons from the general population, a general population of vulnerable elderly or disabled persons extremely susceptible to infection spread.

3.  If the Covid positive patients went to the Jacob Javits Center or to the USN Comfort Ship, the Owner Operator Defendants would not see the recovery boost in their income that the March 25, 2020 Order provided. The Owner Operators sought a surge increase with occupied beds from Covid infected hospital releases. But because of the extremely contagious virus, the virus spread from these infected people to a vulnerable existing population unable to escape the virus spread from contagious persons. It was all about filling beds. There was no drilled and practiced quarantine or isolation, no ability or even intent by the Owner Operator Defendants to follow protocols and procedures because even if there were such written documents, no one had been drilled or practiced in implementation of safeguards for existing population. It was all about filling beds and the March 25, 2020 Order was the ticket.

4.  The March 25, 2020. Order was the ticket to fill beds that caused infection, sickness, and death in the general population and to the Class Plaintiff employees.

5.  It is possible that some of the infection into the facilities of the Owner Operator Defendants was from the workforce, in this litigation that would include the employee Class Plaintiffs. However, the Class plaintiff employees were equally vulnerable due to lack of protective equipment, ignorant of policies and procedures to deal with contagious disease spread, never practiced or drilled to deal with infection spread, poorly trained, making the Class Plaintiff employees themselves victims.

6.  The Class employees were victims of the Employer Defendants' greed to fill beds, greed in diverting Plan assets intended to benefit the Class plaintiff employees who were now exposed to the State Officer Defendants' orders, with no way to protect themselves from infection spread, called a fire through dry grass.

7.  The Class plaintiff employees were victims of the enterprise to fill beds to increase occupied bed reimbursement from Medicaid/Medicare. The Class Plaintiff employees were expended as casualties unprepared and unequipped by the Owner Operator Defendants and the State Operator Defendants for this war. The situation was nothing

15

short of panic and chaos caused by the Owner Operator Defendants and the State Officer Defendants.

8. This is institutionalized wrongful treatment of the Class Plaintiff by selfish pursuit of personal interests of the Owner Operator Defendants, Party-in-Interest Defendants, aided and abetted by State Officer Defendants, named herein, diverting, converting and embezzling benefits funds of the Class Plaintiff, despite the consequences to the Class and the patients in facilities run by the Owner Operator Defendants.

9. Behind the sickness and death nightmare resulting from the Covid-19 pandemic infections, is illicit cooperation between the State Governor's Office, the Government Agencies answering to the Governor's Office, Owner Operators of nursing home businesses, Parties-in-Interest involved in prohibited transactions under the ERISA, all in concert in a conspiracy to deny the benefits to which the employees, members Class Plaintiff, are rightfully entitled. Lack of preparation, lack of skills, lack of practice and lack of benefit compensation to the Class members, is the reason why employees, vulnerable patients that the care for, and the public, were excessively exposed to infection.

10. This is institutionalized wrongful treatment of the Class Plaintiff by selfish pursuit of personal interests of the Owner Operator Defendants, Party-in-Interest Defendants, aided and abetted by State Officer Defendants, named herein, diverting, converting and embezzling benefits funds of the Class Plaintiff, despite the consequences to the Class and the patients in facilities run by the Owner Operator Defendants. They may have gotten away with it but for a highly contagious virus ripping the cover off their scheme.

11. It is not credible for the Owner Operator Defendants and State Officer Defendants to be surprised by the current pandemic. After the Ebola crisis in 2014, dire concerns over deadly communicable disease threats to New York prompted staff drills that revealed gaps in the then deficient pandemic preparedness, foreshadowed the panic when the COVID-19 infection spread. In 2014 mock patients portrayed by actors at dozens of emergency rooms across New York City arrived reporting symptoms that should have triggered immediate infection-control measures, such as masking and isolating the patient, but it did not. Stress tests show that about 40% failed at least one drill and it took nearly an hour for some patients to be masked and isolated. There was training and drilling needed.

12. Instead of training, drilling and educating so that proper responses become second nature, the funding of Plan assets to provide benefits, including training and continuing education, were diverted by the persons named here as Owner Operator Defendants, Party-in-Interest Defendants, aided and abetted by State Officer Defendants.

13. You will learn that Plan asset benefit funds to cover benefits including training, education, and apprenticeship, were diverted from benefiting the employee Class Plaintiff, diverted

16

instead to prohibited transactions under ERISA, used not for benefits to participants and beneficiaries, nor to cover Plan expenses, but instead to buy real estate, make personal private investments, and generally abscond with the Plan assets. By the wrongful acts of the Owner Operator Defendants in concert with Party-in-Interest Defendants, aided and abetted by State Officer Defendants, failure to train using benefit funds expensed and reported to the State, was the direct and proximate cause of the employee Class members being unprepared for naturally occurring and reoccurring infectious diseases.

14. Selfish diversion and conversion of Plan assets is the cause leading to unpreparedness and is directly responsible for the panic that occurred in March 2020 when the Covid 19 virus rapidly spread. Workers did not have emergency processes that should have been drilled and drilled and drilled and practiced and practiced and practiced, to address such expected communicable disease natural disasters. ERISA benefits under the Plan were and are intended to develop skills which include containing spread and providing treatment of infected persons, but the Plan assets were lost to embezzlement.

15. This complaint shows a pattern of conduct with the complicity of Government Agencies and their State Officers in consort with the Owner Operator Defendants and Party-in-Interest Defendants, that warrants judicial intervention to temper the heavy hand that has led to the unpreparedness of private for-profit businesses that the Government Agencies regulate. You will see the misuse of the authority vested in our Government Agencies, misuse under color of law for the benefit of cohorts who have politically and financially endorsed and supported certain State Officers in authority.

16. Then on March 25, 2020, an order issued by the State's Department of Health ("DOH") under the emergency authority given by the State Legislature to the Governor, mandating that nursing homes shall not deny readmission or admission to people "solely based on a confirmed or suspected diagnosis of COVID-19." To make matters worse, tests to determine if the readmission persons were still contagious were not allowed by the Order . So fair a day was March 25, 2020 turned foul.

17. When the pandemic hit in March of 2020, it was as though all front-line workers lacked common sense, but in fact what they lacked was organized training and continuing education to make their responses in the face of natural spread of diseases to be second nature learned from drills and practice in preparation for expected communicable diseases that naturally occur and reoccur throughout time. Drilling should have occurred during intervals of no infection when there is time to learn skills that become second nature when infectious assault happens. That did not occur, you will learn here why.

18. The complacency, bureaucracy and actual conspiracy under color of law by the State Officers was an underlying cause of the current disaster, the spread of a communicable disease caused by unpreparedness by failing to regulate the employers (referred to here

17

as "Employers"), named as Employer Defendants in related Case 21-cv-01366.as the responsible parties, licensed and authorized by the State, failing to use a commonsense approach to monitor the Employers' businesses. The State Officer Defendants received Cost Reports oblivious to misrepresentations in the Cost Reports which accrue monies to be expensed for benefits out of Medicaid and Medicare payments to Employers, benefits that expect a level of investment to improve the welfare of the employee Class. Instead, payment of funds into an ERISA Plan were diverted away from benefits to the personal gain of the Owner Operator Defendants and the Party-in-Interest Defendants.

19. When the COVID 19 pandemic struck, it caused illness, injury and death, exposing the depth of the problem.

20. This Complaint shows that what led to the employee Class members being in circumstances of absolute panic when Covid 19 infected patients were returned from hospitals to nursing homes by order of Government Agencies under the emergency authority of the Governor, rather than quarantine infected persons at the Javits Center or the USN Comfort Ship. The root cause of failing to contain the devastating spread of the virus was the unpreparedness of staff employees suing here as a Class and also suing their employers (referred to here as "Employers"), named as Employer Defendants in related Case 21-cv-01366.

21. This Complaint shows the consequence of conscious disregard amounting to acquiescence by Government Agencies that resulted in unpreparedness for natural disasters of a kind known as far back as ancient events reciting quarantining and other practical knowledge to contain communicable diseases, knowledge of practical procedures adopted as policies that must be drilled and practiced, practiced, practiced by workers as mandatory procedures, both for new apprentices and existing for workers, drilling and training so that actions are second nature at the time of pandemic, drills that prepare first responders to react as has been drilled rather than react with panic.

22. Related causes of actions against Employers identified in related cases, involve the liability of each employer for employment practice mismanagement by disparate treatment where the Plaintiff Class has meet its burden of production and persuasion proving that there was a less discriminatory alternative method of employment practice available that the Owner Operator Defendants could have adopted, failing to adopt the alternative employment practice ("Alternative Employment Practice") without valid justification is an unlawful employment practice violating 42 U.S.C. § 2000e-2(k)(1)(A)(ii) and (k)(1)(C) of the Civil Rights Act of 1964 as amended in 1991. This Alternative Employment Practice developed in detail in detail later in this Complaint, was denied to the Class Plaintiff under color of law by the actions of the State Officer Defendants.

18

23. Moreover, an employer with contracts receiving federal funding, such an employer is liable where such Employer has breached conditions requiring compliance with Presidential Executive Order 11246 ("EO 11246"). Members of the Percy Class are beneficiaries identified in federal funding as conditions and obligations where federal funding is involved.

24. Further, this lawsuit is to rectify and restructure benefits that were not provided by the Owner Operator Defendants under an ERISA Plan and Program, as complained of in related EDNY Case 21-cv-01366,. The Plan under the Program is established and maintained by Owner Operator Defendants engaged in commerce or industry or activity affecting commerce, governed by 29 U.S.C. § 1003, as an "employee benefit plan" defined as a "welfare benefit plan" under 29 U.S.C. § 1002(3.

25. This lawsuit is about providing and restoring skills in the workplace, rectifying wrongs done to multiple generations of people. Safe workplaces with competent well-paid staff have been selfishly denied due to the negligence and mismanagement of employee activities by the Owner Operator Defendants when denying benefits to the employee Class Plaintiff by the Owner Operator Defendants, the Party-in-Interest Defendants, the Union Defendant, all under color of law in concert with the State Officer Defendants, causing foreseeable illness, injury and death to members of the employee Class Plaintiff.

26. Member of the Class Plaintiff, by multiple generations of workers, have been abused causing illnesses and injuries plaguing the Class Plaintiff, by chronic failure by Owner Operator Defendants from lack of governance by financial, management and benefits activities to provide the necessary training, knowledge, supervision, policies, and procedures, and for benefits funded by Plan assets expensed by Owner Operator Defendants and governed by ERISA, allowing instead, the Plan assets to be were diverted out of the Plan, converted, and embezzled.

27. This mismanagement causing diversion of Plan assets has resulted in the Class of workers that was and is sorely unprepared, unskilled, and untrained, lacking basic safety and risk management knowledge, tools and supervision to protect themselves, their coworkers, the patients they care for, and the public.

28. Warnings from prior coronavirus outbreaks should have been heeded by those in responsible authority. Ignored, we didn't learn from history and then COVID happened, and the house collapsed.

29. Faced with this great crisis in 2014, but even past infectious disease and bacterial spread such as tuberculosis, smallpox, polio and other scourges, established protocols. Government Agencies and State Officers Defendants answering to the Governor, and the Owner Operator Defendants, failed to focus on recruiting and retaining men and women

and provide upgraded health care building construction and renovations, with isolation wards and socially distanced floorplans. The problem is that they panicked.

30. Boost in staff training, added isolation units and development of a drill toolkit to shore up infectious-disease defenses were supposed to be instituted at hospitals and nursing homes. We are now experiencing the consequence of not been prepared, facing a period of reckoning, spanning the myriad ramifications of the pandemic that has now fundamentally changed all aspects of life in New York.

31. Training as detailed in the Alternative Employment Practice would have included cross-training and mentoring workers to improve emergency staffing levels and boosting hospital and nursing home capacity during crisis. Long-standing efforts by many hospitals and nursing homes to address racial and ethnic disparities in Americans' health did not receive attention now apparent from COVID-19's disproportionate impact on people of color, including the employee Class Plaintiff

32. Pre-Covid-19 pandemic understaffing issues at many nursing homes statewide helped fuel the spread of coronavirus among the most vulnerable frail and elderly New Yorkers, the state Attorney General's recent report referenced herein, found, and advocates and lawmakers have since pushed legislation seeking to increase staffing and make other reforms.

33. Building a skilled workforce pipeline is critical to success, to identify and invest in workforce development that target youth and teens for soft-skills development career exploration and exposure, and paid on-the-job work experiences including internships, first jobs, and pre-apprenticeships, and then for the partnership under the National Apprenticeship Act, to prepare for the jobs of today and tomorrow is what is needed.

34. The Percy Class has been chronically damaged long-term in lost wages, lost opportunity compensation, these damages also affecting members of the Percy Classes' children and families, significantly disadvantaged in education and skills, struggling to get a job, not able to compete for jobs and employment based on skills.

35. And most important to the well-being of the Class, this action seeks to prohibit Government Agencies and State Officers from interfering with the Alternative Employment Practice identified herein at ALTERNATIVE EMPLOYMENT PRACTICE paragraphs 22 of this Complaint:

The Percy Program, referenced herein (Document #6, Attachment 21 in EDNY Case No. 21-cv-01366): as The Percy Program), benefiting the Percy Class by instilling skills to the Class generally, and the staff of employees of the Employers specifically identified herein.

36. With a reasonable degree of certainty, there is a money trail connecting the fruit of diversion of Plan assets to lining of the pockets of the Employer Operator Defendants

and the Party-in-Interest Defendants. There is a preponderance of evidence to connect the March 25, 2020 Order to increase in income of the Owner Operator Defendants, no different than what has been going on for decades. But now the spread of a virus has ripped off the cover exposing the enterprise, an enterprise the operation of which is traceable by a preponderance of evidence to State Officer Defendants.

37. This Complaint is intended to show what led to the employee Class members being in the circumstances of absolute panic when disease began to spread in March of 2020. While the full extent of damages to the Class Plaintiff is not presently known because events are still unfolding, yet, when quantified is likely to be billions of dollars of damage to the Plaintiff Class. Direct damages of diverted Plan assets, and consequential damages of pain and suffering caused by the acts of the Owner Operator Defendants, Party-in-Interest Defendants, and the State Officer Defendants as detailed in related EDNY Case 21-cv-01366, are set forth in the following categories:

• ........ $53 million admitted were diverted, converted, and embezzled Plan assets, admitted by certain Employer Defendants in EDNY Case 2:20-cv-06291-GRB-AKT.

• ........ $68 million has been identified EDNY Case 2:20-cv-06291-GRB-AKT and this Complaint, as recoverable from culpable parties for prohibited transactions with ERISA Plan assets.

• ........ $30,155,137 in benefits paid to members of the employee Class which the Employers in related EDNY Case 2:20-cv-06291-GRB-AKT failed to reimburse, for which all of the Employers are jointly and severally liable.

• ........ $77,370,613 dollars to be paid into the Plan trust to cover future benefits as actuarily projected and set forth in 2:20-cv-06291-GRB-AKT related EDNY Case.

• ........ $210 million for the loss of Plan assets in the amount of $68 million through and by the RICO enterprise liability as described in this Complaint to be treble damages.

• ........ $500 million in consequential damages and pain and suffering to the members of the Class Plaintiff, these damages expected to grow as events are unfolding and more evidence is available to be quantified at the time of trial, expected to be paid to a fund to be administered by a master for distribution to those members of the Class applying to the fund and qualifying for compensation in accordance with processes and rules as established by the Court for distribution.

38. The actions of the State Officer Defendants of Government Agencies described in this Complaint show an identified conspiracy of the identified Government Agencies, acting independently or in concert, or consciously disregarding the violation of the rights of members of the Class plaintiff, entitling the members of the Class Plaintiff to damages

21

jointly and severally among all persons acting or directing Government Agencies, the Owner Operator Defendants or the Party-in-Interest Defendants.

39. All the Owner Operator Defendants, Party-in-Interest Defendants, and State Officer Defendants are jointly and severally liable and responsible for these damages as may be apportioned at the time of trial.

40. The Class asks for a writ of prohibition of the wrongful actions of State Officers and other equitable relief as the Court deems appropriate.

41. You will see from the breath of this Complaint, not even reciting the past acts of the State Officer Defendants that Percy has beaten back, it would be incredible if all of these Government Agencies are separately acting. Given the single focus of eliminating the Alternative Employment Practice, the only conclusion is that the person in responsible charge beginning with Governor's Executive Order 45, and coming to the very present day, denials and obstructions by the various Government Agencies under color of law, the only conclusion is that the authority for all of this lies with the person who is charged by law as the chief executive officer, the Governor of the State of New York. If for no other reason, the Governor sets the tone, and New York State is most unfriendly to obtaining skills necessary for commerce to flourish, unless, of course, it is controlled by the Government Agencies. The members of the Plaintiff Class are fully capable and do not need a handout. What is sought, are skills to compete based on competency, learned alongside competent journey persons in paid on-the-job apprentice training, not based on skin color or national origin; charity by skin color or ethnicity is abhorrent to the Constitution of the United States and abhorrent to inalienable rights of life, liberty and pursuit of happiness.

42. This Complaint is about fixing the wrongs by recovering the ERISA Plan assets to be used to give members of the Class an equal opportunity to develop skills, which benefits protect not only themselves, but as well all members of society, straightening out wrongs which have existed for over a century, and more.

## PRIVATE ATTORNEY GENERAL ACTION

43. This action is brought as a private attorney general action as permitted by 42 U.S.C. 1988, to enforce certain federal laws, contracts, commitments, obligations and covenants to provide affirmative action for equal employment to correct disparate impact, low wages with few fringe benefits, minimal levels of training, and the lack of a career ladder, contributing to a chronic workforce shortfall, being caused by the neglectful use of Federal Funding thereby impacting not only the Class Plaintiff and safeguarding the welfare of workers, but as well the general public good. The New York State Department of Law and the US Department of Justice have failed to move to protect the interests of the Class Plaintiff.

22

## JURISDICTION

44. Federal question jurisdiction exists in this case based on preemption of Plaintiffs' claims under the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1001 et seq. (1132(a)). This court has original jurisdiction over ERISA actions and subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345, 29 U.S.C. § 1132(e), 29 U.S.C. § 1001 et seq. and "prohibited transaction penalty proceedings" (as defined in §2570.2(o) under section 502(i) of the ERISA). To the extent that any claim in the Complaint is not preempted, it forms part of the same case or controversy under 28 U.S.C. § 1367(a).

45. Federal question jurisdiction also exists in this case based upon the Occupational Security Occupational Safety and Health Act of 1970 ("OSHA"), 29 U.S.C. § 651 et seq.

46. Federal question jurisdiction also exists in this case based upon the Civil Rights Act of 1964, and specifically 42 USCA §2000e-2 and §2000d as amended in 1991 (the "Civil Rights Act"), and in breach of Federal Funding conditions, and of rights secured by the Fifth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§§1981, 1983 and 1985.

## VENUE AND PRIOR PROCEEDINGS

47. This Complaint is on behalf of this new generation of the Class as well as the Percy Class generation and the Class he represents. Procedurally, this class litigation is being commenced in the five boroughs ("Five Counties") of the City of New York, where Percy started his original action Percy v. Brennan 73-cv-04279.

48. In a prior proceeding when seeking to continue Percy v. Brennan in Federal District Court for the Southern District of New York, it was ruled by District Court Judge McMahon that Case 73-cv-04279 was no longer a case and controversy having been closed, and she instructed "If the plaintiffs or any party wishes to file a new case, go right ahead."Document #6, Attachment 1. The Second Circuit Court of Appeals in Appeal 17-2273 affirmed that Percy v. Brennan Case 73-cv-04279, is final. [2]

49. Building on the Percy v. Brennan 73-cv-04279 footing, seeking a writ of prohibition and damages on the authority of Percy v. Brennan 73-cv-04279, is this plenary action, now including Nassau and Suffolk Counties, in the US District Court in the Eastern District of New York.

---

[2] The documents are paginated in the lower right hand corner to correspond with DOCKETED NATIONAL ARCHIVES CERTIFIED DOCUMENTS DETAILED TABLE OF CONTENTS at the beginning of each appendix.

50. Now more than ever there is a desperate need to build skills necessary to protect the safety and well-being of frontline trusted workers in the unselfish work they are called upon to do for the communities and public they serve. This historic crisis is made worse by lack of knowledge, skills and competency in the workforce, a problem needing to be immediately addressed as described in this Complaint.

As we stand now, we are not prepared.

51. This undertaking seems massive and profound, and it is, reference the **PRELUDE**. We have been probing on behalf of Percy, deep into the history of affirmative action and equal employment opportunity to find out why it fails. Each time we think we have reached a solid foundation to build from, only to find we have not reached bedrock. The Class now has the grip it needs in this Complaint.

52. This Complaint against the State of New York begins with the failure of a settlement made by the Governor by New York State Executive Order 45 (9 NYCRR 3.45) ("Governor's Executive Order 45. This action is grounded upon the final and enforceable Memorandum/Order ("Memorandum/Order") of Judge Lasker reported at 384 F Supp 800, (Document #6, Attachment 3 of EDNY Case No. 21-cv-01366), of November 8, 1974, settled by agreement accepting Defendant New York State's offer of Executive Order 45. The problem is that Executive Order 45 failed and has never been rectified by the Governor of the State of New York, which is a significant proximate cause of damages to the Class Plaintiff.

## PARTIES

**PLAINTIFF:**

53. Class Representatives of the Plaintiff Class are Donna Hodge, Annette Hall, Karen Grant Williams, and Alexi Arias, a Class of employees of Employers. The Class is a class of all employees working for the Employers covered by the Program identified in this Complaint.

54. Albert E. Percy, ("Percy") the Class Representative of a subclass of black and Spanish surname persons was certified as the class representative of the certified class by Judge Lasker in the Memorandum/Order at 384 F Supp 800, page 811 [S.D.N.Y. 1974] in Case 73-cv-04279, (Document #6, Attachment 3, page 12 in EDNY Case 21-cv-01366) the Class certified in Percy v. Brennan, Federal District Court SDNY Case 73-cv-04279, reported at 384 F. Supp 800, at Page 808, docketed in EDNY Case 21-cv-01366, Docket 6, Attachment 3, page 9, (the subclass being fully capable of learning to perform and/or performing skilled occupations as apprentices and journeypersons. (384 F Supp 800, at page 811 and also at 17-2273, Docket #99, Appendix 1, Volume 3, Page 660 and docketed in EDNY Case 21-cv-01366, Docket 6, Attachment 3, page 12). Percy, as a Complaining Party under 42 U.S.C. 2000e-2, was denied equal employment opportunities, and

remains a proper representative of the Class, now here designated as a subclass. Percy's personal and business interests and the claims hereinafter set forth are fully aligned with those of the Class.

55. Plaintiff Class Representative Percy Jobs and Careers Corporation is an Internal Revenue Code 501(c)(3) non-profit managing apprentice training at the Maritime College State University Of New York, PO Box 351, 6 Pennyfield Ave, Bronx, NY 10465.

## DEFENDANTS:

56. Defendant Andrew Mark Cuomo is the Governor of the State of New York and, as such, is the chief executive officer of the State of New York, in control of the following agencies under the executive branch of government of the State of New York ("Government Agencies"):

The New York State Department of Financial Services is an agency of the executive branch of government of the State of New York under Governor Cuomo. On October 3, 2011, the State of New York created a new department, the Department of Financial Services, which assumed the responsibilities and authority of the former New York State Department of Insurance which had formerly been responsible for the regulation and oversight of insurance companies (referred to as the "DFS" in this Complaint), and is an agency of the executive branch of government of the State of New York under Governor Cuomo.

The New York State Department of Labor is an agency of the executive branch of government of the State of New York under Governor Cuomo, with Roberta Reardon as successor to Louis J. Levine as Commissioner and is an agency of the executive branch of government of the State of New York under Governor Cuomo (referred to as the "DOL" in this Complaint).

The New York State Division of Human Rights is an agency of the executive branch of government of the State of New York under Governor Cuomo.

The New York State Department of Environmental Conservation ("DEC") is an agency of the executive branch of government of the State of New York under Governor Cuomo.

The State University of New York ("SUNY") is under the executive branch of government of the State of New York under Governor Cuomo or is under the New York State Department of Education which is an agency of the executive branch of government of the State of New York under Governor Cuomo.

The New York Compensation Insurance Rating Board ("NYCIRB") is a quasi-Government Agency under the DFS or is an agency of the executive branch of government of the State of New York under Governor Cuomo.

25

These State of New York parties are collectively referred to as the State or as the Government Agencies.

**The State Officer Defendants named in their official and individual capacities are as follows:**

57.   Howard A. Zucker, M.D., named as the Commissioner of the State of New York Department of Health, New York State Department of Health, Corning Tower, Empire State Plaza, Albany, NY 12237

58.   Martha Lees named as General Counsel of the Department of Financial Services, New York State Department of Financial Services, Office of General Counsel, 1 State Street, New York, NY 10004-1511

59.   Linda A. Lacewell named as Superintendent of Insurance of the State of New York Department of Financial Services, New York State Department of Financial Services, 1 State Street, New York, NY 10004-1511

60.   Dr. Merryl H. Tisch, named as Chairman of the State University of New York Board of Trustees, H. Carl McCall SUNY Building, 353 Broadway Albany, NY 12246

61.   Scott Dietrich named as an Officer of the Research Foundation of the State University of New York, 35 State St, Albany, NY 12207

62.   Peter Fountas named as an Officer of the Research Foundation of the State University of New York, 35 State St, Albany, NY 12207

63.   Basil Seggos has been named in his official capacity as the Acting Commission of the New York State Department of Environmental Conservation.

64.   Jeremy Attie named as an Officer of the New York Compensation Insurance Rating Board.

65.   Ziv Kimmel named as an Officer of the New York Compensation Insurance Rating Board.

66.   Vincent Licause named as an Officer of the New York Compensation Insurance Rating Board.

**The Party-in-Interest Defendants are as follows:**

67.   Allstate Administrators, LLC d/b/a Allstate ASO ("Allstate") is limited liability company organized under the laws of the State of New York with offices and principal place of business at 462 Ocean Parkway, Brooklyn, NY 11218.

68.   Gary Baker, a consultant for Allstate and a current member of the Board of Directors of S&P, address Tanenbaum-Harbor, 320 West 57th Street, New York, NY 10019

26

69. Broad Coverage Services, Inc. ("BCS" or "Broad") is a Corporation registered to do business in the State of New York with offices at 6 Kaser Terrace PO Box 146 Monsey, NY 10952

70. Christopher Buckey, Cullen and Dykman, 80 State Street Suite 900 Albany, NY 12207

71. Michael Camilleri, an individual with a last known address of 55 NE 5th Avenue, Suite 502, Boca Raton, FL 33432

72. Dynamic Claim Services, Inc. is a Corporation registered to do business in the State of New York with a mailing address of PO Box 146 Monsey, NY 10952

73. Eagle North, LLC is a Limited Liability Company registered to do business in New York with offices at 202 Caton Ave, Brooklyn, NY 11218

74. Wolf Eisenbach is an individual in client relations with Ptex Group, 41 Lynch Street, Unit: 3, Brooklyn, NY 11206

75. Grandview Brokerage is an entity located at 1613 52nd Street, Brooklyn, NY 11204

76. Jon Halpern is an individual located at 120 W 45th Street, Suite 2405, New York, NY 10036

77. Chaim Hirsch, with a last known address of 727 Bedford Ave, Brooklyn, NY 11205

78. Ben Landa, 1337 East 7th Street, Brooklyn, NY 11230

79. Ira Lipsius is an individual and a Partner with the law firm Lipsium Benheim, 80-02 Kew Gardens Road, Suite 1030, Kew Gardens, NY 11415

80. Lipsium Benheim, 80-02 Kew Gardens Road, Suite 1030, Kew Gardens, NY 11415

81. Isaac Muller, as licensed agent of Broad Coverage Services, Inc., 6 Kaser Terrace, PO Box 146, Monsey, NY 10952

82. Philipson Family Trust, 68 Highview Road, Monsey NY 10952

83. Samuel Schlesinger, the single owner, director and officer of Allstate who resides at 415 Avenue F, Brooklyn, NY 11218 and is named as a Defendant in his individual capacity

84. Samuel Schlesinger, a principal officer of Eagle North, is an individual located at 202 Caton Ave, Brooklyn, NY 11218

85. Martin Schwartzman, a current member of the Board of Directors of S&P, formerly a senior advisor to the Superintendent of DFS, located at 75-26 Bell Blvd. 5D, Bayside, New York 11364

86. Michael Schwimmer, individually and as a Principal of Grandview Brokerage Corporation, with a principal place of business at 1471 56th Street, Brooklyn, NY 11219

87. Spencer Street Realty, is an entity with offices at 218 Spencer St, Brooklyn, NY 11204

88. Standard and Preferred Insurance Company ("S&P") is an entity with an address at 80-02 Kew Gardens Road, Kew Gardens, NY11415

89. Joseph Stern, Manager of 1153 44, LLC, with an office at 1156 45th Street, Brooklyn, NY 11219

90. The Berkshire Group. Inc., 462 Ocean Parkway 11218

91. The Pitterman Family Trust is an entity with an address at 1689 49th St Brooklyn, NY 11204

92. The Schlesinger Family Trust, 415 Avenue F, Brooklyn NY 11218

93. Stella Vilardi, an accountant at SentosaCare LLC and a current member of the Board of Directors of S&P, with a last known address of 51 Woodland Ave, Rockville, NY 11570

94. Israel Weber, is an individual with a last known address of 1164 59th St, Brooklyn, NY

95. Raphael A. Weitzner, with a last known address of 134 Broadway, Brooklyn, NY 11249

96. Whiteman Osterman & Hanna, One Commerce Plaza, 99 Washington Avenue, Albany, NY 12260

97. Israel Ziegelman, is an individual with a last known address of 200 Wallabout Street, Apt 6B, Brooklyn 11206.

**Owner Operator Defendants are the owners and operators of Employers referred to as the Employer Defendants identified in a related case EDNY 21-cv-01366 as follows:**

98. Gabor Adler, 7 Balint Dr Apt 323, Yonkers NY 10710, is an Owner Operator of Baypark Center Nursing & Rehabilitation and Nassau Operating Company, LLC and Park Avenue Operating Company, LLC dba Park Avenue Extended Care Facility;

99. George Adler, 1 Greenwich Street Hempstead, NY 11550 , is an Owner Operator of Baypark Center Nursing & Rehabilitation and Nassau Operating Company, LLC and Park Avenue Operating Company, LLC dba Park Avenue Extended Care Facility;

100. Kwame Amoafo-danquah, 1825 65th St Ste 1, Brooklyn, NY, 11204,10455, is an Owner Operator of Living Water Home Care Agency;

101. Agnes Arnestein, 220 West Post Road, White Plains, NY10606 is an owner operator of Baypark Center Pursing & Rehabilitation and White Plains;

102. Anthony Bacchi, 99 Golden Hill Drive, Kingston, NY 12401  is an owner operator of Brookside Multicare Nursing Center, Golden Hill, Hamptons, Nassau, Park Avenue, Throgs and Townhouse;

28

103. Matthew Barbara, 1 Greenwich Street Hempstead, NY 11550 is an owner operator of Baypark Center Nursing & Rehabilitation;

104. Paul Barbara, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Baypark Center Nursing & Rehabilitation;

105. Aaron Becher, 355 Broadway, Lawrence, NY 11598 is an owner operator of Baypark Center Nursing & Rehabilitation;

106. Pola Becher, 250 Beach 17th Street, Far Rockaway, NY 11691 is an owner operator of Brookhaven Operating Company, LLC dba Brookhaven Extended Care Facility;

107. Aaron Becher, 355 Broadway, Lawrence, NY 11598 is an owner operator of Baypark Center Nursing & Rehab, Hamptons Operating Company, LLC, Nassau, Park Avenue, Throgs Neck and Townhouse;

108. Hershel Bedansky, 1273 53rd St, Brooklyn, NY, 11219, is an owner operator of Home Attendant Services of Hyde Park;

109. Howard Belford, 3015 West 29th Street, Brooklyn NY 11224 is an owner operator of Baypark Center Nursing & Rehabilitation;

110. Scott Bialick, 250 Beach 17th Street, Far Rockaway NY 11691 is an owner operator of Baypark Center Nursing & Rehabilitation;

111. Robert Bleier, 22-41 New Haven Avenue, Far Rockaway, NY 11691 is an owner operator of Baypark Center Nursing & Rehabilitation and New Surfside;

112. David Bloom, 136 Beach 117th St Apt 513, Rockaway Park NY 11694 is an owner operator of Baypark Center Nursing & Rehabilitation, Nassau, Park Avenue, Throgs and Townhouse;

113. Paula Bokow, 722 ALMONT ROAD, FAR ROCKAWAY, NEW YORK, 11691 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

114. Nathan Brach, 378 Syosset-Woodbury Rd, Woodbury, NY 11797 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

115. Joel Brach, 40 Robert Pitt Dr, Monsey, NY 10952 is an owner operator of Monsey Family Drugstore LLC;

116. Barry Braunstein, 144 S. Oxford Street, Brooklyn NY 11217 is an owner operator of Baypark Center Nursing & Rehabilitation;

117. Murray Bresky, 5190 Main Street, South Fallsburg, NY 12779 is an owner operator of Baypark Center Nursing & Rehabilitation;

118. Steven Brown, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Baypark Center Nursing & Rehabilitation;

119. Philip Buchsbaum, 121 Franklin Place Woodmere, NY 11598 is an owner operator of Baypark Center Nursing & Rehabilitation;

120. Richard Busell, 725 Equestrian Way, Westbury, NY 11590 is an owner operator of Baypark Center Nursing & Rehabilitation;

121. Colin C. Hart, 168 W Main St, Springville, NY, 14141 is an owner operator of Fiddlers Green Manor Rehabilitation;

122. Ira Cammeyer, 1 Greenwich Street Hempstead, NY 11550 is an owner operator of Nassau Operating Company, LLC, Park Avenue, Throgs Neck and Townhouse;

123. Alan Chopp, 5401 Collins Ave #635 Miami Beach FL 33140 is an owner operator of Brookside Multicare Nursing Center and Hamptons;

124. Joshua Chopp, 1800 Ocean Pkwy, Brooklyn, NY 11223 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

125. David Cohen, 378 Syosset-Woodbury Rd, Woodbury, NY 11797 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

126. David Crytryn, 250 Beach 17th Street, Far Rockaway NY 11691 is an owner operator of Brookhaven Rehabilitation & Health Care;

127. David Dachs, 191 Bradley Ave, Staten Island, NY, 10314-5166 is an owner operator of White Plains Operating Company, LLC dba White Plains Extended Care Facility;

128. Solomon Eidlisz, 250 Beach 17th Street, Far Rockaway NY 11691 is an owner operator of Brookhaven Rehabilitation & Health Care and Springcreek;

129. Neil Einhorn, 3015 West 29th Street, Brooklyn, NY 11224. is an owner operator of Nassau Operating Company, LLC, Park Avenue, Throgs Neck and Townhouse;

130. Scott Einiger, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Baypark Center Nursing & Rehabilitation;

131. Abraham Eisen, 378 Syosset-Woodbury Road, Woodbury, NY 11787 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

132. Sam Eisen, 7605 New Utrecht Avenue, Brooklyn NY 11214 is an owner operator of Bay Park Center Nursing & Rehabilitation;

133. Steve Eisman, 801 Coop City Blvd, Bronx NY 10475 is an owner operator of Bay Park Center Nursing & Rehabilitation;

134. Steven Eisman, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Baypark Center Nursing & Rehabilitation;

135. Ignatius Elefant, 6355 Broadway, Bronx, NY, 10471 is an owner operator of Riverdale Operating Company, LLC dba Riverdale Extended Care Facility;

136. Philipson Family Trust, 3400 Cannon Pl, The Bronx, NY 10463 is an owner operator of Kingsbridge Heights Receiver, LLC;

137. Martin Farbenblum, 495 Pinehurst Court, Roslyn NY 11576  is an owner operator of Brookside Multicare Nursing Center, Nassau, Baypark, Eastchester and Hamptons;

138. Benjamin Farbenblum, 147 Avenue O, 1st Floor, Brooklyn NY 11204  is an owner operator of Eastchester Rehabilitation & Health Care Center, LLC;

139. Michael Farbenblum, 495 Pinehurst Court, Roslyn NY 11576  is an owner operator of Eastchester Rehabilitation & Health Care Center, LLC and Hamptons;

140. Edward Farbenblum, 2365 Union Road Cheektowaga, NY 14227 is an owner operator of Golden Hill Health Care Center and Hamptons;

141. Esther Farkovitz, 3400 Cannon Pl, The Bronx, NY 10463 is an owner operator of Kingsbridge Heights Receiver, LLC, Nassau, Park Avenue, Throgs Neck, Townhouse and White Plains;

142. Lori Fensterman, 3 Dakota Drive, Lake Success NY 11042  is an owner operator of Bay Park Center Nursing & Rehabilitation;

143. Robert Fensterman, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Bay Park Center Nursing & Rehabilitation;

144. Jordan Fensterman, 3 Dakota Drive, Lake Success NY 11042  is an owner operator of Baypark Center Nursing & Rehabilitation;

145. Staci Fensterman,  3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Bay Park Center Nursing & Rehabilitation;

146. Samuel Ferrara, address unknown, is an owner of Baypark 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Bay Park Center Nursing & Rehabilitation;

147. Mayer Fischl, 2 Sienna Way, Lakewood NJ 08701  is an owner operator of Baypark Center Nursing & Rehabilitation, Brookhaven, Hamptons, Nassau, Park Avenue, Throgs, Townhouse White Plains and Woodmere;

148. Benjamin Fishoff, 240 Viola Road, Monsey NY 10952  is an owner operator of Bay Park Center Nursing & Rehabilitation and Hamptons;

149. Patrick Formato, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Baypark Center Nursing & Rehabilitation;

150. John Francher, 46 Cortland St, Homer, NY, 13077, is an owner operator of Greenbriar Home for Adults;

151. David Freid, 2510 Avenue K, 1st Floor, First Door, Brooklyn NY 11210 is an owner operator of Brookhaven Rehabilitation & Health Care;

152. Moshe Freilich, 1273 53rd Street, Brooklyn NY 11219 is an owner operator of Greater New York Nursing Services;

153. Sigmund Freundlich, 495 Pinehurst Court, Roslyn NY 11586 is an owner operator of Nassau Operating Company, LLC, Park Avenue, Throgs Neck and Townhouse;

154. Andrew Freundlich, 495 Pinehurst Court, Roslyn NY 11576 is an owner operator of Nassau Operating Company, LLC, Park Avenue, Throgs Neck and Townhouse;

155. Leo Friedman, 3400 Cannon Pl, The Bronx, NY 10463 is an owner operator of Kingsbridge Heights Receiver, LLC;

156. David Gast, 14012 State Route 31, Albion, NY, 14411 is an owner operator of Comprehensive At Orleans;

157. Louis Gellis, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Highgate LTC Management LLC dba Northwoods Rehabilitation & Extended Care, Rosewood;

158. William Gillick, 1205 Delaware Ave, Buffalo, NY, 14209 is an owner operator of Harbour Health Multi Care Center;

159. Rivky Goldberger, 250 Beach 17th Street, Far Rockaway NY 11691 is an owner operator of Brookhaven Rehabilitation & Health Care;

160. Leon Goldenberg, 495 Pinehurst Court, Roslyn NY 11556 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

161. Jeffrey Goldstein, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Fiddlers Green Manor Rehabilitation and North Sea;

162. Anne Gottlieb, 1462 East 27th Street, Brooklyn, NY 11210 is an owner operator of White Plains Center for Nursing, LLC;

163. Miklows Gottlieb, 495 Pinehurst Court, Roslyn NY 11586 is an owner operator of Woodmere Operating Company, LLC dba Woodmere Extended Care Facility;

164. Niklos Gottlieb, 121 Franklin Place Woodmere, NY 11598 is an owner operator of Woodmere Rehabilitation & Health Care Center, Inc.;

165. Solomon Green, 495 Pinehurst Court, Roslyn NY 11586 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

166. Joel Greenberg, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Baypark Center Nursing & Rehabilitation;

167. Eric Greenberger, 46 Mt Ebo Road North, Brewster, NY, 10509 is an owner operator of Putnam Ridge;

168. Eli Greenspan, 11 Virginia Avenue, Clifton, NY 07012 is an owner operator of Baypark Center Nursing & Rehabilitation;

169. Steven Greenstein, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Baypark Center Nursing & Rehabilitation;

170. Avrumi Grossman, 1055 63rd Street, Brooklyn, NY 11224 is an owner operator of SC & BP;

171. Marton Guttman, 54 Walworth St, Brooklyn, NY, 11205 is an owner operator of Upstate Dairy Farms, Inc.;

172. Valarie Henry, 736 Allerton Ave Ste 207, Bronx, NY, 10467 is an owner operator of BeSure Home Health Services, Inc.;

173. Libe Hirsch, 495 Pinehurst Court, Roslyn NY 11556 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

174. Johanan Hirsch, 1714 60th Street, Middle Door, Brooklyn NY 11204 is an owner operator of Eastchester Rehabilitation & Health Care Center, LLC;

175. Leopold Hirsch, 551 Fifth Avenue, Suite 2500, New York, NY 10176 is an owner operator of Eastchester Rehabilitation & Health Care Center, LLC;

176. Ruth Hirsch, 20 Briarwood Lane, Suffern, NY 10901 is an owner operator of Eastchester Rehabilitation & Health Care Center, LLC, Hamptons, Nassau, Park Ave, White Plains, Townshouse and Throgs Neck;

177. Pinchus Hoffman, 70-35 Vleigh Place, Flushing NY 11367 is an owner operator of North Sea Associates, LLC, Nassau, Park Ave, Throgs, Townhouse;

178. David Hoffman, 495 Pinehurst Court, Roslyn NY 11566 is an owner operator of Nassau Operating Company, LLC dba Nassau Extended Care Facility, Park Ave, Throgs, Townhouse;

179. Jack Janklowitz, 495 Pinehurst Court, Roslyn NY 11556 is an owner operator of Brookhaven Operating Company, LLC dba Brookhaven Extended Care Facility and Brookside;

180. Leonard Janklowitz, 495 Pinehurst Court, Roslyn NY 11586 is an owner operator of Brookhaven Operating Company, LLC dba Brookhaven Extended Care Facility and Brookside;

181. Jewish Geriatric Center, Shorefront, 495 Pinehurst Court, Roslyn NY 115116 is an owner operator of Seagate Operating Company, LLC dba Seagate Extended Care Facility;

182. David Jones, 4 Cedar St, Massapequa, NY 11758  is an owner operator of Parkview Care and Rehabilitation Center, Inc;

183. Judith Jones, 5353 Merrick Road Massapequa, NY 11758 is an owner operator of Parkview Care and Rehabilitation Center, Inc;

184. Mendal Kaff, 1273 53rd Street, Brooklyn, NY 11219 is an owner operator of Greater New York Nursing Services;

185. Eric Kalt, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of North Sea Associates, LLC dba The Hamptons Center for Rehabilitation and Nursing;

186. Yoel Karpen, 3048 Brighton 1st St Ste 4, Brooklyn, NY, 11235 is an owner operator of Eagle Home Care;

187. Miriam Karpf, 5353 Merrick Road Massapequa, NY 11758 is an owner operator of Parkview Care and Rehabilitation Center, Inc;

188. Allan Kass, 131 Hickory Kingdom Rd, Bedford, NY 10506  is an owner operator of Baypark Center Nursing & Rehabilitation;

189. Martin Kass, 2061 58th Street, Brooklyn NY 11204  is an owner operator of Baypark Center Nursing & Rehabilitation;

190. Martin Katz, 495 Pinehurst Court, Roslyn NY 11576 is an owner operator of Brookside Operating Company, LLC dba Brookside Extended Care Facility;

191. Shelly Katz,  495 Pinehurst Court, Roslyn NY 11576 is an owner operator of Brookside Operating Company, LLC dba Brookside Extended Care Facility and Baypark;

192. Manny Kaufman, 100 New Turnpike Rd, Troy, NY, 12182  is an owner operator of Diamond Hill Nursing and Rehabilitation;

193. Yosef Kaufman, 495 Pinehurst Court, Roslyn NY 11566 is an owner operator of White Plains Operating Company, LLC dba White Plains Extended Care Facility;

194. Alan Kessler, 129 Prospect Avenue, Cedarhurst, NY 11516  is an owner operator of Baypark Center Nursing & Rehabilitation and Brookside;

195. Arnold Klapper, 2311 Olean Street, Brooklyn, NY 11210  is an owner operator of Eastchester Rehabilitation & Health Care Center, LLC;

196. George Klein, 495 Pinehurst Court, Roslyn NY 11576 is an owner operator of Nassau Operating Company, LLC, Park Avenue, Throgs Neck and Townhouse;

34

197. Larry Klein, 495 Pinehurst Court, Roslyn NY 11566 is an owner operator of Nassau Operating Company, LLC, Park Avenue, Throgs Neck and Townhouse;

198. Eleanor Kluger, 30 Cragmere Rd, Suffern, NY, 10901 is an owner operator of Ramapo Manor;

199. Robert Kolman, 121 Franklin Place Woodmere, NY 11598 is an owner operator of North Sea Associates, LLC dba The Hamptons Center for Rehabilitation and Nursing;

200. Dean Korlik, 5190 S Fallsburg Main St, South Fallsburg, NY 12779 is an owner operator of Baypark Center Nursing & Rehabilitation and MB Food;

201. William Korn, William, 495 Pinehurst Court, Roslyn NY 11586 is an owner operator of Nassau Operating Company, LLC, Park Avenue, Throgs Neck and Townhouse;

202. Irina Kostetsky, 495 Pinehurst Court, Roslyn NY 11566 is an owner operator of Nassau, Park Avenue and Throgs Neck ;

203. Howard Krant, 5353 Merrick Road Massapequa, NY 11758 is an owner operator of Highgate LTC Management LLC dba Northwoods Rehabilitation & Extended Care – Cortland;

204. Ephram Lahasky, 147 Reist Street, Williamsville, NY 14221 is an owner operator of Comprehensive At Orleans;

205. Yechiel Landa, 182 Briarwood Crossing, Lawrence, NY 11559  is an owner operator of Brookhaven Rehabilitation & Health Care;

206. Benjamin Landa,182 Briarwood Crossing, Lawrence, NY 11559  is an owner operator of Diamond Hill Nursing and Rehabilitation, Baypark, Brookhaven, Hamptons, New Surfside, Parkview, Pathways, Spring Creek and Woodmere;

207. David Landa, 169 Davenport Ave, New Haven, CT 06519 is an owner operator of The Landa Group;

208. Nathan Landau,  420 Broadway, Brooklyn NY 11211 is an owner operator of Clinical Staffing Resources Corp.;

209. James Lapolla, 424 E 147th St # 4, Bronx, NY, is an owner operator of Home Health Management;

210. Tibor Lebovich, 99 Golden Hill Dr, Kingston, NY 12401 is an owner operator of Golden Hill Health Care Center;

211. Morty Lehasky, 147 Reist St, Williamsville, NY, 14221 is an owner operator of Comprehensive of Williamsville and Comprehensive Orleans;

212. David Leifer, 1273 53rd St, Brooklyn, NY, 11219, is an owner operator of Home Attendant Services of Hyde Park;

213. Barry Leistner, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Baypark Center Nursing & Rehabilitation;

214. Chana Lerner, 1020 Ocean Parkway, Brooklyn, NY 11230 is an owner operator of Baypark Center Nursing & Rehabilitation, Nassau, Park Avenue, Throgs and Townhouse;

215. Michael Levitan, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Baypark Center Nursing & Rehabilitation;

216. Rich Levitan, 121 Franklin Place Woodmere, NY 11598 is an owner operator of Baypark Center Nursing & Rehabilitation;

217. Teddy Lichtscein, 12 Mark Drive, Spring Valley, NY 10977 is an owner operator of Brookhaven Rehabilitation & Health Care;

218. Neuman LJ Partners, 495 Pinehurst Court, Roslyn NY 11576 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

219. Isaac Madeb, 495 Pinehurst Court, Roslyn NY 11566 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

220. Dovi Marc Faivish, 495 Pinehurst Court, Roslyn NY 11556 is an owner operator of Brookside Operating Company, LLC dba Brookside Extended Care Facility;

221. Sam Mayerovitz, Sam, address unknown is an owner operator of The Landa Group;

222. Girsha Minster, 495 Pinehurst Court, Roslyn NY 11586 is an owner operator of Nassau Operating Company, LLC, Park Avenue, Throgs Neck and Townhouse;

223. Neuman MN Partners, 495 Pinehurst Court, Roslyn NY 11576 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

224. Gabriel Mordechey, Gabriel, 250 Beach 17th Street, Far Rockaway NY 11691 is an owner operator of Brookhaven Rehabilitation & Health Care and Springcreek;

225. Sharyn Mukamal, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Bay Park Center Nursing & Rehabilitation;

226. Katherine Muller, 495 Pinehurst Court, Roslyn NY 115106 is an owner operator of Brookside Operating Company, LLC dba Brookside Extended Care Facility;

227. Laurie Netzer, 495 Pinehurst Court, Roslyn NY 11576 is an owner operator of Nassau Operating Company, LLC dba Park Avenue, Throgs and Townhouse;

228. Leo Oberlander, 78 Birchwood Dr, Huntington Station, NY, 11746 is an owner operator of Birchwood Rest Home;

229. Sander Oberlander, 2107 Ditmas Ave, Brooklyn, NY, 11226 is an owner operator of Ditmas

230. Milton Ostreicher, 250 Beach 17th Street, Far Rockaway NY 11691 is an owner operator of Brookhaven Rehabilitation & Health Care;

231. Susan Ostreicher, 495 Pinehurst Court, Roslyn NY 11566 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

232. Irwin Peckman, 3015 West 29th Street, Brooklyn NY 11224 is an owner operator of Baypark Center Nursing & Rehabilitation;

233. Bent Philipson, a/k/a Ben Philipson and Benjamin Philipson, 495 Pinehurst Court, Roslyn NY 11556 is an owner operator of Baypark Operating Company, LLC, Brookside, Diamond Hill, Park Ave, Nassau, Throgs, Townhouse White Plaints and Parkview;

234. Deborah Philipson, 495 Pinehurst Court, Roslyn NY 11586 is an owner operator of Brookhaven, White Plains Operating Company, LLC , Woodmere, and Springcreek;

235. Robert Pines, address unknown, is an owner of Baypark 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Baypark Center Nursing & Rehabilitation;

236. Theodore Pollak, 250 Beach 17th Street, Far Rockaway NY 11691 is an owner operator of Brookhaven Rehabilitation & Health Care;

237. Sylvia Pollack, 495 Pinehurst Court, Roslyn NY 11576 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

238. Natan Pollack, 495 Pinehurst Court, Roslyn NY 11566 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

239. Jacob Pollack, 25 Calvert Drive, Unit 1, Monsey NY 10952 is an owner operator of North Sea Associates, LLC dba The Hamptons Center for Rehabilitation and Nursing;

240. Israel Pollack, 25 Calvert Drive, Unit 1, Monsey NY 10952 is an owner operator of North Sea Associates, LLC dba The Hamptons Center for Rehabilitation and Nursing;

241. Renee Pollak, 121 Franklin Place Woodmere, NY 11598 is an owner operator of Woodmere Rehabilitation & Health Care Center, Inc;

242. Michael Pruzansky, 64 County Road 39 Southampton, NY 11968 is an owner operator of North Sea Associates, LLC dba The Hamptons Center for Rehabilitation and Nursing;

243. Diana R. Koehler, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Highgate LTC Management LLC dba Northwoods Rehabilitation & Extended Care – Hilltop;

244. Jonathan Redner, 273 53rd St, Brooklyn NY 11219 is an owner operator of Hyde Park;

245. Lawrence Reichenberger, 3015 West 29th Street, Brooklyn, NY 11224. is an owner operator of Baypark Center Nursing & Rehabilitation;

246.  Mark Reisman, 2357 60th St, Brooklyn, NY 11204 is an owner operator of Edison Home Health Care;

247.  Richard Bursek, 99 Golden Hill Dr, Kingston, NY 12401 is an owner operator of Golden Hill Health Care Center & Rehabil;

248.  Mayer Rispler, 755 Hempstead Turnpike, Uniondale, NY 11553 is an owner operator of Townhouse Center for Rehab & Nursing;

249.  Brian Rosenman, address unknown is an owner operator of Birchwood Rest Home;

250.  Kenneth Rozenberg, 495 Pinehurst Court, Roslyn NY 11586 is an owner operator of Northwoods Operating Company, LLC dba Northwoods Extended Care Facility;

251.  Berish Rubenstein, 951 Broadway, Woodmere, NY 11598  is an owner operator of Baypark Center Nursing & Rehabilitation;

252.  Rivkie Rubenstein, 495 Pinehurst Court, Roslyn NY 11576 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

253.  Dina Rubenstein, 495 Pinehurst Court, Roslyn NY 11556 is an owner operator of Hamptons Operating Company, LLC dba Hamptons Extended Care Facility;

254.  Ira Rubin, Ira, 495 Pinehurst Court, Roslyn NY 11546 is an owner operator of Brookside Operating Company, LLC dba Brookside Extended Care Facility;

255.  Malkey Saffran, 121 Franklin Place Woodmere, NY 11598 is an owner operator of Woodmere Rehabilitation & Health Care Center;

256.  Boruch Schepps, 495 Pinehurst Court, Roslyn NY 11576 is an owner operator of Northwoods Operating Company, LLC dba Northwoods Extended Care Facility;

257.  Pamela Schepps, 495 Pinehurst Court, Roslyn NY 11576 is an owner operator of Northwoods Operating Company, LLC dba Northwoods Extended Care Facility;

258.  Nat Scherman, 495 Pinehurst Court, Roslyn NY 11546 is an owner operator of White Plains Operating Company, LLC dba White Plains Extended Care Facility;

259.  Richard Schildron 495 Pinehurst Court, Roslyn NY 11586 is an owner operator of Baypark Operating Company, LLC dba Baypark Extended Care Facility;

260.  Samuel Schlesinger 1040 East 22nd Street, Brooklyn, NY 11210 is an owner operator of Allstate ASO;

261.  Jacob Schoenberger 65 Lafayette St, Spring Valley, NY, 10977 is an owner operator of Evergreen Court Home for Adults;

262.  Michael Scwartz, 495 Pinehurst Court, Roslyn NY 11586 is an owner operator of Nassau Operating Company, LLC, Park Avenue, Throgs Neck and Townhouse;

263. Leslie Shafrank, 495 Pinehurst Court, Roslyn NY 11576 is an owner operator of Nassau Operating Company, LLC, Park Avenue, Throgs Neck and Townhouse;

264. Henry Shayovitz, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Baypark Center Nursing & Rehabilitation;

265. Agnes Shemia, 1989 Coney Island Ave, Brooklyn, NY 11223 is an owner operator of HCS Homecare;

266. Jeff Shemia, 1989 Coney Island Ave, Brooklyn, NY 11223 is an owner operator of HCS Homecare;

267. Israel Sherman, 495 Pinehurst Court, Roslyn NY 11576 is an owner operator of Brookside Operating Company, LLC dba Brookside Extended Care Facility and Amerifalls;

268. Alexander Sherman, 168 West Main Street, Springville, NY 14141 is an owner operator of Fiddlers Green Manor Rehabilitation;

269. Leah Sherman, 168 W Main Street, Springville, NY 14141 is an owner operator of Fiddlers Green Manor Rehabilitation;

270. Warren Sherman, 1273 53rd St., Brooklyn, NY 11218 is an owner operator of Home Attendant Services of Hyde Park;

271. Nat Sherman, 495 Pinehurst Court, Roslyn NY 11546 is an owner operator of Nassau Operating Company, LLC, Park Avenue, Throgs Neck and Townhouse;

272. Samuel Sherman, 822 Cedar Avenue, Niagara Falls, NY 14301 is an owner operator of Sunharbor Acquisition, LLC and Fiddlers Green Manor, Amerifalls and HCS Homecare;

273. Hindy Sirkis, 5814 17th Ave, Brooklyn, NY 11204 is an owner operator of Baypark Center Nursing & Rehabilitation;

274. Moshe Sirkis, 220 West Post Road, White Plains, NY10606 is an owner operator of Baypark Center Nursing & Rehabilitation, Nassau, Park Avenue, Throgs and Townhouse;

275. Tali Skoczylas, 495 Pinehurst Court, Roslyn NY 11556 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

276. Alexander Skoczlas, 495 Pinehurst Court, Roslyn NY 115106 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

277. Joseph Skoczylas, 495 Pinehurst Court, Roslyn NY 11576 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

278. Dominic Spira Md, 1335 Portland Ave, Rochester, NY, 14621 is an owner operator of New Roc Nursing & Rehabilitation;

279. Jonathan Steinberg, 70-20 Austin St., Suite 135 Forest Hills, NY 11375 is an owner operator of Caring Companion Services, inc;

280. Miriam Steinberg, 1400 Pelham Parkway South, New York NY 10461 is an owner operator of Caring Companion Services, inc;

281. Ronald Stern, 495 Pinehurst Court, Roslyn NY 11576 is an owner operator of Hamptons Operating Company, LLC dba Hamptons Extended Care Facility and Preferred Home;

282. Miriam Sternberg, 495 Pinehurst Court, Roslyn NY 11576 is an owner operator of Caring Professionals Operating Company, LLC dba Caring Professionals Extended Care Facility;

283. Lorraine Takesky, 495 Pinehurst Court, Roslyn NY 11596 is an owner operator of Baypark Operating Company, LLC dba Baypark Extended Care Facility;

284. Mitch Teller, 495 Pinehurst Court, Roslyn NY 11566 is an owner operator of Brookside Operating Company, LLC dba Brookside Extended Care Facility;

285. Kenneth Tessler2214 Avenue I Brooklyn, NY 11210 is an owner operator of Baypark Center Nursing & Rehabilitation;

286. Aaron Unger, 14744 76th Ave, Flushing, NY 11376  is an owner operator of Brookhaven Rehabilitation & Health Care;

287. Eila Vinitzky, 144-12 75th Ave, Flushing, New York 11367 is an owner operator of Expert Care Staffing, LLC & Staffing Age;

288. Yuliya Vinokurova, 99 Golden Hill Dr, Kingston, NY 12401 is an owner operator of Golden Hill Health Care Center & Rehabil

289. Jeffrey Vogel, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Baypark Center Nursing & Rehabilitation;

290. Sherman Vogel, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Baypark Center Nursing & Rehabilitation;

291. Peggy Weberman,  495 Pinehurst Court, Roslyn NY 11566 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

292. Philip Weberman, 495 Pinehurst Court, Roslyn NY 11576 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

293. Toby Weinberger, 250 Beach 17th Street, Far Rockaway NY 11691 is an owner operator of Brookhaven Rehabilitation & Health Care;

294. Zoltan Weinberger, 54 Walworth St, Brooklyn, NY, 11205 is an owner operator of Upstate Dairy Farms, Inc.;

295. Regina Weinstock, 28 Burton Avenue, Woodmere, NY 11498 is an owner operator of Eastchester Rehabilitation & Health Care Center, LLC;

296. Michael Weiss, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Baypark Center Nursing & Rehabilitation;

297. Shlomie Weiss, 6321 New Utrecht Ave., 2nd Floor, Brooklyn, NY 11219-5425 is an owner operator of Clinical Staffing Resources Corp. ;

298. Ari Weiss, 2357 60th Street, Brooklyn NY 11204 is an owner operator of Edison Home Health Care;

299. Robyn Weiss, 495 Pinehurst Court, Roslyn NY 11566 is an owner operator of Nassau Operating Company, LLC, Park Avenue, Throgs Neck and Townhouse;

300. Berish Weiss, 2357 60th Street, Brooklyn NY 11204 is an owner operator of Preferred Home Care of NY and Riverdale Operating Company

301. Chaya Willinger, 46 MT Ebo Road North, Brewster, NY 10509 is an owner operator of Putnam Ridge;

302. Robert Wolf, 250 Beach 17th Street, Far Rockaway NY 11691 is an owner operator of Brookhaven Rehabilitation & Health Care;

303. Peyman Younesi, 309 Rutledge Street, Suite 2B, Brooklyn, New York 11211 is an owner operator of Clear Choice Medical PC;

304. Mark Zaffrin, 3015 West 29th Street, Brooklyn, NY 11224 is an owner operator of Baypark Center Nursing & Rehabilitation

305. Ephraim Zagelbaum, 88 Calvary Dr, Norwich, NY, 13815 is an owner operator of Norwich Rehabilitation and Nursing and Palffy;

306. Kenneth Zitter, 495 Pinehurst Court, Roslyn NY 11586 is an owner operator of Cold Spring Operating Company, LLC dba Cold Spring Extended Care Facility;

307. David Zohler, 1055 63rd Street, Brooklyn, NY 11219 is an owner operator of SC & BP;

**Carrier, Derivative, and Trust Defendants are as follows:**

308. Carrier Defendant Oriska Insurance Company (also referred to herein as "OIC" and, "Oriska Insurance") was and still is a domestic corporation chartered and licensed by the State of New York as a Property and Casualty Insurance Company engaged in the sale and writing of workers' compensation, surety and fidelity bonding and health and disability insurance, maintaining offices at 129 South 8th Street, Brooklyn, New York.

309. Derivative Defendant Oriska Corporation (also referred to herein as "OCorp") is a New York corporation which owns 100% of the issued and outstanding stock of OIC, does business at 6 Pennyfield Ave, Throgs Neck, Bronx County, New York. Oriska Insurance

41

Company and Oriska Corporation are sued here as their interests may appear. OIC and OCorp also collectively referred to as "Oriska".

310. Trust Defendant Rashbi Management, Inc. is the administrator of the Plan Trust known as a NY Regulation 114 Trust as hereinafter identified.

**Union Defendant**

311. Local 1199 is the National Health Care Workers' Union with a chapter in New York City, a union upon information and belief representing some of the members of the Class Plaintiff.

**Parties previously named in Case SDNY 73-cv-04279 who are not named here because the Percy Class does not have a controversy with the following former defendants:**

312. Eugene Scalia succeeded Peter J. Brennan as the United States Secretary of Labor and, as such, is the chief executive official of the Defendant United States Department of Labor previously named as a Defendant in SDNY 73-cv-04279.

313. United States Department of Labor is the agency of the United States government that is charged with the duty of enforcing EO 11246, and was a party to Case 73-cv-04279. The Department of Labor's Employment Standards Administration was dissolved.

314. Defendant Craig E. Leen is the Director of the Defendant Office of Federal Contract Compliance ("OFCC") of USDOL succeeding Phillip J. Davis, and OFCC is the Office of the USDOL that has responsibility for enforcing EO 11246.

315. Building and Construction Trades Council of Greater New York, doing business at 71 West 23rd Street, Suite 501-03, New York, NY 10010, is an organization consisting of local affiliates of 15 national and international unions representing working men and women in New York City, previously named as a defendant in SDNY 73-cv-04279.

316. New York Building and Construction Industry Board of Urban Affairs Fund, referenced in Case 73-cv-04279 as a defendant, is no longer in existence.

317. New York Plan for Training, Inc. a previous Plaintiff in Case 73-cv-04279, is no longer in existence.

318. The National Association for the Advancement of Colored People referenced in Case 73-cv-04279 as a Plaintiff, is no longer involved in this controversy.

319. Manuel E. Mejia, now deceased, was a Spanish-surnamed citizen of the United States and a resident of the City of New York. Plaintiff Mejia was a named Plaintiff in the US Southern District of New York Case 73-cv-04279.

320. John Mercado, now deceased, was a Spanish-surnamed citizen of the United States and resident of the City of New York. Plaintiff Mercado was a named Plaintiff on the US Southern District of New York Case 73-cv-04279.

### FACTS COMMON TO ALL CAUSES OF ACTION

321. A Plan is and was "established or is maintained for the purpose of providing benefits for its participants or their beneficiaries, through the purchase of insurance or otherwise", the beneficiaries being employee Class Plaintiff, and is governed by ERISA.

322. This lawsuit is about denial of benefits to employees, the Class Plaintiff. The benefits are governed by ERISA. Even though the Employers accrued and expensed funding for the benefits, the funds never made it to trust to be held by the Trustee Plaintiff. The benefits were to improve the skills of members of the Class Plaintiff through apprentice training and continuing education, health, disability, Worker's Compensation, disability benefits, health benefits, as selected by each employer for its Plan, selected from the benefits available under a Program approved by the State in 1994, for the purpose of investing in the welfare of employees of Employers.

323. To provide skills for opportunities, but now even more important for safety of well-trained employees, the persons they work or care for, and the general public, the funding was for the welfare benefit of the employee Class Plaintiff for investment in an improvement of their welfare by investing in the employees.

324. Instead, the Owner Operator Defendants diverted and converted the Plan funding into prohibited transactions with Party-in-Interest Defendants.

325. During the entire period of their Plan, these Owner Operator Defendants and Party-in-Interest Defendants, in collusion with State Officer Defendants, continued to wrongfully diverted funds intended exclusively for their Plan, to other purposes which had no relationship to the Program, although the diversions had personal significance to the Party-in-Interest Defendants who were allowed by the Owner Operator Defendants to divert the Plan assets. Intervention Pg. 9 Par 7. reference to Nassau County Amended Complaint in Intervention[3].

---

[3] Amended Complaint in Intervention in an intervention by Order of Justice Libert in Nassau County Action Index number 609877/2019, which was not appealed and is final, now removed to related Case 20-cv-06291.

To access the document in the link above you may need to register for a Free Pacer Account. https://pacer.psc.uscourts.gov/pscof/registration.jsf

326. Evidence shows that the diversion and conversion of Plan assets in this Complaint, cover the period from 2010 to the present, although the Employers were sponsoring the ruse of a Plan as far back as 2002, the records have had to be uncovered through forensic investigations because the Employers never filed the required Internal Revenue Code 5500 Returns until some of the Employers filed partial 5500 Returns began to be filed at the end of 2016, but even then failing to report the full extent of Plan assets that were accumulated in Fund bank accounts. However, not reported are the same funds identified in this Complaint as diverted and converted away from their intended purpose of providing benefits to the employee Class, but instead were ensnared in transactions prohibited under ERISA, transactions not identified in the IRC 5500 Returns.

327. The Plan as organized by the Owner Operator Defendants failed to provide any mechanisms for the Employers to manage the operation of their Plan under the Program. The Employers failed to monitor their Plan, failed to protect their Plan assets required for the Program and failed to supervise their Plan to make certain their Plan and Program functioned within the law as designed. Their Plan as organized failed to provide any mechanisms to monitor, supervise and audit to ascertain that the funds were properly being administered from the time Employers paid funds to provide employee benefits until the funds were spent for Plan and Program purposes; the Employers were required to, but did not, establish, supervise and maintain the operation of their Plan and Program pursuant to authorization of ERISA and in accordance with the Program approved by the State. Intervention Pg. 8 Par 4.

## Precedent, Authority and Jurisdiction

328. This Complaint is based on the record in US SDNY Case 73-cv-04279, the case file archived as potentially of national significance in St. Louis, Missouri, the case file returned from St. Louis to the National archives in New York City, returned upon the request on behalf of Albert Percy, to and certified by the National Archives to the United States District Court for the Southern District of New York, which record was then filed by ECF as the Docket on Appeal to the United States Second Circuit Court of Appeals.

329. One of the Causes of Action here seeks to enforce the United States District Court for the Southern District of New York Order in the Case of Percy v Brennan Case 73-cv-04279 (the "Percy Action" or "Case 73-cv-04279" or "Percy v. Brennan") reported at (384 F Supp 800 [S.D.N.Y. 1974]), the Memorandum/Order, rendered by Judge Lasker on November 8, 1974 in favor of Percy Class, and the Order of Judge Edelstein of May 4, 1977, page 740 of Appendix 1 at Docket #99 in 17-2273 and Document #6, Attachment 4 in EDNY Case No. 21-cv-001366, accepting Governor's Executive Order 45 in settlement of Case 73-cv-04279.

330. The title of Case 73-cv-04279 was changed by the Second Circuit Court of Appeals pursuant to FRAP 43(c)(2) and Plaintiff Percy was ordered to revise all of its printing to reflect this changed title which was done at Docket #96-104 in 17-2273, docketed at Document #6, Attachment #5 in EDNY Case No. 21-cv-001366, replacing Rockefeller with Cuomo and Brennan with Scalia, as well as other public officials where a new person has succeeded them in office.

331. Standing was found by the Lasker Court in its Memorandum/Order stating the Percy Class has alleged "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions" citing Baker v. Carr, 369 U.S. 186 (1962) 82 S Ct 691, 7 L Ed 2d 663; (*see* Flast v Cohen, 392 US 83, (1968), 88 S Ct 1942, L Ed 2d 947)". In Percy v. Brennan, black and Spanish-surnamed workers were alleged to "have been and continue to be denied employment in the New York construction industry, demonstrating the Percy Class continues to have a personal stake", 384 F Supp 800, page 808 [S.D.N.Y. 1974], 17-2273, Document #6, Attachment #2, page 15 in EDNY Case No. 21-cv-001366.

332. The Memorandum/Order of Judge Lasker in the Percy Action, Percy v. Brennan, 384 F. Supp. 800, (S.D.N.Y. 1974), page 811 in 17-2273, Docket #6, Attachment 3, page 2, in EDNY Case No. 21-cv-01366, granted Plaintiffs motion to be maintained as a class and found standing to seek relief as a class of persons within the protections of the Fifth and Fourteenth Amendments to the Constitution, 42 USC 1981, and has met the requirements of subdivisions 2 and 3 of FRCP 23.

333. The Class defined and certified by Judge Lasker in Case 73-cv-04279 was "all black and Spanish-surnamed persons who are capable of performing, or capable of learning to perform . . .", with Plaintiff Albert Percy designated as the Class Representative (384 F Supp 800, at page 811 and also at 17-2273, Docket #6, Attachment 3, page 2, in EDNY Case No. 21-cv-01366).

334. The Order certifying the Class in Case 73-cv-04279 is at 17-2273 Docket 99, Appendix 1, Volume 3 of 3, page 640, and Docket #6, Attachment 2, page 33, in EDNY Case No. 21-cv-01366).

335. Percy v. Brennan Case 73-cv-04279 sought and was granted relief as affirmative action for apprenticeship to develop skills and equal employment opportunity.

336. The issues adjudicated by the Court's February 24, 1975 Order in Case 73-cv-04279, Document #6, Attachment 8, in EDNY Case No. 21-cv-01366, and are enforceable under the doctrine of collateral estoppel with respect to the preclusive effect asserted in this action of the Memorandum/Order of November 8, 1974 against the Governor of the State of New York and the various heads of his agencies. Plaintiff Percy Class is entitled to a

45

declaration that the Defendants are precluded under the doctrine of collateral estoppel, from denying the standing and relief for enforcement of EO 11246.

337.   This action, grounded on the record in US SDNY Case 73-cv-04279 and related laws and regulations identified in Percy v. Brennan 73-cv-04279, is now relied on for certifying the Percy Class, thereby determining the issue of standing in favor of the Percy Class. The issues adjudicated by the Court's February 24, 1975 Order in Case 73-cv-04279, Document #6, Attachment 8, in EDNY Case No. 21-cv-01366 are enforceable under the doctrine of collateral estoppel with respect to the preclusive effect asserted in this action of the Memorandum/Order of November 8, 1974.

338.   Under the doctrine of collateral estoppel of the Court's February 24, 1975 Order in Case 73-cv-04279, Document #6, Attachment 8, in EDNY Case No. 21-cv-01366, and by Appeal 17-2273, this plenary action enforces the Memorandum Order of Judge Lasker of November 8, 1974 entered by the Court's February 24, 1975 Order.

339.   The title of Case 73-cv-04279 has changed pursuant to FRAP 43(c)(2) by order of the Second Circuit Court of Appeals to reflect the changed parties, which was done at Docket #96-104 in 17-2273, docketed at Document #6, Attachment 5, EDNY Case No. 21-cv-001366, replacing public officials where a new person has succeeded them in office.

**DEFENDANT GOVERNOR OF THE STATE OF NEW YORK presented Executive Order 45 in an effort toward affirmative action, but it failed and has never been corrected, Percy undertakes self-help with the Percy Program but is Stymied.**

340.   This Complaint is against the Governor of the State of New York for failure of settlement involving New York State Executive Order 45 (9 NYCRR 3.45) ("Executive Order 45"), Docket 6, Attachment 14 in EDNY Case No. 21-cv-001366. This action is grounded upon the final and enforceable Memorandum/Order ("Memorandum/Order") of Judge Lasker reported at 384 F Supp 800 of November 8, 1974, settled by agreement on May 4, 1977 accepting Defendant New York State's offer of Executive Order 45. The problem is that Executive Order 45 failed, and the Percy Class was never notified, reference herein.

341.   Each employer ("Employer(s)"), also referenced as Employer Defendant(s) in related Case 21-cv-01366, is liable for unlawful employment practices of discrimination where the Class Plaintiff has met its burden of production and persuasion proving that there was a less discriminatory alternative method of employment practice available that the Employer could have adopted, failing to adopt the alternative employment practice without valid justification is an unlawful employment practice violating 42 U.S.C. § 2000e-2(k)(1)(A)(ii) and (k)(1)(C) of the Civil Rights Act of 1964 as amended in 1991.

342.   The Percy Program, referenced herein (Document #6, Attachment 21 in EDNY Case No. 21-cv-01366): and THE PERCY PROGRAM paragraphs 782-815, COMPONENTS OF PERCY PROGRAM paragraphs 816 – 817, REGULATORY APPROVALS OF PERCY

PROGRAM paragraph 818 – 829 of this Complaint), as the Alternative Employment Practice, is delivered as a function of safety and training with workers' compensation under the covered payroll. The Percy Program as an Alternative Employment Practice functions as an element of a workers' compensation coverage. Registered apprenticeship in the Percy Program is a function of risk-management, safety training and loss control of workers' compensation insurance.

343. All employment is required to be covered by workers' compensation. Along with the payment of benefits to cover injury and death while on-the-job as required in under New York Workers' Compensation Law §10, workers' compensation coverage which may also include registered apprenticeship with risk-management, safety training and loss control as part of the coverage.

344. Workers' compensation coverage delivers the Alternative Employment Practice by providing apprenticeship for new hires and continuing education for existing employees. The Alternative Employment Practice provides skills to educate workers to competently and safely perform work, protect themselves and people with whom they come into contact. Too long employees have struggled without being provided the skills necessary to protect themselves and the communities they serve, including the general public with whom they come in contact.

345. The Percy Program does not require public funding. Properly run, the apprenticeship part of the program is funded by savings in workers' compensation costs resulting from safe work habits learned through registered apprenticeship, without extra cost to Employers. This is accomplished by simply applying savings from reduced losses resulting from the Percy Program, and allocating those savings to pay for apprenticeship out of the premium paid for workers' compensation coverage.

346. This Alternative Employment Practice meets the burden of production and persuasion, demonstrated as set forth at 42 USCA §2000e-2.

347. Yet, members of the Percy Class have been constantly denied access to apprenticeship to gain skills to compete for employment. The Defendants the State of New York and its agencies under Andrew Cuomo, Governor of the State of New York (the "Government Agencies") violated and continue to violate the Memorandum/Order and Order of Judge Lasker by having failed to implement the settlement in Case 73-cv-04279, in harmony with the Civil Rights Act of 1964, and specifically 42 USCA §2000e-2 and §2000d as amended in 1991 (the "Civil Rights Act"), and in breach of Federal Funding conditions, and of rights secured by the Fifth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§§1981, 1983 and 1985.

47

**NUMEROSITY**

348. The real Parties-in-Interest are the Class of employees of the Employers. Intervention Pg. 98 Par 202.

349. The number of members of the Class are essentially unenumerable but are not indeterminate. The members of the Class can be identified by payroll records, 940 and 941 reports to the Internal Revenue Service, and NYS 45 Reports to the State of New York filed by the Employers. Intervention Pg. 98 Par 203.

350. The number of members of the Percy Class are essentially unenumerable but are not indeterminate and have been identified in the Percy v. Brennan action Case 73-cv-04279 being enforced here.

351. There are two subclasses to the Class: Intervention Pg. 98 Par 204.

352. First- the sub-class of the Class is all employees injured on the job while working for the Employers. Intervention Pg. 98 Par 204.

353. Second- the sub-class of the Class is "black or Spanish-surnamed persons who are capable of performing, or capable of learning to perform" in skilled occupations (herein the "Percy Sub-Class") entitled to apprentice training and continuing education in safety and skills. Intervention Pg. 99 Par 204.

354. Both sub-classes are united in interest with the Class. Intervention Pg. 99 Par 205.

355. The Class Plaintiff replaces the redacted names of persons listed as Defendant Employees in a motion to intervene in Nassau County Action 60987/2019, to protect the confidentiality of the individuals by proceeding as a Class of Employees entitled to benefits. Donna Hodge, Annette Hall, Karen Grant Williams and Alexi Arias are the class representatives of the Class Plaintiff. Intervention Pg. 99 Par 206.

**CLASS ACTION COMMON ISSUES OF LAW AND FACT**

356. There is a commonality of the members of the Class as participants in a welfare plan sponsored by the Employers, for health, disability and workers' compensation, apprenticeship, training, continuing education, safety benefits. Intervention Pg. 99 Par 207.

357. Neither the State Government Agencies, State Officer Defendants nor the Owner Operator Defendants had policies and procedures in place to provide common sense control of the use of Plan assets; it was and is as though no one was monitoring the use of Plan assets to assure they benefited the Class of employees working for the Employers for whom the Plan assets were paid as represented by the Owner Operator Defendants. Detailed in this Complaint are the tens of millions of dollars represented to provide

benefits to the employee Class, which instead were diverted and converted to prohibited transactions in violation of ERISA, and embezzled.

358. The issues of law and fact determining the claims of the Class, that the actions of the Defendant Employers named in this action and the tag-along actions, have caused, are causing, and will continue to cause serious, permanent, and irreparable economic and social injury and damage to the Class, are common to all members of the Class. Intervention Pg. 99 Par 208.

359. The common issues of law and fact must be determined by this Court in order to fashion an appropriate remedy and provide relief for the benefit of the Class. Intervention Pg. 99 Par 209.

## JUDICIAL ECONOMY

360. The Defendant Government Agencies and State Officer Defendants, individually and collectively, alone and in concert with other still unidentified parties, cloaking themselves under the color of law, utilized and are still utilizing all the power of their government offices, in capricious and conspiratorial disregard to deny and to inflict damages on the Class without justification. The Percy Class has been denied and deprived of an opportunity to compete effectively within the American free enterprise system and as a result the members of the Percy Class have sustained serious and ongoing damages, and if the wrongdoing of the Defendants is not enjoined and prevented, the chronic damage will continue unabated.

361. This action avoids the prosecution of separate actions by multiplicity of actions involving the same individual members of the Class against the Owner Operator Defendants which would create a likelihood of inconsistent or varying adjudications with respect to individual members of the Class. Intervention Pg. 99 Par 210.

362. The issues of law and fact determining the claims of the Percy Class, that the actions of the Defendant State and its DFS and the Employers named in this action, have caused, are causing, and will continue to cause serious, permanent and irreparable economic and social injury and damage to the Percy Class, are common to all members of the Class.

## CLASS COUNSEL

363. The credentials of the legal team are set forth in a separate submission being filed with this Complaint on the adequacy of the proposed Representatives and Counsel to show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4) by (1) absence of conflict and (2) assurance of vigorous prosecution. Class Counsel and the proposed class representatives meet the requirements of Rule 23(a)(4).

## CLASS REPRESENTATIVE

364. Class Representatives of the Plaintiff Class are Donna Hodge, Annette Hall, Karen Grant Williams, and Alexi Arias, a Class of employees of Employers. The Class is a class of all employees working for the Employers covered by the Program identified in this Complaint. The Employee Defendants in 26 subrogation actions removed to are a sub-class to the Class, being employees injured on the job while working for the Employers. The personal and business interests of these Class Representatives and the claims hereinafter set forth are fully aligned with those of the Class.

365. Class Representative of the Percy Class, Albert E. Percy has and will fairly and adequately protect the interests of the members of the Class. Percy resides at 119-09 232 Street, Cambria Heights, NY 11411-2223, where he owns a residence and is an active registered voter in election district 70 in Queens. Percy was the Class Representative in lawsuit Percy v. Brennan, 73 Civ. 4279; File # 41415384 (S.D.N.Y.) (the "Percy vs Brennan Action") for the class of all black and Spanish-surnamed persons identified in Percy v. Brennan. Percy has no conflict of interest with the members of the Class.

## FIRST CAUSE OF ACTION AGAINST DEFENDANT GOVERNMENT AGENCIES AND STATE OFFICERS FOR INJUNCTIVE RELIEF PROHIBITING INTERFERENCE WITH THE ALTERNATIVE EMPLOYMENT PRACTICE UNDER 42 U.S.C. 1981 AND 1985 IN VIOLATION OF 42 U.S.C. 1983

366. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

367. Relief is sought under 42 U.S.C. 1981 and 1985 for acts of the the Owner Operator Defendants and the Party-in-Interest Defendants, in concert with New York State Officer Defendants under color of law in violation of 42 U.S.C. 1983. The 42 U.S.C. 1983 causes of action involve denial of equal protection and due process of law under the 1st, 5th and 14th Amendments to the United States Constitution for denial of equal protection and due process of laws, and for denial of right of assembly, as well as violation of 42 U.S.C. 2000e-2 for refusal of the Employer Defendants to adopt and implement the Program as an Alternative Employment Practice.

368. The State of New York, its Government Agencies and its State Officers are implicated in all of these cases by the failure of Executive Order 45 (9 NYCRR 3.45), and complicity in the wrongful acts of the Employer Defendants, the Owner Operator Defendants, and the Prohibited Transaction Defendants, as a causes of action in favor of the Class for damages for violation of 42 U.S.C. 2000 e-2, 42 U.S.C. 1981, 1983, and 1985, under the 1st, 5th and 14th Amendments to the United States Constitution, for denial of equal protection and due process of laws, and for denial of right of assembly.

50

**Focusing on the current spread of infection that has occurred in nursing homes as it affects members of the Plaintiff Class employed in nursing homes, the root cause of this disaster begins with the failure of Governors Executive Order 45. We draw here from the following as evidence of the consequence:**

**Findings of the New York Attorney General in Report of January 30, 2021, Attachment #1 hereto**

369. The New York Attorney General ("AG" or "OAG") has corroborated the deficiencies in qualifications of employee members of the Class described in her report as staff, in her report on investigations of nursing homes.

370. Regarding nursing home Employers, there is direct corroboration from the Report ratifying what the employee Class now knows: extreme irreparable harm has been visited upon everyone, as identified by the OAG Report, due to shortcoming in staffing training and competency. And in wider sense, the Percy Class was promised affirmative action in a settlement with the Percy Class in Case 73 Civ. 4279 by presenting Executive Order 45 in settlement. The problem is that Executive Order 45 was declared unconstitutional and unenforceable. The Percy Class pursued its own self-help as permitted by law over many years despite the challenges by the State Officer Defendants.

371. Now the interference by the State in complicity with the Owner Operator Defendants and Party-in-Interest has exposed pre-existing insufficient staffing competency in nursing homes that are a consequence of State Officer Defendants' lack of support that was supposed to come from by Executive Order 45, and active interference as identified herein.

372. Culpability as identified herein put residents and staff in nursing homes at increased risk of harm, causing sickness and death during this pandemic.

373. The AG found that as nursing home resident and staff COVID-19 infections rose during the initial wave of the pandemic, staffing absences increased at many nursing homes. As a result, already-low staffing levels decreased even further, to especially dangerous levels in some homes, even as the need for care increased due to the need to comply with COVID-19 infection control protocols and the loss of assistance from family visitors. Attorney General James Releases Report on Nursing Homes Response to COVID-19 New York State Attorney General page 4

COVID-19 exposure is documented to:

Health care workers

First responders

Transportation workers

51

Corrections officers

Food service workers

Janitors

Retail workers

Maintenance Workers

Mechanics

Nurses and Nurses Assistants

Physicians and Physicians' Assistants

Administrative Personnel

374. The AG Report found that nursing home operators failed to comply with the State's infection control protocols. The problem is that this triage is all after the fact. Lack of reasonable preparation in readiness was sorely lacking. The OAG Report found that operators failed to properly isolate COVID-positive residents; failed to adequately screen or test employees; forced sick staff to continue working and caring for residents; failed to train employees in infection control protocols; and failed to obtain, fit, and train caregivers with PPE.

375. Staffing in the Nursing Home – Many nursing homes had staff absent with symptoms, self-quarantining, or at home due to child-care issues, since schools were closed and there were few alternative child-care options. Staffing agencies were being stretched thin and have limited ability to fill in gaps. Moreover, agency staff increase risk as these staff may be working in numerous buildings.

376. While New York has minimal staffing level requirements for nursing homes, nursing homes require sufficient staffing levels on a daily basis and over the long haul in order to be able to provide the care required by New York law, including by individualized resident care plans.

377. Certified Nursing Assistant (CNA), Licensed Practical Nurses (LPN), and Registered Nurses (RN) are the bulk of the caregivers who have primary, daily contact with residents. CNAs aid with activities of daily living, such as ambulation, transfers to/from bed, feeding, hygiene, toileting, bathing, dressing, bed cleaning and adjustments, turning and positioning of immobile patients, and other care and comfort. LPNs primarily focus on medication administration, monitoring vital signs, and providing certain treatments. RNs primarily focus on acute care needs, complex treatments, compliance with medical orders, communication with physicians and specialists, record-keeping, and complex health assessments AG Report page 22.

52

378.  The business model in too many for-profit nursing homes: (1) seeks admission of increased numbers of residents to increase income per occupied bed; (2) assigns low numbers of staff to cover the care needs of as many residents as feasible; and (3) transfers facility funds to related parties and investors that the home could otherwise invest in staffing to care for residents – essentially taking profit prior to ensuring care, AG Report page 23.

379.  On March 25, 2020, the state's Health Department issued an advisory requiring nursing homes to accept "the expedited receipt of residents returning from hospitals" if the patients were deemed medically stable.

380.  Why it issued its March 25, 2020 advisory to nursing home administrators, directors of nursing and hospital discharge planners: the explanation was that there was an "urgent need" to free up space in hospitals for seriously ill coronavirus patients. The advisory said all nursing homes "must comply with the expedited receipt of residents returning from hospitals to" nursing homes, and that hospitals must declare residents medically stable before they are sent back to the nursing homes.

381.  The March 25, 2020 DOH issued order under the authority of the Governor provided that "[n]o resident shall be denied re-admission or admission to the nursing home solely based on a confirmed or suspected diagnosis of COVID-19. Nursing homes are prohibited from requiring a hospitalized resident who is determined medically stable to be tested forCOVID-19 prior to admission or re-admission." [footnote 43 AG Report] The guidance was rescinded on May 10, 2020 in Executive Order 202.30. From March 25 to May 8, 2020, 326 hospital patients were admitted to 310 nursing homes. The peak of these admissions was the week of April 14, 2020. [footnote 44 AG Report] The peak single day in reported resident COVID-19 deaths was April 8, with 4,000 reported deaths occurring after that date. AG Report page 36.

382.  DOH's March 25, 2020 order directing nursing homes to accept incoming residents known to have the corona virus, an order that the State Officers of the DOH and of the Governor's Office, did not rescind until May 10, stands out as foolish and disastrous — especially because the State Officers were warned of the danger.

383.  Many nursing home industry and other commentators have criticized DOH's March 25, 2020 guidance as a directive that nursing homes had to accept COVID-19 patients who were infectious. [Footnote 45 of the AG Report]. At the same time, the DOH asserts that the March 25, 2020 guidance was consistent with the CMS guidance on March 4 that said nursing homes should accept residents they would have normally admitted, even if from a hospital with COVID-19, and that patients from hospitals can be transferred to nursing homes if the nursing homes have the ability to adhere to infection prevention and control recommendations. AG Report page 36.

384. Long Island seemed well-prepared for the coronavirus in early March, with movable walls to seal off hallways for the infected. But after the state order, a trickle of recovering COVID-19 patients from local hospitals turned into a flood of people. Infections from persons being shipped back from hospitals to nursing homes, exposing both staff and patients to infection.

385. The State Officers panicked in March, thinking that the hospitals were going to be overrun and said that they had to ship infected but recovering people out to make way for an expected huge surge. The surge fell short of the expectations, there was not any change in policy to accommodate the reality of the circumstances, there was no overload of the hospitals. The State Officers were relying upon their own evaluations, clearly bad policy by the State Officers.

386. The State Officers covered up the blunder by saying that the workers at the nursing homes, the staff, were the persons who brought the virus into and contaminated the nursing homes, alleging that it was not the patients who left the hospital.

387. The OAG reported data linking the number of nursing home deaths to the admissions policy contained in the March 25, 2020 which also prohibited nursing homes from requiringbCOVID-19 testing as a criterion for admission. This phenomenon was compounded by both the March 21 directive that largely paused the testing of downstate residents, and the under-reporting of nursing home deaths generally. AG Report page 37.

388. [Footnote 43 AG Report] DOH, Advisory: Hospital Discharges and Admissions to Nursing Homes, March 25, 2020 DOH Revised Report at pp. 4-5. AG Report page 71.

389. [Footnote 45 AG Report] While some commentators have suggested DOH's March 25, 2020 guidance was a directive that nursing homes accept COVID-19 patients even if they could not care appropriately for them, such an interpretation would violate statutes and regulations that place obligations on nursing homes to care for residents. For example, New York law requires a nursing home to "accept and retain only those residents for whom it can provide adequate care. "See 10 NYCRR § 415.26(i)(1)(ii). AG Report page 72.

390. The CDC's guidance at the time of the March 25, 2020 state order was that COVID-19 patients who are medically stable can be discharged from a hospital to a nursing home, but only if the nursing home can implement all recommended infection control procedures.

391. The March 25, 2020 advisory has been removed from the state website, and the state's directive to nursing homes is now much different. DOH issued an executive order on May 10, which states that hospitals "shall not discharge a patient to a nursing home, unless the nursing home operator or administrator has first certified that it is able to properly care for such a patient." The new order also required that a patient must be tested for COVID-19, and the test must be negative.

392. The CDC's guidance at the time of the March 25, 2020 state order was that COVID-19 patients who are medically stable can be discharged from a hospital to a nursing home, but only if the nursing home can implement all recommended infection control procedures.

393. The March 25, 2020 memo did not say anything about making sure that a nursing home can care for a patient before making an admission decision and said they "must comply with the expedited receipt of residents."

394. The CDC's guidance at the time of the March 25, 2020 state order was that COVID-19 patients who are medically stable can be discharged from a hospital to a nursing home, but only if the nursing home can implement all recommended infection control procedures. CMS, a federal agency that regulates nursing homes, issued similar guidance, and also said that preferably, coronavirus patients should be cared for in a dedicated unit.

395. Since the mandate took effect, recuperating patients across New York state have been discharged to nursing homes, especially where the Owner Operator Defendants have facilities in Staten Island, Queens, Brooklyn, Bronx, New York City, and Long Island.

396. Lack of Compliance with Infection Control Protocols Put Residents at Increased Risk of Harm During the COVID-19 Pandemic, AG Report page 17. A facility is required to have an infection control program in which the facility:

» investigates, controls, and takes action to prevent infections in the facility;

» determines what procedures, such as isolation, should be utilized for an individual resident to prevent continued transmission of a disease;

» maintains a record of incidence and corrective actions related to infections. AG Report page 17;

» Restricts all visitors except for compassionate care, such as end-of-life situations;

» Restricts all volunteers and nonessential personnel;

» Cancels all group activities and communal dining;

» Screens residents and personnel for fever and respiratory symptoms. AG Report page 18; and

» incorporates COVID-19 into written emergency plans [footnote 26 AG Report] and instructions on infection control policies. AG Report page 18.

397. Preliminary investigations indicate that nursing homes significantly lacked compliance with infection control protocols resulted in increased risks to residents at a number of facilities. AG Report page 22.

398. When low staffing levels dropped further due to staff COVID-19 illness or quarantine, there were even fewer staff available to care for residents' needs at these facilities. At the same time, when residents had COVID-19, their individual and collective care needs increased due to the need to comply with COVID-19 infection control protocols. This need increased the workload for the remaining staff providing direct care in several respects, even as low staffing numbers dropped further. These decreases in staffing levels occurred at the same time that necessary visitation restrictions removed the supplemental caregiving provided pre-pandemic by many family visitors at low staff facilities. AG Report page 25.

399. AOG investigations indicate that when there were insufficient staff to care for residents, some nursing homes pressured, knowingly permitted, or incentivized existing employees who were ill or met quarantine criteria to report to work and even work multiple consecutive shifts, in violation of infection control protocols. Thus, poor initial staffing before the pandemic meant even less care for residents during the pandemic: subtraction of any caregivers from an already under-staffed facility results in increased interaction among possibly infectious staff and residents, with less time for the staff to adhere to proper infection control precautions. AG Report page 25.

400. Multiple Complaints of Insufficient Staffing: OAG received several other complaints and allegations of insufficient staffing due to COVID-19 in facilities that had pre-pandemic low staffing, AG Report page 26.

401. An employee complained that a for-profit nursing home on Long Island had an insufficient number of staff due to staff being out sick. The facility reportedly tried to fill vacant positions by using staffing agencies but said there was a limited pool of personnel from which it could hire. AG Report page 26.

402. Government issued a policy may have led to an increased risk to residents in some facilities and may have obscured the data available to assess the risk. AG Report page 36.

403. The program must include "a system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents, staff, volunteers, visitors, and other individuals providing services; "and "precautions to be followed to prevent spread of infections." [Reference to footnote 92] The plan must be reviewed annually and updated as necessary and the facility must hire an infection preventionist who is responsible for the infection control plan. [Reference to footnote 93] Finally correcting the State issued policy, the regulation outlining infection control was updated on May 8, 2020 to include specific reporting and communication requirements relating to COVID-19. AG Report page 46

404. Many nursing homes severely lacked personal protective equipment ("PPE") for workers. In some instances, nursing home owners forewent infection control protocols, telling

56

staff that masks and other PPE were not mandatory because they did not have enough supplies. In other cases, re-use of PPE may have contributed to the spread of infection. Nursing homes should be required to have a sufficient inventory of PPE in case of a future outbreak. AG Report page 50.

405. Owner Operator facilities were so understaffed due to staff quarantining, working from home, and pre-existing low staffing, that the onsite management of the entire facility was left in the hands of just a few supervisory nurses, New York State Attorney General Report Pg. 4

406. The Owner Operator Defendants failed to properly isolate residents who tested positive for COVID-19; failing to adequately screen or test employees for COVID-19; demanded that sick employees continue to work and care for residents or face retaliation or termination; failed to train employees in infection control protocols; and failed to obtain, fit, and train caregivers with PPE. New York State Attorney General Report Pg. 3

407. OAG received reports that nursing homes did not properly screen staff members before allowing them to enter the facility to work with residents. Among those reports, OAG received an allegation that a for-profit nursing home north of New York City failed to consistently conduct COVID-19 employee screening. It was reported that some staff avoided having their temperatures taken and answering a COVID-19 questionnaire at times when the screening station at the facility's front entrance had no employees present to take that information or when staff entered the facility through a back entrance, avoiding the screening station altogether. New York State Attorney General Report

408. In one instance in late April 2020, a nurse supervisor had set up bins in front of the units with gowns and N95 masks to make it appear that the facility had an adequate supply of appropriate PPE for staff. The nurse alleged that the nurse supervisor came in to work unusually early the day of the first inspection and brought out all new PPE and collected all of the used gowns. Although the initial DOH survey conducted that day did not result in negative findings, DOH returned to the facility for follow-up inspections, issued the facility several citations, and ultimately placed the facility in "Immediate Jeopardy." New York State Attorney General Report Pg. 4

409. Insufficient personal protective equipment (PPE) for nursing home staff put residents at increased risk of harm during the COVID-19 pandemic in some facilities. AG Report page 6

410. Insufficient COVID-19 testing for residents and staff in the early stages of the pandemic put residents at increased risk of harm in some facilities. AG Report page 6

411. The AG Report identifies what is quantified by the Class Plaintiff in this Complaint, by saying: "The current state reimbursement model for nursing homes gives a financial incentive to owners of for-profit nursing homes to transfer funds to related parties

57

(ultimately increasing their own profit) instead of investing in higher levels of staffing and PPE." AG Report page 6.

412. The DOH failed to require nursing homes to comply with labor practices that prevent nursing homes from pressuring employees to work while they have COVID-19 infection or symptoms, while ensuring nursing homes obtain and provide adequate staffing levels to care for residents' needs. AG Report page 7

413. Nursing homes did not invest sufficiently in effective training so staff can fully comply with infection control protocols or hold operators accountable for failure to have clinically appropriate policies in place and to effectively train staff to comply with them. AG Report page 7

414. There was inadequate planning regarding post-mortem care needs and implementing and training staff on policies for dignified care of the remains of deceased residents. AG Report page 8.

415. Basic protocols are expected of nursing homes: required isolation of residents, proper sterilization and storage of all equipment to prevent the spread of infection, were not followed. Facilities are required to mandate basic infection control practices including ensuring staff wash their hands after each direct resident contact and properly handle and store linens. AG Report page 18.

416. Lax employee screening put all residents and staff at increased risk of harm. AG Report page 21.

417. The Program sponsoring Employers so negligently oversaw the operation of the Program by failing to maintain proper controls, policies and procedures regarding control of the Plan assets so as to carelessly and recklessly allow Plan assets intended for the Program to be taken for illegal and unauthorized uses, utilizing these Plan assets for their own purposes, which were purposes not permitted or allowed by the Program because they are prohibited transactions under ERISA.

418. This led to violation of 42 U.S.C. 2000e-2 for neglect of the Owner Operator Defendants to adopt and implement the Program as an Alternative Employment Practice. The denial of the Alternative Employment Practice is directed at disadvantaged persons based upon race and color as permitted proof on a 42 U.S.C. 2000e-2 action allowed by the US Supreme Court in Ricci v DeStefano 557 U.S. 557, a violation shown by the refusal to adopt the Alternative Employment Practice, injuring the Class as disadvantaged persons based on race and color, warranting the award of damages and injunctive relief as detailed herein. Intervention Pg. 8 Par 6.

419. The Union Defendant failed to implement training. The Union Defendant made peace with the Owner Operator Defendants failing to pursue and implement apprentice

training to provide the skill level and knowledge necessary to handle a communicable disease, such as COVID 19. The Union Defendant is part of the problem having failed in its duty to protect the interests of its members, the Union Defendant is part of the mess, the Union Defendant is part of the default in protecting the interests of the employee Class Defendant.

420. What happened is that the Owner Operator Defendants, in the course of the management of the Program deviated drastically from the purposes of the Program and ERISA by failing to put their Plan assets in trust, but instead took funds of their Plan to other personal purposes of wrongdoing Owner Operator Defendants and Party-in-Interest Defendants, permitting these persons to utilize Plan assets for prohibited personal transactions, all of which had nothing to do with their Plan or Program. The Owner Operator Defendants continued to misuse or allow others to misuse the fiduciary control over the Plan assets. This Complaint describes a pattern of conduct of the Owner Operator Defendants and Party-in-Interest Defendants who were wrongfully aided and abetted by State Officer Defendants, which has caused their Plan to deny benefits to the employee Class Plaintiff. Intervention Pg. 9 Par 8.

421. Exposed greed in the scheme of the Owner Operator Defendants and Party-in-Interest Defendants involves nursing home and healthcare facilities and businesses named herein, manipulating Medicaid and Medicare paid to nursing home and healthcare facilities, a fixed payment per bed based on costs of operation. Under the scheme the Owner Operator Defendants gutted labor costs upon acquiring employer facilities by hiring new employees with very limited skills and little or nonexistent experience. The Owner Operator Defendants provided little, if any, training or continuing education to raise the level of competency of the workforce as well did not provide other benefits under their Plan. Instead, the Owner Defendants and Party-in-Interest Defendants hid, laundered and reaped the tens of millions of dollars in reported costs not spent on benefits for training, education, apprenticeship and employee benefits, getting away with these laundered funds embezzled to illicit prohibited transactions, the very funds intended to pay employee benefits. The Defendants probably would have gotten away with their illegal enterprise, if not for the unexpected and unprepared for COVID-19 pandemic event, exposing the greedy and illegal enterprise of stealing employee benefits. Intervention Pg. 8 Par 5.

422. The funds involved in prohibited transactions were diverted, converted and embezzled by the Owner Operator Defendants and Party-in-Interest Defendants, under color of law with the complicity of the State Officer Defendants. The State Officers at a minimum grossly neglected responsibility to monitor the use of Medicare/Medicaid payments. Accrued and expensed costs were diverted, converted and embezzled by the Owner Operator Defendants and the Party-in-Interest Defendants under the nose of several

State Agencies run by the named State Officer Defendants. The liability of the Owner Operator Defendants and the State Officer Defendants who were complicit by their gross negligence or active involvement, is set forth in this Class Complaint.

423. Defendant Governor and his Government Agencies are implicated dating back to the failed settlement involving New York Executive Order 45 (9 NYCRR 3.45) upon the final and enforceable Memorandum/Order ("Memorandum/Order") of Judge Lasker reported at 384 F Supp 800 of November 8, 1974, settled by agreement accepting Defendant New York State's offer of Executive Order 45, but Executive Order 45 failed, and the Percy Class was never notified.

424. This Cause of Action also is to enforce the relief in SDNY Case 73-cv-04279 record of which was then filed by ECF in Appeal No. 17-2274 as the Docket on Appeal to the United States Second Circuit Court of Appeals.

425. A ruling by District Court Judge McMahon, EDNY Case No 21-cv-001366, Docket 6, Attachment 1, that Case 73-cv-04279 was no longer a case and controversy having been closed, and she instructed "There will be NO REOPENING of this case. If the plaintiffs or any party wishes to file a new case, go right ahead." docket #15 of 73-cv-04279. The Second Circuit Court of Appeals in Appeal 17-2273 affirmed that Percy v. Brennan Case 73-cv-04279, is final. This Cause of Action is that new case.

426. This Cause of action is grounded upon the final and enforceable Memorandum/Order of Judge Lasker reported at 384 F Supp 800 of November 8, 1974, and the Settlement agreement accepting Defendant New York State's offer of Executive Order 45 (Governor Carey's Executive Order 45 (9 NYCRR 3.45) in settlement to resolve the issues raised in the Case 73-cv-04279. Thereupon, Percy v. Brennan Case 73-cv-04279 was closed without prejudice by Judge Edelstein's Order of May 4, 1977.

427. Then the New York Court of Appeals in Fullilove v Carey (48 NY2d 826, 1979), decided together with Fullilove v Beame, 48 NY2d 376, (1979), declared that Executive Order 45 as promulgated by Governor Carey was an unauthorized exercise of legislative power, illegal and unconstitutional. Implementation of the provisions of said Executive Order 45 was enjoined, including promulgation or enforcement of any rules and regulations issued pursuant to said Executive Order 45. The Settlement failure caused by the State of New York's actions or failure to act, are actionable, and were compounded by The State of New York's misrepresentation in failing to notify the Court and the Percy Class of the failure of the Settlement.

428. The Office of the Governor and its Government Agencies have actively continued to obstruct a private solution Alternative Employment Practice demonstrated to be a less discriminatory employment practice.

60

429. Failures by the Owner Operator Defendants to adopt the Alternative Employment Practice are unlawful employment practices under the 42 U.S.C. §2000e-2 of the Civil Rights Act. Additionally, when an employer is receiving federal funding, such an employer must comply with conditions set forth in Presidential Executive Order 11246 and regulations requiring affirmative action for equal employment opportunity, by enforcement of Percy v. Brennan.

430. The Class members are beneficiaries identified in federal funding. The alternative employment practice of paid on-the-job apprentice training with related classroom instruction, enforced by 42 U.S.C. 2000 e-2 of the Civil Rights Act, addresses the need for affirmative action to foster equal employment opportunity for the significantly disadvantaged Percy Class, the class wanting to compete for jobs and careers based on skills, not offensive, arbitrary, and segregating classifications. Despite the favorable ruling and Settlement of Percy v. Brennan, the apprenticeship never materialized, and the Alternative Employment Practice has been thwarted. Today, even with shortages of skilled labor and the Percy Class experiences unacceptable income disparity, few fringe benefits, and the lack of a career ladder, all contributing to chronic staff workforce shortage and severe income inequality.

431. It is prayed that the State Officer Defendants and the Government Agencies be enjoined under 42 U.S.C. §1983 from denying the Class by conspiring with the Owner Operator Defendants and Party-in-Interest Defendants to Violate 14th Amendment Equal Protection Constitutional Rights of the Class to the benefit of 42 U.S.C. §2000e-2 Alternative Employment Practice under color of law.

**SECOND CAUSE OF ACTION AGAINST OWNER OPERATOR DEFENDANTS OF IDENTIFIED EMPLOYERS FOR BREACH OF ERISA FIDUCIARY DUTIES IN THE DIVERSION OF $53 MILLION IN PLAN ASSETS**

432. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

433. The Employee Retirement Income Security Act (ERISA), codified at 29 USC§ 1001 et seq., has governed "employee welfare funds, which are defined, 29 USC§1002(1) as: any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries." Intervention Pg. 112 Par 246.

434. The Program was established and maintained by the Employers for the purpose of providing benefits for its participants or their beneficiaries, through the purchase of insurance covering health, disability and workers' compensation. Intervention Pg. 113 Par 247.

435. Each of the Employer identified as Employer Defendants in related Case 21-cv-01366, are plan sponsors ("Plan Sponsors") under the Program, the employer-sponsored Program governed by ERISA, in which the Class of employees participate. Intervention Pg. 113 Par 248.

436. The Owner Operator Defendants are Parties in Interest and/or fiduciaries, along with a myriad of persons identified as Parties in Interest, pursuant to ERISA § 3(14), 29 U.S.C. § 1002(14) which defines a "party in interest" to an employee benefit plan, in relevant part, as:"(A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan; (B) a person providing services to such plan; (C) an employer any of whose employees are covered by such plan; and (D) an employee organization any of whose members are covered by such plan. Intervention Pg. 113 Par 249.

437. ERISA Section 502(a)(2) provides for relief under ERISA Section 409, 29 U.S.C. § 1109 and Section 409(a) which provides that a fiduciary is personally liable to a plan for any losses their Plan suffers as a result of the fiduciary's breach and must restore to their Plan any profits the fiduciary realized as a result of a misuse of plan assets to the damage of Plaintiff.

438. Carrier Defendant is subrogated to the rights of the Class." Intervention Pg. 113 Par 250.

439. ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between their Plan and Parties in Interest. Specifically, ERISA § 406(a) (1), 29 U.S.C. § 1106(a) (1), provides: "A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect(A) sale or exchange, or leasing, of any property between the plan and a party in interest;(B) lending of money or other extension of credit between the plan and a party in interest;(C) furnishing of goods, services, or facilities between the plan and a party in interest;(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title". Intervention Pg. 113 Par 251.

440. In violation of ERISA's fiduciary duty and prohibited transaction provisions, as part of the scheme, the Employer Defendants in the operation of the Program diverted from their Plan funds identified for health, disability, and workers' compensation benefits, diverting Plan assets needed to cover benefits in violation of their fiduciary duties to act solely in the interest of the Class as plan participant beneficiaries. Plan assets are for the exclusive purpose of providing benefits to the Class along with specific identified expenses of their Plan. The Employer Defendants in control of their Plan, failed to carry out their duties to prudently pay only reasonable plan expenses. Intervention Pg. 114 Par 252.

441. Under 29 U.S.C.S. §1003(b)(3), the Plan of the Employer Defendants is not maintained solely for the purpose of complying with applicable workers' compensation laws, therefore their Plan and Program is preempted by ERISA, 29 U.S.C.S. § 1001 et seq. Intervention Pg. 114 Par 253.

442. Employer Defendants, as a result of exercising control and management over Fund Assets under 29 U.S.C. 186(c)(5) "employee benefit plans" within the meaning of 29 U.S.C. 1002(37), (1), (2) and (3), the Employer Defendants, are fiduciaries under ERISA, as defined in 29 U.S.C. § 1002(1)(a) of ERISA. Intervention Pg. 114 Par 254.

443. Under ERISA, a fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to [them]." 29 U.S.C. §1104(a)(1). Intervention Pg. 114 Par 255.

444. As part of the scheme the Employer Defendants as fiduciaries used Fund assets to satisfy other personal or business obligations or otherwise underfunded the obligations, breaching their fiduciary duty under ERISA. Under ERISA, any person who is a fiduciary with respect to the plan who breaches any one of the responsibilities, obligations, or duties imposed upon fiduciaries is personally liable "to make good to such plan any losses to the plan resulting from each such breach, and to restore the plan any profits of such fiduciary which have been made through the use of assets of the plan by the fiduciary..." 29 U.S.C. §1109(a). Intervention Pg. 115 Par 256.

445. It was part of the scheme for Employer Defendants, or persons of controlling the Employer Defendants, to willfully and intentionally use Fund assets for purposes other than the exclusive purpose of providing benefits to fund participants and beneficiaries. Intervention Pg. 115 Par 257.

446. The Employer Defendants breached their fiduciary duties under ERISA by failure to maintain Plan assets in a fiduciary capacity, because of Employer Defendants failure to deposit Plan assets in trust. Intervention Pg. 115 Par 258.

447. Employer Defendants owe the Class of Employees, their Plan and its trust, and the Plaintiff in Intervention, a common-law fiduciary duty to act in good faith. Intervention Pg. 115 Par 258.

**$53 Million- Embezzlement Admitted in Court Documents**

448. Admissions in 2019 and 2020 of the diversion, conversion and embezzlement of Plan assets preceded the arrival of the March 2020 COVID virus. The Employers filed a complaint in Nassau County Action Index 609877/2019 identifying $53 million, which was diverted to a Bermuda insurance enterprise from monies paid by the Employers.

449. The defalcation regarding the ERISA Plan assets that the Employers and Owner Operator Defendants failed to detect became known when Derivative Defendant Oriska

Corporation commenced actions against some of the Employers to subrogate for the injuries sustained due to the unsafe workplace, negligence, and culpability of the Employers, in the following cases which have all been removed to Federal Court in their respective listed districts. Intervention Pg. 13 Par 18. The Amended Complaint in Intervention in an Action in Nassau County Index 609877/2019 references the following lawsuits:

1 NASSAU EFCA 615390/2019, EDNY Case No. 2:21-cv-00454-JMA-ARL Pg. 13 Par 18

2 RICHMOND EFCA 152540/2019, EDNY Case No. 2:21-cv-00454-JMA-ARL Pg. 13 Par 18

3 SCHENECTADY 2019-2469, 1:21-cv-00104-MAD-DJS Pg. 13 Par 18

4 BRONX EFCA 33061/2019E, SDNY Case No. 1:21-cv-00762-LJL Pg. 13 Par 18

5 QUEENS EFCA 718647-2019, EDNY Case No. 2:21-cv-00454-JMA-ARL Pg. 13 Par 18

6 NASSAU EFCA 615382/2019, EDNY Case No. 2:21-cv-00454-JMA-ARL Pg. 13 Par 18

7 QUEENS EFCA 718651-2019, EDNY Case No. 2:21-cv-00454-JMA-ARL Pg. 13 Par 18

8 SCHENECTADY 2019-2470, NDNY Case No. 1:21-cv-00109-MAD-DJS Pg. 13 Par 18

9 WESTCHESTER EFCA 68209-2019, SDNY Case No. 1:21-cv-00762-LJL Pg. 13 Par 18

10 SUFFOLK EFCA 621892/2019, EDNY Case No. 2:21-cv-00454-JMA-ARL Pg. 13 Par 18

11 NASSAU EFCA 615418/2019, EDNY Case No. 2:21-cv-00454-JMA-ARL Pg. 13 Par 18

12 NASSAU EFCA 615476/2019, EDNY Case No. 2:21-cv-00454-JMA-ARL Pg. 13 Par 18

13 NASSAU EFCA 615372-2019, EDNY Case No. 2:21-cv-00454-JMA-ARL Pg. 14 Par 19

14 KINGS EFCA 524009-2019, EDNY Case No. 2:21-cv-00454-JMA-ARL Pg. 14 Par 18

15 BRONX EFCA 33057/2019E, SDNY Case No. 1:21-cv-00762-LJL Pg. 14 Par 18

16 NASSAU EFCA 615360-2019, EDNY Case No. 2:21-cv-00454-JMA-ARL Pg. 14 Par 18

17 RENSSELAER 2019-264821, NDNY 1:21-cv-00106-MAD-DJS Pg. 14 Par 18

18 QUEENS EFCA 718683-2019, EDNY Case No. 2:21-cv-00454-JMA-ARL Pg. 14 Par 18

19 WESTCHESTER EFCA 68230-2019, SDNY Case No. 1:21-cv-00762-LJL Pg. 14 Par 18

20 KINGS EFCA 524028-2019, EDNY Case No. 2:21-cv-00454-JMA-ARL Pg. 14 Par 18

21 NASSAU EFCA 615348-2019, EDNY Case No. 2:21-cv-00454-JMA-ARL Pg. 14 Par 18

22 SUFFOLK EFCA 621891_2019, EDNY Case No. 2:21-cv-00454-JMA-ARL Pg. 14 Par 18

23 BRONX EFCA 33547_2019, SDNY Case No. 1:21-cv-00762-LJL Pg. 14 Par 18

24 NASSAU EFCA 615286_2019, EDNY Case No. 2:21-cv-00454-JMA-ARL Pg. 14 Par 18

25 QUEENS EFCA 718613-2019, EDNY Case No. 2:21-cv-00454-JMA-ARL Pg. 14 Par 18

26 BRONX EFCA 33060_2019, SDNY Case No. 1:21-cv-00762-LJL Pg. 14 Par 18

450. Certain identified Employers sued in Nassau County Action Index 609877/2019 to recover $53 million, which was diverted to a Bermuda insurance enterprise from monies paid by the Employers.

451. Within days of Oriska Corporation seeking recovery for the injuries which occurred to injured members of the Class of employees, the Employers scrambled to retract the Complaint to recover $53 million for insurance fraud in Nassau County Case Index 609877/2019. Intervention Pg. 14 Par 18.

452. In fact in excess of $68 million was diverted as identified herein, obviously exceeding the $53 million that the certain Employers have admitted.

453. Derivative Defendant Oriska Corporation moved to intervene on behalf of the employees of the Employers in November 2020, against the Employers in claiming the $53 million sought by the Complaint filed July 19, 2019 in Nassau County under Index number 609877/2019, uniting in the relief demanded in the July 19, 2019 Complaint reproduced in its entirety at pages 16 through 38 of the Nassau County Amended Complaint in Intervention, but demanding that the recovery be paid into trust, reference to Nassau County Amended Complaint in Intervention[4].

454. The employee Class Plaintiffs are the real party in interest as identified by the Nassau County Supreme Court by order of Honorable Jack L. Libert, dated October 7, 2020[5], (Docketed at EDNY 20-cv-06291-NGG-CLP, Document 1, Attachment 2). This Action was then removed to the EDNY and is now Case 20-cv-06291.

455. The Plan assets should have been held for the payment of benefits for employees of the Class Plaintiffs for medical care, lost wages, and expenses. But instead, the Owner Operator Defendants did conspire, convert, divert, and embezzle the funds expensed in Cost Reports and financial reports. Employers accrued and reported benefit expenses to the DOH, but then instead of paying the funds to the trust to self-insure or to a

---

[4] Amended Complaint in Intervention in an intervention by Order of Justice Libert in Nassau County Action Index number 609877/2019, which was not appealed and is final, now removed to related Case 20-cv-06291.

To access the document in the link above you may need to register for a Free Pacer Account. https://pacer.psc.uscourts.gov/pscof/registration.jsf

[5] Order of Honorable Jack L. Libert dated October 7, 2020 filed in EDNY Case 20-cv-06291 Document 1, Attachment 2, an Order which was not appealed and is final.

commercial carrier, they paid the funds to operators, managers, and Parties-in-Interest of the enterprise, a racket to embezzle Plan assets that were paid to Employers by Medicaid, Medicare, private insurance and private pay, assets supposed to be dedicated by the Plan and Program to provide benefits. Intervention Pg. 14 Par 19.

456. Oriska Corporation, as the Plaintiff in Intervention, sought return of the $53 million Risk Retention fund identified in the Nassau County Intervention Complaint, as Plan assets. Intervention Pg. 14 Par 20.

457. The Employers amended their complaint, removing the causes of action and facts setting forth fraud causing $53 million to be diverted by the Defendant Philipson, replaced with a single cause of action for breach of a contract for money lent of $50,000, pretending that the $53 million causes of action do not exist, are gone, evaporated, the same as the security fund identified in the Complaint as the Risk Retention fund in Action in Nassau County Index 609877/2019. Intervention Pg. 15 Par 21.

458. It is obvious that the Owner Operator Defendants cannot be trusted to pursue and protect the $53 million or any of the monies identified in this Complaint. Oriska Corporation has been permitted to intervene to prevent a miscarriage of justice by the Owner Operator Defendants by the attempted replacement of the $53 million Risk Retention fund with $50,000. Intervention Pg. 15 Par 22.

459. Nassau County Plaintiff in Intervention Oriska Corporation repeated and realleged the original Complaint in Nassau County under Index number 609877/2019 filed July 19, 2019, the original Complaint to recover $53 million for the defalcation involving certain Owner Operator Defendants, by reproducing on page 100, paragraph 219 of the Amended Complaint and is likewise realleged here as if more fully set forth. Intervention Pg. 15 Par 23.

460. Rights of subrogation of Derivative Defendant Oriska Corporation arise out of common law rights of subrogation, exoneration and contribution, and Workers' Compensation Law §§26, 26-a, 50 and 52, requiring that the Employers by law disgorge and forfeit funds that have been diverted and wrongfully converted, including but not limited to the security fund identified in the Nassau County Complaint removed to the EDNY in Action Nassau County Index 609877/2019, funds diverted from the Program established and maintained by the Employers for the purpose of providing benefits for its participants and/or their beneficiaries, by self-insurance or through the purchase of insurance covering health, disability, including training, safety, loss control, risk-management and workers' compensation under the Program. Intervention Pg. 39 Par 24, Pg. 100 Par 216.

461. The Plaintiffs in Nassau County Action Index number 609877/2019 are certain Employers of the Class.

462. The Carrier Defendant is identified at Intervention Pg. 53 Par 33.

463. The Trust Defendant Rashbi Management, Inc. is the settlor and administrator of a trust for the Program as hereinafter identified at Intervention Pg. 53 Par 34.

464. The Employers, as Plan Sponsors, sponsored the benefit plan (the "Plan" or "Program") for health, disability, apprenticeship and safety training, loss control, risk management and workers' compensation benefits which are the obligations of their Plan. Intervention Pg. 54 Par 35.

465. The Class Representatives of the Class Plaintiff are Donna Hodge, Annette Hall, Karen Grant Williams, and Alexi Arias, a Class of employees of Employers. The Class is a class of all employees of the Employers working for the Employers covered by the Program identified in this Complaint. The Employee Defendants in the 26 subrogation actions are a sub-class to the Class, being employees injured on the job while working for the Employers. Intervention Pg. 40 Par 28.

466. The Class are participants in the Program sponsored by the Employers, with their Plan providing benefits to Class members. Intervention Pg. 54 Par 36. In this Complaint the Class Plaintiff encompasses and replaces the individually named employees in Nassau County under Index number 609877/2019. Intervention Pg. 13 Par 17.

467. The real Parties-in-Interest are the employees, the Class, and the Rashbi Trust of the Trust Defendant, being persons damaged by the actions of the Owner Operator Defendants, and State Officer Defendants, in conspiring to and diverting, converting, and secreting Plan Funds, and they must respond in damages in amounts set forth herein. Intervention Pg. 139 Par 343.

468. That was followed by the New York Steak Office of the Attorney General Report on the handling of the COVID 19 pandemic, exposing the deficiencies of staff in qualifications, numbers and procedures to handle the COVID 19 pandemic, a pandemic which should not have been an unexpected event, but rather an event, like many disease events through history from which experience developed sterilization, quarantine etc to control spread of disease.

469. As a direct and proximate cause of breaches of the Owner Operator Defendants, the Party-in-Interest Defendants, and the Employers, the Class has suffered damages including, but not limited to, additional and ongoing life of claim costs for medical treatment and reimbursement of lost wages of employees of Employer Defendants which are unable to be reimbursed out of Plan assets which should have been in trust. Intervention Pg. 115 Par 260.

470. By reason of the acts of Employers alleged herein, the Class Defendants have suffered, are suffering and will continue to suffer damages and irreparable damage, unless said, Owner Operator Defendants and Party-in-Interest Defendants are restrained from these wrongful acts. Intervention Pg. 115 Par 261.

471. Plaintiffs seek monetary and equitable relief in connection breach of ERISA fiduciary duties of Owner Operators of certain identified Employers. Intervention Pg 116 Par 262.

472. The Owner Operators in control of the Employers identified in the related EDNY Case 21-cv-01366, are individually liable in damages in the share that they have received by direct payment or accounting considerations in corporate distributions as follows: Intervention Pg. 116 Par 263.

473.

| OWNER OPERATORS | 53 Mil |
|---|---|
| Gabor Adler | $436,986 |
| George Adler | $436,986 |
| Kwame Amoafo danquah | unknown |
| Agnes Arnestein | minority owner |
| Anthony Bacchi | $2,082,056 |
| Matthew Barbara | minority owner |
| Paul Barbara | minority owner |
| Aaron Becher | $549,179 |
| Pola Becher | $127,801 |
| Hershel Bedansky | unknown |
| Howard Belford | minority owner |
| Scott Bialick | minority owner |
| Robert Bleier | $1,129,451 |
| David Bloom | $436,986 |
| Paula Bokow | unknown |
| Joel Brach | unknown |
| Natan Brach | unknown |
| Barry Braunstein | minority owner |
| Murray Bresky | minority owner |
| Steven Brown | minority owner |
| Philip Buchsbaum | minority owner |

| | |
|---|---|
| Richard Bursek | unknown |
| Richard Busell | minority owner |
| Colin C. Hart | unknown |
| Ira Cammeyer | $339,644.65 |
| Alan Chopp | $112,192.86 |
| Joshua Chopp | unknown |
| David Cohen | unknown |
| David Crytryn | $127,801 |
| David Dachs | unknown |
| Solomon Eidlisz | $199,864 |
| Neil Einhorn | $339,644 |
| Scott Einiger | minority owner |
| Abraham Eisen | unknown |
| Sam Eisen | unknown |
| Steve Eisman | minority owner |
| Ignatius Elefant | unknown |
| Philipson Family Trust | unknown |
| Martin Farbeblum | $403,573 |
| Benjamin Farbenblum | $477,717 |
| Ed Farbenblum | unknown |
| Edward Farbenblum | $704,139 |
| Martin Farbenblum | $1,306,399 |
| Michael Farbenblum | $589,910 |
| Esther Farkovits | $339,644 |
| Jordan Fensterman | minority owner |
| Lori Fensterman | $1,475,254 |
| Robert Fensterman | $1,006,499 |
| Staci Fensterman | minority owner |

69

| | |
|---|---|
| Samuel Ferrara | minority owner |
| Mayer Fischl | $961,442 |
| Benjamin Fishoff | $566,768 |
| Patrick Formato | minority owner |
| John Francher | unknown |
| David Freid | $127,801 |
| Moshe Freilich | unknown |
| Andrew Freundlich | $339,644 |
| Sigmund Freundlich | $339,644 |
| Leo Friedman | unknown |
| David Gast | unknown |
| Louis Gellis | unknown |
| William Gillick | unknown |
| Rivky Goldberger | $127,801 |
| Leon Goldenberg | unknown |
| Jeffrey Goldstein | $112,192 |
| Anne Gottlieb | unknown |
| Miklows Gottlieb | unknown |
| Niklos Gottlieb | unknown |
| Solomon Green | unknown |
| Joel Greenberg | minority owner |
| Eric Greenberger | unknown |
| Eli Greenspan | minority owner |
| Steven Greenstein | minority owner |
| Avrumi Grossman | unknown |
| Marton Guttman | unknown |
| Valarie Henry | unknown |
| Johanan Hirsch | $477,717 |

| | |
|---|---|
| Leopold Hirsch | $477,717 |
| Libe Hirsch | unknown |
| Ruth Hirsch | $929,555 |
| David Hoffman | $339,644 |
| Pinchos Hoffman | $112,192 |
| Pinchus Hoffman | $339,644 |
| Steven J Eisman | $1,422,330 |
| Anthony J. Bacchi | minority owner |
| Jack Janklowicz | $199,864 |
| Leonard Janklowicz | $199,864 |
| Jack Janklowitz | $72,063 |
| Shorefront Jewish Geriatric Center | unknown |
| David Jones | unknown |
| Judith Jones | unknown |
| Mendel Kaff | unknown |
| Eric Kalt | $112,192 |
| Yoel Karpen | unknown |
| Miriam Karpf | unknown |
| Allen Kass | minority owner |
| Martin Kass | minority owner |
| Martin Katz | unknown |
| Shelley Katz | minority owner |
| Shelly Katz | unknown |
| Manny Kaufman | unknown |
| Yosef Kaufman | unknown |
| Alan Kessler | minority owner |
| Arnold Klapper | $477,717 |

| | |
|---|---|
| George Klein | $339,644 |
| Larry Klein | $339,644 |
| Eleanor Kluger | unknown |
| Robert Kolman | $112,192 |
| Dean Korlik | minority owner |
| William Korn | $339,644 |
| Irina Kostesky | $339,644 |
| Howard Krant | unknown |
| Ephram Lahasky | unknown |
| Benjamin Landa | $4,263,177 |
| David Landa | unknown |
| Yechiel Landa | $127,801 |
| Nathan Landau | unknown |
| James Lapolla | unknown |
| Tibor Lebovich | unknown |
| Morty Lehasky | unknown |
| David Leifer | unknown |
| Barry Leistner | minority owner |
| Chana Lerner | $436,986 |
| Michael Levitan | minority owner |
| Rich Levitan | minority owner |
| Teddy Lichtscein | $127,801 |
| Neuman Lj Partners | unknown |
| Isaac Madeb | unknown |
| Dovi Marc Faivish | unknown |
| Sam Mayerovitz | unknown |
| Girshas Minster | $339,644 |
| Neuman Mn Partners | unknown |

| | |
|---|---|
| Gavriel Mordechaev | $72,063 |
| Gabriel Mordechey | $127,801 |
| Sharyn Mukamal | minority owner |
| Katherine Muller | unknown |
| Laurie Netzer | $339,644 |
| Leo Oberlander | unknown |
| Sander Oberlander | unknown |
| Milton Ostreicher | $127,801 |
| Susan Ostreicher | unknown |
| Irwin Peckman | minority owner |
| Ben Philipson | $4,690,290 |
| Bent Philipson | minority owner |
| Deborah Philipson | $1,363,270 |
| Robert Pines | minority owner |
| Israel Pollak | $112,192 |
| Jacob Pollak | $112,192 |
| Natan Pollak | unknown |
| Renee Pollak | unknown |
| Sylvia Pollak | unknown |
| Theodore Pollak | $127,801.56 |
| Michael Pruzansky | $112,192.86 |
| Diana R. Koehler | unknown |
| Jonathan Redner | unknown |
| Lawrence Reichenberger | minority owner |
| Mark Reisman | unknown |
| Mayer Rispler | $113,170 |
| Brian Rosenman | unknown |
| Kenneth Rozenberg | unknown |

73

| | |
|---|---|
| Berish Rubenstein | minority owner |
| Dina Rubenstein | $112,192 |
| Rivkie Rubenstein | unknown |
| Ira Rubin | unknown |
| Malky Saffran | unknown |
| Boruch Schepps | unknown |
| Pamela Schepps | unknown |
| Nat Scherman | unknown |
| Richard Schildron | minority owner |
| Samuel Schlesinger | unknown |
| Jacob Schoenberger | unknown |
| Michael Schwartz | $339,644 |
| Leslie Shafrank | $339,644 |
| Henry Shayovitz | minority owner |
| Agnes Shemia | unknown |
| Jeff Shemia | unknown |
| Alexander Sherman | unknown |
| Israel Sherman | unknown |
| Leah Sherman | unknown |
| Nat Sherman | $339,644.65 |
| Samuel Sherman | unknown |
| Warren Sherman | unknown |
| Hindy Sirkis | minority owner |
| Moshe Sirkis | $534,329 |
| Alexander Skoczlas | unknown |
| Joseph Skoczylas | unknown |
| Tali Skoczylas | unknown |
| Dominic Spira Md | unknown |

| | |
|---|---|
| Jonathan Steinberg | unknown |
| Miriam Steinberg | unknown |
| Ronald Stern | $112,192 |
| Mariam Sternberg | unknown |
| Lorraine Takesky | minority owner |
| Mitch Teller | unknown |
| Kenneth Tesslar | minority owner |
| Kenneth Tessler | minority owner |
| Aaron Unger | $127,801 |
| unknown | $10,874,24unknown |
| Eila Vinitzky | unknown |
| Yuliya Vinokurova | unknown |
| Jeffrey Vogel | minority owner |
| Sherman Vogel | minority owner |
| Peggy Weberman | unknown |
| Philip Weberman | unknown |
| Toby Weinberger | $127,801 |
| Zoltan Weinberger | unknown |
| Regina Weinstock | $477,717 |
| Ari Weiss | unknown |
| Berish Weiss | unknown |
| Berry Weiss | unknown |
| Micahel Weiss | minority owner |
| Michael Weiss | minority owner |
| Robyn Weiss | $339,644 |
| Shlomie Weiss | unknown |
| Chaya Willinger | unknown |
| Robert Wolf | $127,801 |

| | |
|---|---|
| Peyman Younesi | unknown |
| Mark Zaffrin | minority owner |
| Ephraim Zagelbaum | unknown |
| Kenneth Zitter | unknown |
| David Zohler | unknown |

**THIRD CAUSE OF ACTION AGAINST PARTY-IN-INTEREST DEFENDANTS TO RECOVER PLAN ASSETS DIVERTED BY PARTIES-IN-INTEREST IN PROHIBITED TRANSACTIONS**

474. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

475. Party[ies] in interest for purposes of this Complaint is used to describe a person who receives monies, property or assets which is not at arms-length aiding in the scheme, wittingly or unwittingly, as their names may appear herein, along with other Parties-in-Interest not yet known, are identified herein as Parties-in-Interest on the diversion of funds intended for benefits of the Class of employees. Intervention Pg 122 Par 268.

**Parties-in-Interest**

476. Parties-in-Interest are identified as receiving and converting Plan Assets and or aiding and abetting conversion of Plan Assets. Intervention Pg. 69 Par 113.

477. Parties-in-Interest were either paid from the scheme, aided in the diversion of funds and assets intended to be held to pay for benefits for injured employees of Employers, or became principals and instrumentalities investing in enterprises owned by Parties-in-Interest, such as a real estate and capitalization, development, chartering and licensing of a private carrier with Fund assets intended for benefits for the Class. One such enterprise was S & P Insurance. Intervention Pg. 71 Par 114, Pg. 71 Par 115, Pg. 71 Par 116, Pg. 71 Par 117, Pg. 72 Par 118, Pg. 72 Par 119, Pg. 72 Par 120, Pg. 73 Par 121. Pg. 73 Par 12, Pg. 73 Par 123, 73 Par 124, Pg. 74 Par 125,, Pg. 74 Par 126, Pg. 74 Par 127, Pg. 74 Par 128, Pg. 74 Par 129, Pg. 75 Par 130, Pg. 66 Par 90, Pg. 66 Par 91, Pg. 66 Par 92, Pg. 66 Par 93, Pg. 66 Par 94, Pg. 67 Par 95, Pg. 67 Par 96, Pg. 67 Par 97, Pg. 67 Par 98, Pg. 67 Par 99, Pg. 67 Par 100, Pg. 68 Par 101, Pg. 68 Par 102, Pg. 68 Par 103, Pg. 68 Par 104, Pg. 68 Par 105, Pg. 68 Par 106, Pg. 69 Par 107, Pg. 69 Par 108.

478. Plaintiff seeks monetary and equitable relief in connection with defendants' improper, fraudulent, and unlawful diversion, embezzlement and defalcation to an offshore fund which the parties to this Nassau County case are attempting to take beyond the reach of the Class in the following amounts: Intervention Pg 122 Par 269.

479. Prohibited transactions under ERISA so far identified for the period June 11, 2010 through May 1, 2018, but not limited to, are as follows: list Intervention Pg 123 Par 269.

| | |
|---|---|
| Berkshire | $8,306,850 |
| Spencer Street Realty | $15,937,849 |
| Allstate ASO | $1,740,128 |
| Customer Withdrawals | $4,577,084 |
| Sam Schlesinger | $2,020,647 |
| Pitterman Family Trust | $1,891,037 |
| Wolf Eisenbach | $1,479,965 |
| National Financial Service | $1,415,972 |
| Dana K. Miklos | $1,153,532 |
| Israel Zeigelman | $619,612 |
| North American Mktg Spec Inc. | $589,218 |
| National Financial Service | $345,099 |
| B Kogan PLLC | $771,151.31 |
| Ira Lipsius and/or his firm of Lipsius-Benhaim Law, LLP | $797,329 |
| Christopher Buckey and/or his law firms Whiteman Osterman and Hanna, LLP and Cullen and Dykman, LLP | $1,101,395 |

These identified prohibited transactions total $42,746,868, but the diversion in fact exceeds $68 million, which includes unknown and unaccounted for of $25,253,132, presumed diverted, converted, and embezzled in prohibited transactions.

480. The Owner Operator Defendants and Party-in-Interest Defendants took advantage of assets diverted to develop business enterprises as fronts to give the appearance of providing benefits, while diverting tens of millions of dollars of accrued and expensed benefits to and for the use of the Owner Operator Defendants and Party-in-Interest Defendants.

481. The Owner Operator Defendants and Party-in-Interest Defendants are responsible for and are liable for the $68 million damages in prohibited transactions.

**FOURTH CAUSE OF ACTION AGAINST IDENTIFIED OWNER OPERATOR DEFENDANTS FOR BREACH OF ERISA FIDUCIARY DUTIES IN THE DIVERSION OF $68 MILLION IN PLAN ASSETS**

482. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

483. Upon information and belief, the amounts recoverable in this Fourth Cause of Action overlap the amounts recoverable in the Second Cause of Action. Intervention Pg 119 Par 265.

484. The Owner Operators in control of the Employers are individually liable in damages in the share that they have received by direct payment or accounting considerations in corporate distributions as follows: Intervention Pg 119 Par 266.

| Owner Operators | 68 Mil |
|---|---|
| Gabor Adler | $578,360.83 |
| George Adler | $578,360.83 |
| Kwame Amoafo-danquah | $7,516.81 |
| Agnes Arnestein | $280,399.78 |
| Anthony Bacchi | $2,693,748.08 |
| Matthew Barbara | $215,979.56 |
| Paul Barbara | $215,979.56 |
| Aaron Becher | $655,896.29 |
| Pola Becher | $83,673.93 |
| Hershel Bedansky | $307,585.68 |
| Howard Belford | $215,979.56 |
| Scott Bialick | $215,979.56 |
| Robert Bleier | $292,139.86 |
| David Bloom | $578,360.83 |
| Paula Bokow | $118,263.67 |
| Joel Brach | $245.19 |
| Natan Brach | $118,263.67 |
| Barry Braunstein | $215,979.56 |
| Murray Bresky | $215,979.56 |
| Steven Brown | $215,979.56 |
| Philip Buchsbaum | $215,979.56 |
| Richard Bursek | $244,163.75 |
| Richard Busell | $215,979.56 |
| Colin C. Hart | $50,019.55 |

| | |
|---|---|
| Ira Cammeyer | $362,381.27 |
| Alan Chopp | $125,776.62 |
| Joshua Chopp | $118,263.67 |
| David Cohen | $118,263.67 |
| David Crytryn | $83,673.93 |
| David Dachs | $18,424.18 |
| Solomon Eidlisz | $102,022.14 |
| Neil Einhorn | $362,381.27 |
| Scott Einiger | $215,979.56 |
| Abraham Eisen | $118,263.67 |
| Sam Eisen | $6,622.16 |
| Steve Eisman | $215,979.56 |
| Ignatius Elefant | $108,510.19 |
| Philipson Family Trust | $80,652.10 |
| Martin Farbeblum | $765,424.85 |
| Benjamin Farbenblum | $121,632.85 |
| Ed Farbenblum | $488,327.51 |
| Edward Farbenblum | $486,624.20 |
| Martin Farbenblum | $1,639,511.17 |
| Michael Farbenblum | $199,168.31 |
| Esther Farkovits | $523,803.82 |
| Jordan Fensterman | $215,979.56 |
| Lori Fensterman | $3,273,243.69 |
| Robert Fensterman | $2,233,186.76 |
| Staci Fensterman | $215,979.56 |
| Samuel Ferrara | $215,979.56 |
| Mayer Fischl | $1,008,024.65 |
| Benjamin Fishoff | $540,395.70 |
| Patrick Formato | $215,979.56 |
| John Francher | $603.03 |
| David Freid | $83,673.93 |

79

| | |
|---|---|
| Moshe Freilich | $81,393.35 |
| Andrew Freundlich | $362,381.27 |
| Sigmund Freundlich | $362,381.27 |
| Leo Friedman | $80,652.10 |
| David Gast | $24,040.99 |
| Louis Gellis | $9,543.17 |
| William Gillick | $36,247.59 |
| Rivky Goldberger | $83,673.93 |
| Leon Goldenberg | $118,263.67 |
| Jeffrey Goldstein | $127,555.00 |
| Anne Gottleib | $18,424.18 |
| Miklows Gottlieb | $350,038.11 |
| Niklos Gottlieb | $63,788.27 |
| Solomon Green | $118,263.67 |
| Joel Greenberg | $215,979.56 |
| Eric Greenberger | $63,005.05 |
| Eli Greenspan | $215,979.56 |
| Steven Greenstein | $215,979.56 |
| Avrumi Grossman | $156,984.35 |
| Marton Guttman | $27,041.67 |
| Valarie Henry | $12,889.82 |
| Johanan Hirsch | $121,632.85 |
| Leopold Hirsch | $121,632.85 |
| Libe Hirsch | $118,263.67 |
| Ruth Hirsch | $722,600.10 |
| David Hoffman | $362,381.27 |
| Pinchos Hoffman | $77,535.46 |
| Pinchus Hoffman | $362,381.27 |
| Steven J Eisman | $3,155,817.91 |
| Anthony J. Bacchi | $215,979.56 |
| Jack Janklowicz | $214,051.56 |

| | |
|---|---|
| Leonard Janklowicz | $214,051.56 |
| Jack Janklowitz | $18,348.20 |
| Shorefront Jewish Geriatric Center | $122,460.34 |
| David Jones | $170,988.51 |
| Judith Jones | $153,889.65 |
| Mendel Kaff | $81,393.35 |
| Eric Kalt | $77,535.46 |
| Yoel Karpen | $45,811.99 |
| Miriam Karpf | $5,711.02 |
| Allen Kass | $215,979.56 |
| Martin Kass | $215,979.56 |
| Martin Katz | $48,241.16 |
| Shelley Katz | $215,979.56 |
| Shelly Katz | $48,241.16 |
| Manny Kaufman | $0.00 |
| Yosef Kaufman | $18,424.18 |
| Alan Kessler | $264,220.73 |
| Arnold Klapper | $121,632.85 |
| George Klein | $362,381.27 |
| Larry Klein | $362,381.27 |
| Eleanor Kluger | $2,500.48 |
| Robert Kolman | $77,535.46 |
| Dean Korlik | $633,052.43 |
| William Korn | $362,381.27 |
| Irina Kostesky | $362,381.27 |
| Howard Krant | $219.46 |
| Ephram Lahasky | $24,040.99 |
| Benjamin Landa | $3,622,728.89 |
| David Landa | $413,572.18 |
| Yechiel Landa | $83,673.93 |
| Nathan Landau | $41,492.88 |

| | |
|---|---|
| James Lapolla | $106,862.65 |
| Tibor Lebovich | $244,163.75 |
| Morty Lehasky | $120,204.93 |
| David Leifer | $307,585.68 |
| Barry Leistner | $215,979.56 |
| Chana Lerner | $578,360.83 |
| Michael Levitan | $215,979.56 |
| Rich Levitan | $215,979.56 |
| Teddy Lichtscein | $83,673.93 |
| Neuman Lj Partners | $118,263.67 |
| Isaac Madeb | $118,263.67 |
| Dovi Marc Faivish | $48,241.16 |
| Sam Mayerovitz | $413,572.18 |
| Girshas Minster | $362,381.27 |
| Neuman Mn Partners | $236,527.35 |
| Gavriel Mordechaev | $18,348.20 |
| Gabriel Mordechey | $83,673.93 |
| Sharyn Mukamal | $215,979.56 |
| Katherine Muller | $48,241.16 |
| Laurie Netzer | $362,381.27 |
| Leo Oberlander | $32,991.46 |
| Sander Oberlander | $2,198.89 |
| Milton Ostreicher | $83,673.93 |
| Susan Ostreicher | $1,441,096.61 |
| Irwin Peckman | $215,979.56 |
| Ben Philipson | $6,267,329.87 |
| Bent Philipson | $215,979.56 |
| Deborah Philipson | $776,792.36 |
| Robert Pines | $215,979.56 |
| Israel Pollak | $77,535.46 |
| Jacob Pollak | $77,535.46 |

82

| | |
|---|---|
| Natan Pollak | $118,263.67 |
| Renee Pollak | $159,470.66 |
| Sylvia Pollak | $118,263.67 |
| Theodore Pollak | $83,673.93 |
| Michael Pruzansky | $77,535.46 |
| Diana R. Koehler | $219.46 |
| Jonathan Redner | $307,585.68 |
| Lawrence Reichenberger | $215,979.56 |
| Mark Reisman | $157,006.30 |
| Mayer Rispler | $123,491.34 |
| Brian Rosenman | $32,991.46 |
| Kenneth Rozenberg | $1,755.69 |
| Berish Rubenstein | $215,979.56 |
| Dina Rubenstein | $77,535.46 |
| Rivkie Rubenstein | $118,263.67 |
| Ira Rubin | $48,241.16 |
| Malky Saffran | $63,788.27 |
| Boruch Schepps | $14,923.35 |
| Pamela Schepps | $219.46 |
| Nat Scherman | $18,424.18 |
| Richard Schildron | $215,979.56 |
| Samuel Schlesinger | $370.67 |
| Jacob Schoenberger | $26,578.91 |
| Michael Schwartz | $362,626.46 |
| Leslie Shafrank | $362,381.27 |
| Henry Shayovitz | $215,979.56 |
| Agnes Shemia | $144,573.61 |
| Jeff Shemia | $144,573.61 |
| Alexander Sherman | $50,019.55 |
| Israel Sherman | $114,978.19 |
| Leah Sherman | $50,019.55 |

| | |
|---|---:|
| Nat Sherman | $362,381.27 |
| Samuel Sherman | $256,673.55 |
| Warren Sherman | $307,585.68 |
| Hindy Sirkis | $215,979.56 |
| Moshe Sirkis | $831,188.76 |
| Alexander Skoczlas | $118,263.67 |
| Joseph Skoczylas | $118,263.67 |
| Tali Skoczylas | $118,263.67 |
| Dominic Spira Md | $9,223.42 |
| Jonathan Steinberg | $478.18 |
| Miriam Steinberg | $478.18 |
| Ronald Stern | $97,288.96 |
| Mariam Sternberg | $226,099.77 |
| Lorraine Takesky | $215,979.56 |
| Mitch Teller | $48,241.16 |
| Kenneth Tesslar | $215,979.56 |
| Kenneth Tessler | $215,979.56 |
| Aaron Unger | $83,673.93 |
| UNKNOWN | $4,350,317.18 |
| Eila Vinitzky | $21,069.03 |
| Yuliya Vinokurova | $488,327.51 |
| Jeffrey Vogel | $215,979.56 |
| Sherman Vogel | $215,979.56 |
| Peggy Weberman | $118,263.67 |
| Philip Weberman | $118,263.67 |
| Toby Weinberger | $83,673.93 |
| Zoltan Weinberger | $27,041.67 |
| Regina Weinstock | $121,632.85 |
| Ari Weiss | $157,006.30 |
| Berish Weiss | $19,753.50 |
| Berry Weiss | $108,510.19 |

84

| | |
|---|---|
| Micahel Weiss | $215,979.56 |
| Michael Weiss | $215,979.56 |
| Robyn Weiss | $362,381.27 |
| Shlomie Weiss | $41,492.88 |
| Chaya Willinger | $63,005.05 |
| Robert Wolf | $83,673.93 |
| Peyman Younesi | $4,673.92 |
| Mark Zaffrin | $215,979.56 |
| Ephraim Zagelbaum | $6,021.57 |
| Kenneth Zitter | $494,557.18 |
| David Zohler | $156,984.35 |

**FIFTH CAUSE OF ACTION UNDER 42 U.S.C. 1983 INVOKING 42 U.S.C. 1981 AND 1985 AGAINST THE PARTY-IN-INTEREST DEFENDANTS AND OWNER OPERATOR DEFENDANTS IN COMPLICITY WITH STATE OFFICER DEFENDANTS CONSPIRING TO DEPRIVE THE CLASS OF RIGHTS AND PRIVILEGES DENYING EQUAL PROTECTION OF THE LAWS UNDER THE 14TH AMENDMENT**

485. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

486. It was conspired as part of the scheme to defraud to cover the diversion of Plan assets that Employers electronically filed annual Cost Reports (Form RHCF-4) with the DOH for the years 2002 through the present as payments for benefits to the Class, when in fact, the funds were diverted to Prohibited transactions Defendants. The Owner Operator Defendants and Parties-in-Interest diverted funds received from Medicaid, private pay, Medicare and insurance, converted to be unreachable by Class to reimburse claims paid on behalf of employees of the Employers. Intervention Pg. 128 Par 297.

487. Owner Operator Defendants made representations in Cost Reports to the DOH regarding expenses for employee benefits which included statements that insurance coverage was being provided by party in interest Allstate as represented by its billing. The fraudulent scheme is premised on the unlawful siphoning the Employers' Medicaid, private pay, Medicare and insurance funds reported as intended for employee benefits. By virtue of the acts described here, the Owner Operator Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay money to the State, and/or knowingly concealed or knowingly and improperly received

85

funds which were not used for their intended and represented purpose. Intervention Pg. 128 Par 298.

488. The DOH was at best grossly negligent, bordering on intentional conduct in its management of Medicaid/Medicare payments to the benefit of certain of the Employers that provide Cost Reports upon which the rate per occupied bed was computed by the DOH in accordance with 10 N.Y. Comp. Codes R. & Regs. § 86-2.10. The DOH with gross negligent and conscious disregard, accepted the certified costs numbers that were accrued in Cost Reports to the DOH, failing to verify the representations of the Employers that the costs incurred were in accordance with Centers for Medicare and Medicaid Services ("CMS") directives for "administering the Medicare and Medicaid programs" and "interpret[ing] Medicare policies, procedures and rules". CMS provides detailed guidance for completing Medicare Cost Reports in their Medicare Provider Reimbursement Manual covering expenses for commercial insurance or self-insured with funds held in a commercial bank. CMS specifies that certain fringe benefits qualify for inclusion in the hospital's costs, including the cost of any health insurance premiums incurred on behalf of employees on behalf of the Employers, Part I, § 2144.4.4, 42 C.F.R. § 413.24(f)(4)(iv). The Provider Reimbursement Manual is authority to implement Medicare regulations.

489. It was a part of the scheme that the reimbursements received by the Defendants were diverted from and not used to fund the 114 Trusts with the Trust Defendant, the same funds identified as the Loss Retention Fund in the Lead Action. Intervention Pg. 129 Par 299.

490. Philipson personally or through agents, allegedly made purchases of insurance coverages or made recommendations with respect thereto, facilitating the placement of health, workers' compensation and disability coverage, while furthering the scheme using the opportunity and superior knowledge, access and experience of Philipson to accomplish the embezzlement. Intervention Pg. 129 Par 300.

491. As a result of the relationship between Owner Operator Defendants and Philipson, including, but not limited to, their role of control and superior knowledge and information regarding the occupational and non-occupational benefit plans for employees, along with ownership in the Employers in common with other Owner Operator Defendants, caused the Employers to file Cost Reports to the DOH of costs expensed and payment of employee benefits. Intervention Pg. 129 Par 301.

**What Happened to the Monies Expensed in Cost Reports to Fund the ERISA Plan and Program?**

492. The Employers received funds from Medicaid, Medicare, private pay, and insurance. Intervention Pg. 62 Par 68.

493. The Employers electronically filed annual Cost Reports (Form RHCF-4) with the DOH for the years 2002 through the present, when in fact, the Plan funding reported in these Cost Reports was diverted for personal purposes instead of held to pay benefits under the Program. Intervention Pg. 62 Par 69.

494. Such funds received by the Defendants were diverted from and not used to fund the 114 Trust or otherwise used by the Owner Operator Defendants to pay or reimburse the payment of benefits paid to the Class on behalf of the Employers. Intervention Pg. 62 Par 70.

495. It was part of the scheme that from 2002 to the present, the Defendants would and did submit false and fraudulent annual Cost Reports to the DOH via interstate wire (electronic filing), to report expenses by the Employers. Intervention Pg. 62 Par 71.

496. It was part of the scheme, as a result of the relationship between Owner Operator Defendants and Defendant Philipson, including, but not limited to, their role and superior knowledge and information regarding the occupational and non-occupational benefit plans for Employers' employees, along with ownership in the Employers in common makes the Owner Operator Defendants, knowledgeable of the Cost Reports represented and submitted to the DOH. Intervention Pg. 63 Par 77, Pg. 64 Par 78.

497. Employers reported in Cost Reports to the DOH expenses for employee benefits which included statements that insurance coverage was being provided by Allstate as represented by its billing to the Employers. Intervention Pg. 64 Par 79, Pg. 65 Par 83, Pg. 65 Par 84, Pg. 65 Par 85, Pg. 65 Par 87.

498. Medicaid, private pay, Medicare and insurance funds reported as intended for employee benefits, the Defendant knowingly made, used, or caused to be made or used, false records or statements material to an obligation for the Government to pay money, and/or knowingly concealed or knowingly and improperly receiving funds which were not used for their intended and represented purpose. Intervention Pg. 64 Par 80.

499. Through the above-described conduct, Owner Operator Defendants knowingly presented or caused to be presented false or fraudulent reports for payment or approval; and/or made, used, or caused to be made or used, a false record or statement to get false or fraudulent claims paid or approved; and/or made, used, or caused to be made or used, false records or statements to conceal that Owner Operator Defendants were diverting funds. Intervention Pg. 64 Par 82.

500. Through the above-described conduct, agents of Employers knowingly presented or caused to be presented false or fraudulent reports for payment or approval; and/or made, used, or caused to be made or used, a false record or statement to get false or fraudulent claims paid or approved; and/or made, used, or caused to be made or used, false records or statements to conceal the diversion of Plan Assets. Specifically, agents filed on behalf

87

of Employers annual Cost Reports with the New York DOH, which among other things, impliedly and certified that Employers were in compliance with all applicable laws and regulations. Intervention Pg. 129 Par 302.

501. It was part of the scheme for the agents to provide false certification where the act of submitting false reports themselves imply compliance with governing rules that are a precondition to payment by the DOH. Intervention Pg. 130 Par 303.

502. It was part of the scheme for Owner Operator Defendants to submit claims falsely representing and certifying compliance with a statute, regulation, or contractual provision, compliance being a precondition to State DOH payment of the claim. Intervention Pg. 130 Par 304.

503. It was part of the scheme for the Owner Operator Defendants to fail to disclose noncompliance with material statutory, regulatory, or contractual requirements. Intervention Pg. 130 Par 305.

504. Owner Operator Defendants well knew that Plan services were not lawfully represented in the billing, yet the Owner Operator Defendants engaged in a continuous and pervasive pattern of deceiving the DOH by Defendants' filing false Cost Reports when in fact the pattern and practice was to receive the monies and then divert the reimbursement for purposes other than as represented to the DOH. Intervention Pg. 130 Par 306.

505. Owner Operator Defendants owe the Class of Employees and the Trust Defendant a common-law fiduciary duty to act in good faith. Intervention Pg. 130 Par 307.

506. As a direct and proximate cause of Owner Operator Defendants' breaches, Plaintiffs and the Class have suffered damages including, but not limited to, additional and ongoing life of claim costs for medical treatment and reimbursement of lost wages of employees of Employers which are unable to be reimbursed out of trust funds because the trusts have not been funded. Intervention Pg. 130 Par 308.

507. The Party-in-Interest Defendants, Owner and Operator Defendants, conspired and acted under color of law to deny plaintiff equal protection of the laws under the 14th Amendment to the United States Constitution of individual and collective constitutional rights of the Class. Intervention Pg. 130 Par 309.

508. The Parties-in-Interest, and Owner/Operator Defendants conspired with State Officers to deprive the Class of rights and privileges to deny equal protection of the laws under the 14th Amendment and must respond in monetary damages in an amount set forth at the First, Second, Third, Fourth, Fifth, Sixth and Seventh Causes of Action herein to be determined after trial. Intervention Pg. 131 Par 310.

509. Then the COVID-19 pandemic exposed it all, causing immense and continuing damages to the Class Plaintiff.

510. The actions of the State Officer Defendants, in particular the order of the DOH March 25, 2020 issued by the State Officers, were actions of under color of law preceded by denial of rights of the Class Plaintiff to access to knowledge and skills to compete for employment and advancement in pay and grade, denial of benefits to the Class Plaintiff for apprenticeship, continuing education, health, disability, workers' compensation, and has led to the illness and injury of the Class Plaintiff, in damages in excess of the $68 million which was diverted away from the ERISA Plan and includes all consequential damages.

**SIXTH CAUSE OF ACTION UNDER 42 U.S.C. 1983 INVOKING 42 U.S.C. 1981 AND 1985 AGAINST THE PARTY-IN-INTEREST DEFENDANTS AND OWNER OPERATOR DEFENDANTS CONSPIRING WITH STATE OFFICERS TO DEPRIVE THE CLASS OF RIGHTS AND PRIVILEGES DENYING EQUAL PROTECTION OF THE LAWS UNDER THE 14TH AMENDMENT**

511. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

512. In violation of ERISA's fiduciary duty and prohibited transaction provisions, the Owner Operator Defendants and Parties-in-Interest Defendants, as part of the scheme, the Owner Operator Defendants in the operation of their Plan diverted from their Plan funds identified for workers' compensation, health and disability benefits, diverting Plan assets needed to cover benefits in violation of their fiduciary duties to act solely in the interest of the Class as plan participant beneficiaries, Plan assets are for the exclusive purpose of providing benefits to the Class along with specific identified expenses of their Plan. The Owner Operator Defendants in control of their Plan, failed to carry out their duties. Intervention Pg. 135 Par 332.

513. Under 29 U.S.C.S. §1003(b)(3), the Plan of the Employers was not maintained solely for the purpose of complying with workers' compensation laws, therefore their Plan is preempted by ERISA, 29 U.S.C.S. § 1001 et seq. Intervention Pg. 135 Par 333.

514. Owner Operator Defendants in a scheme to defraud their Plan as an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1)(a) of ERISA, exercised control and management over fund assets under 29 U.S.C. 186(c)(5) "employee benefit plans" within the meaning of 29 U.S.C. 1002(37), (1), (2) and (3), the Owner Operator Defendants are fiduciaries under ERISA. Intervention Pg. 136 Par 334.

515. Under ERISA, a fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to [them]." 29 U.S.C. §1104(a)(1). Intervention Pg. 136 Par 335.

516. Each Owner Operator Defendants retained authority on their Plan Funds and payments from their Plan. As part of the scheme the Owner Operator Defendants as fiduciaries used fund assets to satisfy other personal or business obligations or otherwise underfunded the obligations, breaching their fiduciary duty under ERISA. Under ERISA, any person who is a fiduciary with respect to the plan who breaches any one of the responsibilities, obligations, or duties imposed upon fiduciaries is personally liable "to make good to such plan any losses to the plan resulting from each such breach, and to restore the plan any profits of such fiduciary which have been made through the use of assets of the plan by the fiduciary..." 29 U.S.C. §1109(a). Intervention Pg. 136 Par 336.

517. The Party-in-Interest Defendants and State Officer Defendants have used the law to cover and hide their offenses, giving them the appearance of legality, all while the State Officers stood by and watched the misapplication of the law, not lifting one iota to straighten out the miscarriage, knowing intimately that the Owner Operator Defendants were misusing the rulings of State Officers to cover prohibited transactions of party in Interest Defendants, knowing that the law and the rulings of State Officers were being misapplied and misinterpreted to cover and justify the looting by the Defendants, looting that must be disgorged and forfeited back to trust. Intervention Pg. 136 Par 337.

518. The Party-in-Interest Defendants and State Officer Defendants' intent is to drive the Plan, Program and Trust into insolvency, liquidation making it extremely unlikely that the State Officers will pursue the Owner Operator Defendants, Party-in-Interest Defendants, or any other parties receiving booty from funds that should have been paid into trust, and the Parties-in-Interest knowing, relying and expecting the State Officers all the while knowing of the defalcation by the Owner Operator Defendants, releasing the Owner Operator Defendants from their obligations to the trust and to their Plan participant Class of employees. Intervention Pg. 137 Par 338.

519. From at least about May 23, 2017, and long before dating back to May, 2002, and continuing to date, in or about the State of New York, and elsewhere, the Party-in-Interest Defendants in the Program and Trust and the State Officers, together and with others known and unknown, to obtain money and property by false pretenses, representations, and promises, did knowingly communicate to effectuate the scheme by means of electronic communications, signs and signals or facsimile transmissions, and did willfully, knowingly combine and conspire and agree to deny equal protection of the laws as guaranteed by the 14th Amendment to the US Constitution, enforced by 42 U.S.C. 1983, by executing a scheme to divert, convert and secrete money and property by means of and for the purpose of executing the scheme, knowingly caused to be delivered by transmitting or cause to be transmitted by means of wire, radio, or television, communication, writings, signs, signals, pictures, or sounds all to cause and carry out the purpose of the conspiracy. It was part of the conspiracy for Party-in-Interest Defendant

90

Lipsius to communicate with State Officer Defendant Lees in furtherance of the conspiracy, and to achieve the objects thereof, the Defendants as co-conspirators, each for their part in the scheme. Conspirators known and unknown, committed the overt acts set forth herein, and other overt acts in furtherance of the conspiracy as a continuing conspiracy, even though participants in the conspiracy have changed over time, the preceding are only the most recent events. These recent events were preceded by acts beginning in May 2002, starting a pattern beginning on May 1, 2002, involving the same Employers with some attrition and new participants from time to time from then to the present, and involving State Officers who preceded the State Officers joined herein. Intervention Pg. 137 Par 339.

520. Section 1983, 42 U.S.C. 1983, provides every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State subjects, or causes to be subjected, members of the Class or other person within the jurisdiction thereof to the deprivation of rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the Class in action at law, suit in equity, or other proper proceeding for redress. Intervention Pg. 138 Par 340.

521. Under color of State law, State action occurred in the exercise of power possessed by virtue of state law, making possible the scheme because co-conspirators clothed with the authority of state law provided the means and methods for the Owner Operator Defendants to be able to divert funds intended for benefits to the Class. The acts of State Officers caused harm and is a result of executed regulation or decision officially adopted and authorized by the State, the State created a danger by its enforcement policies affecting the Class, and there is a corresponding duty by the State Officers to protect the Class, giving rise to a 42 U.S.C. § 1985 Action to vindicate Fourteenth Amendment rights of equal protection of the laws and due process of laws. Intervention Pg. 138 Par 341.

522. It is prayed that the Party-in-Interest Defendants conspiring with State Officers to deprive the Class of rights and privileges denying equal protection of the laws under the 14th Amendment, be enjoined under 42 U.S.C. §1983 from conspiring to deny the Class Equal Protection of Laws under Color of Law, in violation of the 14th Amendment to the US Constitution, and that they all respond jointly and severally in monetary damages. Intervention Pg. 138 Par 342.

523. The acts of Defendant Government Agencies and each of them have violated of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §§§1981, 1983 and 1985.

524. Plaintiff Percy and the Class he represents have been constantly denied due to such acts in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §§§1981, 1983 and 1985, depriving the Percy Class of opportunity, entitling the

91

Percy Class to actual damages for lost wages, for lost opportunity and compensation as money damages, not limited to members of the Class, but also including members of the Percy Classes' children and families, significantly disadvantaged in education and skills, struggling to get a job, for damages under 42 U.S.C. §1985 against Defendant Government Agencies and State Officer Defendants conspiring with the Owner Operator Defendants and Party-in-Interest Defendants to Violate 14th Amendment Equal Protection Constitutional Rights of the Class to the benefit of 42 U.S.C. §2000e-2 Alternative Employment Practice under Color of Law.

## Damages for an illegal employment practice

525. Damage and injury has been caused to members of a class of persons injured on the job, injured primarily because of the negligent or intentional behavior of the Owner Operator Defendants of Employers to conduct on-the-job training with related classroom instruction is a function of an alternative employment practice demonstrated and delivered to the Defendants as safety and loss management under the National Apprenticeship Act, demonstrated to have provided to the risk control manager of Defendants, for almost 20 years, the Owner Operator Defendants failed to adopt this demonstrated employment practice.

526. The State of New York Government Agencies by their State Officer Defendants , took overt steps to dismantle the Percy employment practice undermining the Percy employment practice by the actions of State Officer Defendants under color of law.

527. The Executive Branch of New York government, through its appointed Commissioner of Insurance, failed to acknowledge and give credit to the Percy Alternative Employment Practice demonstrated as provided through Workers' Compensation Insurance to the Owner Operator Defendants, causing egregious injury to the Class as a whole, and in particular, beginning with the attempted receivership to terminate the Percy Alternative Employment Practice brought by then NY Attorney General Andrew Cuomo in 2006 which he lost with prejudice on December 6, 2007. Nevertheless, He continued permitting an illegal employment practice with particular disparate impact upon the Percy subclass under color of law, by the State Officer Defendants permitting this illegal employment practice under 42 U.S.C. 2000 e-2.

### SEVENTH CAUSE OF ACTION AGAINST THE GOVERNOR OF THE STATE OF NEW YORK AND THE DEFENDANT GOVERNMENT AGENCIES FOR FAILURE OF GOVERNOR'S EXECUTIVE ORDER 45

528. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

529. This Cause of Action is on behalf of a sub-class of the Class herein involving liability of the Employers for unlawful discriminatory employment practices, the sub-class being

"black or Spanish-surnamed persons who are capable of performing, or capable of learning to perform" in skilled occupations (herein the "Percy Sub-Class") entitled to apprentice training and continuing education in safety and skills. The Percy Sub-Class herein is united in interest with the class as certified in Percy v. Brennan reported at 384 F Supp 800 of November 8, 1974. Case 73-cv-04279 (the "Percy Class"). Intervention Pg. 91 Par 181.

530. Members of the Percy Class undertake to enforce the Percy Class Settlement in Case 73-cv-04279, now the "Alternative Employment Practice" pled herein, against defendant State of New York and others, for failure of settlement involving New York State Executive Order 45 (9 NYCRR 3.45, Docket #6, Attachment 14, EDNY Case No. 21-cv-01366) and"Executive Order 45, Docket #6, Attachment 11 in EDNY Case No. 21-cv-01366") for enforcement of the Settlement. The Percy Class action is pending identification of the current members of the Percy Class with a reasonable degree of certainty using census records and other cultural scoring to identify Percy Class Members. Intervention Pg. 91 Par 182.The acts of Defendants Governor of the State of New York and his Government Agencies and each of them violated and deprived the Class Plaintiff of opportunity, entitling the Class to actual damages for lost wages, for lost opportunity and compensation as money damages, not limited to members of the Class, but also including members of the Percy Classes' children and families, significantly disadvantaged in education and skills, struggling to get a job, damaging the families of the members of the Percy Class, in an amount to be determined at trial.

531. The Defendant Government Agencies, Owners and Employers have failed to provide a mechanism which enables disenfranchised persons ready and able to work, to gain experience on-the-job and join the gainfully employed workforce.

532. The Defendant Government Agencies, Owners and Employers have conspired, obfuscated, shirked and otherwise simply delegated the responsibility for the enforcement of these regulations which protect the Percy Class.

533. The Advocates later herein identified, explained that the Class is ready and able to work, has consistently been deprived of the opportunity to obtain employment at the facilities and projects which receive Federal Funding.

534. In depriving the Percy Class the equal opportunity, the Employers have covered up by the use of some minority business enterprise contractors only as fronts in order to appear to satisfy the contract requirements of hiring the identified minority and disadvantaged, failing to place the Percy Class on a level playing field and depriving the Class of vast numbers of real employment opportunities.

535. The Defendant Owner Operator Defendants of Employers must sustain a very heavy burden of justification to show that there are no less onerous alternatives for achieving

the purpose of affirmative action in equal employment opportunity, and yet to exacerbate this inaction, the Government Agencies have intentionally or unwittingly provided support and comfort to others yet to be identified and not named at this time, who have interfered and obstructed the Percy Program Alternative Employment Practice.

536. The proof will show that the State has actively supported and aided scoundrels who have taken improper advantage of the Percy Program, undermining the unique qualities and subverting the Percy Program to the scoundrels' selfish and illegal purposes, undermining the viability of the Percy Program, injuring the Percy Class's efforts to obtain by self-help the relief for which it sued Percy v. Brennan Case 73-cv-04279.

537. The Percy Class ready and able to work, is a proper party to invoke judicial resolution of the dispute. This is not a suit merely for the ventilation of public grievances, there is injury-in-fact as set forth here as damages for lost wages and lost opportunity along with prospective equitable relief enjoining the Defendants from undermining the Percy Program, and mandating adoption of the Alternative Employment Practice.

538. This plenary action is brought by Percy on behalf of Class Plaintiffs, to enforce the Memorandum/Order and Order and settlement in the lawsuit by Percy seeking relief as affirmative action for apprenticeship to develop skills and equal employment opportunity enforcing the Civil Rights Act and LBJs Presidential EO 11246, still on the books and written into all Federal Funding.

539. This Action is to require affirmative action by providing Apprenticeship Training pursuant Fitzgerald Act (29 U.S.C. § 50, the National Apprenticeship Act of 1937, section 1 (29 U.S.C. 50) under U.S. Department of Labor's Bureau of Apprenticeship and Training (BAT) and 29 C.F.R. Subt. A, Pt. 29 and Pt. 30 and as may be delegated by the US Department of Labor Bureau of apprenticeship training and complies with the following New York State Department of Labor regulations: Equal Employment Opportunity in Apprenticeship Training (Part 600), Regulations Governing the Registration of Apprenticeship Programs and Agreements (Part 601), and Labor Law, Apprenticeship Training (Article 23).

540. 40 U.S.C. § 121 (formerly 42 U.S.C. 486(a)) is the source of the Executive power to issue EO 11246, authorizing the President to prescribe such policies and directives as he deems necessary to effectuate the provisions of Chapter 10 of Title 40.21 and Chapter 4 of Title41. 22, chapters dealing with procurement of Government property and services, not limited to federal assistance programs. The federal government has a vital interest in assuring that the largest possible pool of qualified manpower be available for the accomplishment of federally assisted projects.

541. Discrimination in employment affects the cost and the progress of projects in which the federal government has both financial and completion interests.

542. 40 U.S.C. § 121 imposes no restraint upon the measures which the President may require of the beneficiaries of Federal Funding where discrimination would adversely affect cost and progress of federally funded projects. The strong federal interest in ensuring that the cost and progress of these projects were not adversely affected by an artificial restriction of the labor pool caused by discriminatory lack of skilled craftsmen in employment practices, federal procurement acts provide constitutional authorization for the nexus between the efficiency and economic criteria of the federal procurement acts thereby establishing the sufficiently close nexus sought by the Supreme Court in Fullilove v Klutznick 448 U.S. 448, 100 S. Ct. 2758, 2785-90, 65 L. Ed. 2d 902 1980, where application must be reasonably related to the Procurement Act's purpose of ensuring efficiency and economy in government procurement in order to lie within the statutory grant of power.

543. The exercise of quasi-legislative authority by the President in his departments and agencies is rooted in a grant of legislative power by the Congress, Chrysler Corp v Brown 441 US at 304 99 S Ct at 1719 U.S. and lies reasonably within the contemplation of that grant of authority, Id. at 306, 99 S. Ct. at 1720, resting upon the close nexus between the Procurement Act's criteria of efficiency and economy and the executive order's predominant objective of containing procurement costs. When the Congress authorizes an appropriation for a program of federal assistance and authorizes the Executive branch to implement the program by arranging for assistance to specific projects, in the absence of specific statutory regulations it must be deemed to have granted to the President a general authority to act for the protection of federal interests, including all federal procurement contracts and also all federally assisted contracts. In direct procurement the federal government has a vital interest in assuring that the largest possible pool of qualified manpower be available for the accomplishment of its projects

544. In Case 73-cv-04279, Percy sought apprenticeship to obtain skills to enable members of the Percy Class to compete for employment. In Case 73-cv-04279, Defendant Government Agencies had a full and fair opportunity to litigate the issue of the enforcement requiring that affirmative-action be taken to provide apprenticeship to develop skills and equal employment opportunity.

545. The Percy Class has been injured by the Defendant Government Agencies, Owners and Employers violating and continuing to violate the Memorandum/Order and Order by failing to implement regulations and laws.

546. For all of the federal dollars poured into facilities over these past forty-five years since the decision of Judge Lasker in Percy v. Brennan 73 Civ. 4279, 384 F.Supp. 800 (1974), there has been virtually no meaningful training, enabling the equal employment opportunity envisioned by President Lyndon Johnson upon the signing of the Civil Rights Act of 1964 and the adoption of the Presidential EO 11246.

547. Parties who would oppose this action should not fear a threat because training the Percy Class in skills and safety will not take jobs, instead it will create economic opportunities which does not currently exist by utilizing the free enterprise wealth of our nation, its labor which is so desperately needed. Workers are the real wealth of our country, the labor-theory of value

**DEFENDANT GOVERNOR OF THE STATE OF NEW YORK OFFERED A SETTLEMENT OF PERCY V. BRENNAN IN CASE 73-CV-04279 THAT IS UNENFORCEABLE AND FAILED**

548. In January of 1977, the Defendant State of New York presented to the Lasker Court, Governor's Executive Order 45 (9 NYCRR 3.45, Document #6, Attachment 14, EDNY Case No. 21-cv-001366) in settlement to resolve the issues raised in the Case 73-cv-04279, Docket #99, Appendix 1, Volume 3 pages 749-757, 758-785, 786, 795 and Docket #103, Appendix 2, Volume 4, pages 823, 851 and 860 in 17-2273.

549. Thereupon, Case 73-cv-04279 was closed without prejudice, Judge Edelstein's Order of May 4, 1977, page 740 of Appendix 1 at Docket #99 in 17-2273 and Document #6, Attachment 4, EDNY Case No. 21-cv-001366.

550. Then the New York Court of Appeals in Fullilove v Carey 48 NY2d 826 1979, Document #6, Attachment 20, EDNY Case No. 21-cv-00136, declared that Executive Order 45, Document #6, Attachment 11, EDNY Case No. 21-cv-001366 (9 NYCRR 3.45 docket at Document #6, Attachment 14, EDNY Case No. 21-cv-001366) as promulgated by Governor Carey was an unauthorized exercise of legislative power, illegal and unconstitutional and enjoined implementation of the provisions of said Executive Order or promulgating or enforcing any rules and regulations issued pursuant to said Executive Order 45. Decided together with Fullilove v Carey, was Fullilove v Beame 48 NY2d 376 1979, where the Court of Appeals of the State of New York determined that despite the redeeming social needed for the relief which Executive Order 45 intended, would not save the illegality of the method to provide the opportunity for the Percy Class to acquire necessary skills to compete for employment, *see* Fullilove v Carey 48 NY2d 826 1979. Unfortunately, Executive Order 45 was and is unconstitutional and unenforceable, causing the Percy Class to not receive the relief provided for in Executive Order 45.

551. Despite the illegality of Executive Order 45, it still remains today at 9 NYCRR 3.45, with no notification having been made to the Percy Class of its unconstitutionality and unenforceability.

552. The State's actions or failure to act, and failure to notify, were gross negligence and active misrepresentation, causing injury and damage to the Percy Class when the State proffered Executive Order 45 in settlement of Case 73-cv-04279, but it failed.

553. There is an ongoing obligation of the State to notify and correct the misrepresentation about Executive Order 45. The Governor never notified the Percy Class that the settlement offered by the State and its Government Agencies had failed.

**Defendant Governor and his Agencies Actively Undermine the Percy Program**

554. The Plaintiff will produce evidence to persuade and show that the State has, in fact, interfered with the Percy Program's ability to provide affirmative action in equal employment opportunity, despite the redeeming value of allowing the Percy Program as an Alternative Employment Practice demonstrated to the State to meets the burden of production and persuasion under Title VII of the Civil Rights Act by the Advocates on behalf of the Percy Class.

555. The State and the Government Agencies are failing to effectively foster affirmative action, and in fact, the State has no meaningful affirmative action program at all. The State should have allowed a vehicle to provide affirmative action where none exists.

556. The Advocates at paragraph 565 hereof, presented the Percy Program as an Alternative Employment Practice to Governor David Patterson, at a meeting arranged by Clemmie Harris, while Attorney General Andrew Cuomo was seeking to terminate the Percy Program Alternative Employment Practice , proposing that the State of New York adopt and mandate the Alternative Employment Practice but the State of New York has remained apathetic to the plight of the Percy Class and has not taken effective steps to correct the disparate treatment to the Percy Class, especially where, as here, the State in concert with others yet to be identified in fact have taken active steps to put the Percy Program out of business.

557. The Advocates identified herein at paragraph 567, then followed up with Governor Andrew Cuomo in 2011 in an effort to bring affirmative action of Executive Order 45 to fruition by the private solution of the Alternative Employment Practice, but Governor Cuomo was likewise apathetic.

558. Failure to notify the Percy Class, covering up, hiding and secreting the State's failure to accomplish the affirmative action relief awarded in Case 73-cv-04279, whether negligently or intentionally, and then taking overt steps to eliminate the Percy Program, is all to the damage of the Percy Class.

559. The Class, as the intended beneficiaries of federal funding described herein, are entitled to an accounting relative to the compliance with Federal Funding from Medicaid and Medicare described herein.

560. The Percy Class is also entitled to an accounting as to how Defendant Government Agencies calculate both their compliance with these statutes and regulations, and how

they calculate and implement their required "affirmative action" intended for the direct benefit of the Class.

561. The Percy Class requests a full accounting as well as declaratory relief from this Honorable Court that they are entitled to this information, and that the Defendant Government Agencies be ordered to provide the same.

562. Although there is some positive benefit of identifying disadvantaged business enterprises to be entitled to special treatment, the 14th amendment does not permit that to occur, based upon race, color, or creed, either positively or negatively. Minority business enterprise goals have been corrupting and evil, propagating fraud and criminal activity, ***but that is not complained of in this action***. Goals being used under the guise of fostering disadvantaged business enterprises thereby satisfying affirmative action for equal employment opportunity, has been accepted apparently due to the view that by allowing unequal treatment based upon the color of skin or ethnicity under the guise of equalizing opportunity, that is okay in leveling the playing field? ***Again, that is not within this Action***. This proceeding is not to challenge that mechanism, but rather to enable the Alternative Employment Practice identified in the Lincoln Reconstruction Speech of April 11, 1865, namely: apprenticeship for freed people.

## EIGHTH CAUSE OF ACTION AGAINST OWNER OPERATOR AND THE UNION DEFENDANTS FOR ILLEGAL EMPLOYMENT PRACTICES IN VIOLATION OF 42 U.S.C. § 2000E-2

563. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

564. This action contains an element of the Percy Sub-Class's ability to meet its burden of production and persuasion proving it has demonstrated a less discriminatory alternative method of employment practice ("Alternative Employment Practice") causing violation of 42 U.S.C. §2000e-2 by the Owner Operator Defendants for continuing discriminatory unlawful employment practices. The demonstration on behalf of the Percy Sub-Class is in accordance with the law as it existed on June 4, 1989 with respect to an Alternative Employment Practice, described in subparagraph (C) referred to by subparagraph (A)(ii) of 42 U.S.C. §2000e-2(k)(1). The Owner Operator Defendants, and upon information and belief, abetted by the Union Defendant, have refused to adopt such Alternative Employment Practice without valid justification, violating 42 U.S.C. §2000e-2 of the Civil Rights Act of 1964 as amended in 1991. Intervention Pg. 92 Par 183.

## ALTERNATIVE EMPLOYMENT PRACTICE THE PERCY PROGRAM, REFERENCED HEREIN (DOCUMENT #6, ATTACHMENT 21 IN EDNY CASE NO. 21-CV-01366)

**The Advocates**

565. Carl Evans with Irving Hurdle, Webster Gillory, Walter Fauntroy, Roger Edmunds, Anthony Robinson, and Lynette Barnhardt, along with James M. Kernan as Percy's counsel (referred to hereinafter as the "Advocates"), comprise a team which sought unsuccessfully to have the Defendant Government Agencies and Owners require the Percy Class be employed under an Alternative Employment Practice at businesses adopting it. The members of the Percy Class are ready, willing and able to work, all to no avail because the Defendant Government Agencies, Owners and Employers have denied the Percy Class, frustrating the Alternative Employment Practice, failing to enforce EO 11246 and the mandates of the 1964 Civil Rights Act 42 U.S.C. §2000(e) and §2000(d) (1964) (the "Civil Rights Act. The purpose of this litigation is not related to goals for minority employment inclusion. Instead, there is a fundamental responsibility on the part of the Government Agencies, Owners and their agents to enforce the provisions of the Civil Rights Act for the benefit of the Percy Class.

566. The Advocates when explaining the Alternative Employment Practice as hereinafter detailed, presented statistics that lower socioeconomic communities such as the Percy Class face disproportionate negative exposure to market conditions that result from a long-term and discernible lack of fair and equal access to the skills and markets that result in employment. Coincidentally, disproportionate number of blacks among the disenfranchised remains a huge racial justice problem that has existed for the multiple generations separating African Americans in the United States. The Class from disadvantaged neighborhoods have been continually kept of the major trades, which is not just a relic of past discriminatory practices, but the continuation of present-day conspiracy of separation and consistent poverty that leads to major health concerns and quality of life issues.

**The Percy Program Presented by the Advocates as an Alternative Employment Practice under 42 USC 2000 e-2(k)(1)(A)(ii) and (k)(1)(C) meets the burden of production and persuasion under Title VII of the Civil Rights Act.**

567. All employment is required to be covered by workers' compensation. Along with the payment of benefits to cover injury and death while on-the-job ("OJT") as required in under New York Workers' Compensation Law §10, workers' compensation can include risk-management, safety training and loss control. Using workers' compensation coverage as the delivery method for the Alternative Employment Practice to provide apprenticeship for new hires and continuing education for existing employees, is the most efficacious practice of providing skills to educate workers to competently and safely

perform work, protect themselves and people with whom they come into contact, by changing employment practices, by adopting the Alternative Employment Practice to be a part of workers' compensation coverage, coverage existing overall employment. The Advocates of the Percy Program have presented to Defendant Government Agencies, and to Owners, and Employers and their agents, the Percy Program as the Alternative Employment Practice. The Percy Program is part of workers' compensation coverage as a mandated coverage required by the Employers, so there is no extra cost to the Employer.

568. The Percy Program as an Alternative Employment Practice , is ideally suited to train and create jobs for the Class of disadvantaged persons. The Apprentice Program of the Percy Program is an outgrowth of a commitment to minimize loss and risk in the workplace by educating and training apprentices and journeypersons on safe and healthful practices. Workers' safety is impacted in a positive manner resulting in greater control of risk reducing loss for Employers and their insurance carriers.

569. An acceptable apprenticeship program is vigorous and comprehensive and takes many years for an apprentice to fulfill the requirements as established by the US Bureau of Apprenticeship Training and the New York State Department of Labor by means of approved work processes of On-the-job training and related classroom instruction.

570. The Percy Program first presented to the U.S. Department of Labor Employment Standards Administration in 1984, as an apprenticeship program for Wage and Hour Davis-Bacon purposes as qualifying under the US Department of Labor Bureau of Apprenticeship Training 29 C.F.R. Subt. A, Pt. 29 and Pt. 30, and yet the Owners have been ambivalent regarding encouraging an Alternative Employment Practice which actually provides jobs and careers to the Percy Class, all the while the Percy Class is ready, willing and able to work, and worse yet, damaging the families of the members of the Percy Class, their children growing up in poverty, significantly disadvantaged in education and skills, struggling to get a job, in an amount to be determined at trial.

571. The Advocates explained the transformational changes taking place in every industry, tradespersons are requested to keep abreast of technological developments, regardless of age or position in an organization – this has never been more important and represents a powerful key to unlock equal employment. This is an opportunity to give disadvantaged persons the skills to compete and make them desirable to hire based upon their capabilities rather than the color of their skin or ethnicity. This is not accomplished by the swipe of a pen or a provision in a contract. Instead, it will take time to infuse the skill and training to give naturally intelligent and industrious persons wanting to improve their lives and allow them to move out of poverty into middle class opportunity, this is just good business. Yet, the Government Defendants and Owner agencies, have spent over 40 years attempting to enforce goals which have miserably failed to create skills to compete for jobs, and well they should fail because the goals flow from a forced

interpretation of the vision of the Civil Rights Act and the 14th Amendment to the US Constitution - equal protection. The goals are just plain contrary to law and it is obvious that the illegal activity has caused very little good.

572. The Advocates explained that there is a significant difference between OJT and education or apprenticeship. In order to succeed in today's world of nearly instantaneous and constant technological change, it is important to have both, and to ensure that the Class receives the best training and education.

573. The Advocates explained that OJT is distinguished from education. OJT teaches and education provides tools to continually adapt to changes. An ancient truism says that if you give a man a fish, you feed him for a day, and if you teach a man to fish, you feed him for life. We go a step further: don't just teach how to catch a fish, educate about the art and science of fishing. Go beyond the mechanics of catching a fish and enlighten by explaining the biological forces underlying the key elements of fishing. Give the big picture. Teach the reasons behind the design of the equipment. Teach about water currents, patterns in fish mating and feeding cycles, including economic and environmental trends that impact the life cycles of fish.

574. The Advocates explained that this clichéd old saw about the fishermen illustrates the divide between apprenticeship on-the-job (OJT) and education. OJT is skill-oriented — it is learning how to fish. Education is concept-based — it is learning to see the big picture of why and how things work together. Both are necessary but without OJT the Percy Class never gains the experience to get a job and cannot get a job due to lack of experience.

575. The Advocates explained that training someone to do something is task-oriented, it is skill-based. You can train someone to increase their proficiency. A trained person is faster, better able to perform tasks competently and safely. OJT has a skill-based focus training people for performance, educating people for understanding. OJT takes full advantage of the new tools and systems coming onto the market by manufacturers.

576. The Advocates explained that OJT is the not only a less onerous alternative, it is the most beneficial and constitutionally acceptable alternative, and is just good business.

577. The Alternative Employment Practice is the "Percy Program" described here at ALTERNATIVE EMPLOYMENT PRACTICE" The Percy Program, referenced herein (Document #6, Attachment 21 in EDNY Case No. 21-cv-01366), (THE PERCY PROGRAM, paragraphs 782 – 815, the COMPONENTS OF PERCY PROGRAM paragraphs 816-817, REGULATORY APPROVALS OF PERCY PROGRAM paragraph 818 – 829 of this Complaint, the subject of this Complaint.

578. The Percy Program as an Alternative Employment Practice was registered with the New York State Department of Labor effective January 1, 1991 and approved by the New York

State Department of Insurance on December 6, 1994, registration and approvals which remain intact.

579. The Percy Program was offered as an Alternative Employment Practice by the Advocates, as hereinafter set forth, on behalf of the Percy Class as the complaining party under 42 U.S.C. §2000e–2(k)(1)(A)(ii), and is the required demonstration set forth at subparagraph (k)(1)(C).

580. The Percy Program as an Alternative Employment Practice answers the need for affirmative action to assist the Percy Class in obtaining competitive skills by utilizing registered apprenticeship meeting the requirements of the Fitzgerald Act (29 U.S.C. § 50 commonly known as the National Apprenticeship Act of 1937, section 1 (29 U.S.C. 50) under U.S. Department of Labor's Office of Apprenticeship and Training (BAT) and 29 C.F.R, Subt. A, Pt. 29 and Pt. 30. Apprenticeship is the process of learning a skilled occupation through both on-the-job training (practical, paid experience) and learning the related technical knowledge in a classroom. Candidates must be 18 years old and possess a GED (the Percy Program will help a candidate obtain a GED). Enrollment must be done openly under the procedures established by federal and state regulations for Minimum Qualifications Review and Eligibility List Ranking using educational achievement, work experience, seniority, job aptitude, oral interview, and general demographic inquiries to determine a score for ranking for eligibility to be enrolled in OJT and continuing education.

581. The Percy Program as an Alternative Employment Practice develops the skills of the class of persons recruited from within communities mired in poverty, the Percy Class, ready, willing and able to compete for paid OJT with related classroom instruction and continuing education provided as part of risk management, loss control and safety training by the Alternative Employment Practice.

582. Providing apprenticeship as proposed by the Percy Program and enrolling the new workforce to work alongside existing journeypersons will grow the depth of skilled workers ready, willing, and able to work, whose ranks are being diminished through age and attrition. Disadvantaged persons are given an opportunity, and Employers build a reliable workforce, to complete contracts competently and profitably.

583. The 1991 amendment to the Civil Rights Act of 1964 (42 U.S.C. §§2000e et al, commonly referred to as PL Title VII of the Civil Rights Act of 1964 as amended in 1991) set forth a methodology whereby the Percy Class has demonstrated to the Government, Owner and Employers, an Alternative Employment Practice to address the disparate impact of the lack of skills, low wages, few fringe benefits, minimal levels of training, and the lack of a career ladder contributing to a chronic workforce shortage caused by inadequate training

of persons in the Percy Class so as to have equal employment opportunity by possessing the necessary skills to compete for jobs.

**The Percy Program is a Less Discriminatory Alternative Method of Employment Practice Available to these Employers and Presented it the Defendant US Department of Labor and the Executive Branch Office of the President of the United States**

584. The Advocates, on behalf of the Percy Class, complained and demonstrated the Alternative Employment Practice to the Executive Branch Office of the President on March 31, 2011, to Rohm Emanuel when he was Chief of Staff for President Barack Obama, and to Eric Holder when he was the United States Attorney General, and to Hilda L. Solis when she was the United States Secretary of Labor, and to other Secretaries of federal government agencies, such as the United States Department of Transportation and the local and state government agencies to whom federal funds were provided for public work facilities. The Advocates submitted the Alternative Employment Practice in submissions for Homeless Veterans' Reintegration Program (HVRP) National Technical Assistance Center Cooperative Agreement(s) and meeting the burdens of production and persuasion for the Alternative Employment Practice. Then on June 29, 2010 the Advocates submitted again the Alternative Employment Practice, when the Advocates on behalf of the Percy Class applied to assist the USDOL Homeless Veteran Reintegration and Veterans Workforce Investment Programs DOL Homeless Veteran and the DOL Homeless Veteran Reintegration and Veterans Workforce Investment Programs for Incarcerated Veterans Transition Program.

585. The Percy Program as an Alternative Employment Practice was first presented to the U.S. Department of Labor Employment Standards Administration for review in 1984 and was accepted on June 14, 1984 as an apprenticeship program under the National Apprenticeship Act of 1937 for as qualifying under the US Department of Labor Bureau of Apprenticeship Training, meeting the requirement of (k)(1)(C) that the demonstrated Alternative Employment Practice of subparagraph (A)(ii) is "in accordance with the law as it existed on June 4, 1989, with respect to the concept of ""alternative employment practice"", 42 USC 2000e-2(k)(1)(A)(ii) and (k)(1)(C).

586. Even with disadvantaged business enterprises, systematic racial discrimination existing in the surety bonding of business enterprises who are qualified to perform public works projects, encounter this disparate impact due to pervasive and persistent institutional discrimination placing the Percy Class ready, willing and able to work, at a disadvantage in financing procurement, capital acquisition, obtaining experience and competency to safely perform work, all of which are programs intended to be aided by the Federal Funding. This can be addressed and also be used to develop enterprises which will

provide jobs to the Percy Class using bonding of disadvantaged business enterprises under the Percy Program presented to Defendant Government Agencies.

## The Percy Program Presented to the NYS Empire State Development Corporation is an Available Less Discriminatory Alternative Method of Employment Practice

587.   The Advocates presented the Alternative Employment Practice to Empire State Development Corporation (ESDC) director and the Deputy Commissioner for Community Economic Development, for presentation to Gov. Andrew Cuomo as evidence to produce and persuade the ESDC to mandate the Alternative Employment Practice but the ESDC has remained apathetic to the Alternative Employment Practice and the Class ready, willing and able to work, and have not taken effective steps to correct the disparate treatment to the Class.

## The Percy Program Presented to the Port Authority of New York/New Jersey is an Available Less Discriminatory Alternative Method of Employment Practice

588.   The Advocates presented the Alternative Employment Practice to Lash Green, Diversity Officer of the Port Authority of New York and New Jersey, and to past Executive Director Chris Ward as evidence to produce and persuade them to mandate the Alternative Employment Practice but they have remained apathetic to the Alternative Employment Practice and the Class ready, willing and able to work, and have not taken effective steps to correct the disparate treatment to the Class.

## The Percy Program Presented to the Metropolitan Transportation Authority is an Available Less Discriminatory Alternative Method of Employment Practice

589.   The Advocates presented the Alternative Employment Practice to Michael J. Garner, Chief Diversity Officer of the Metropolitan Transportation Authority (MTA), as evidence to produce and persuade them to mandate the Alternative Employment Practice but they have remained apathetic to the Alternative Employment Practice and the Class ready, willing and able to work, and have not taken effective steps to correct the disparate treatment to the Class.

## The Percy Program Presented to the New York Dormitory Authority is an Available Less Discriminatory Alternative Method of Employment Practice

590.   The Advocates presented the Alternative Employment Practice to New York Dormitory Authority (DASNY) Diversity Officer Paul Williams, as evidence to produce and persuade them to mandate the Alternative Employment Practice but they have remained apathetic to the Alternative Employment Practice and the Class ready, willing and able to work, and have not taken effective steps to correct the disparate treatment to the Class.

## The Percy Program Presented to the School Construction Authority is an Available Less Discriminatory Alternative Method of Employment Practice

591. The Advocates presented the Alternative Employment Practice to School Construction Authority through Thacher & Associates proposing that the School Construction Authority (SCA) and MTA as evidence to produce and persuade them to mandate the Alternative Employment Practice but they have remained apathetic to the Alternative Employment Practice and the Class ready, willing and able to work, and have not taken effective steps to correct the disparate treatment to the Class.

## The Percy Program Presented to the State University of New York is an Available Less Discriminatory Alternative Method of Employment Practice

592. The Advocates presented the Alternative Employment Practice to Chairman Carl McCall of the State University of New York for presentation to state Government Agencies for the State University of New York to partner with us to provide the Alternative Employment Practice, as evidence to produce and persuade them to mandate the Alternative Employment Practice but they have remained apathetic to the Alternative Employment Practice and the Class ready, willing and able to work, and have not taken effective steps to correct the disparate treatment to the Class.

## The Percy Program Presented to the City Of New York and its Agencies is an Available Less Discriminatory Alternative Method of Employment Practice

593. The Advocates presented the Percy Program as an Alternative Employment Practice to New York City Government for presentation to City government agencies for the City of New York to provide the Alternative Employment Practice, as evidence to produce and persuade them to mandate the Alternative Employment Practice but they have remained apathetic to the Alternative Employment Practice and the Class ready, willing and able to work, and have not taken effective steps to correct the disparate treatment to the Class.

### Percy Class as Third-Party Beneficiaries of Contracts

594. Owners, as the recipients of Federal Funding from the United States of America, have accepted Federal Funding pursuant to terms and conditions that Owners must certify that it will legally, financially, and otherwise require the Employers to employ these funds to accomplish affirmative action in equal employment opportunity for the economic benefit of the Percy Class.

595. The Defendant Employers must adopt the Alternative Employment Practice under the Fitzgerald Act (29 U.S.C. § 50 commonly known as the National Apprenticeship Act of 1937, section 1 (29 U.S.C. 50) under U.S. Department of Labor's Bureau of Apprenticeship and Training (BAT) and 29 C.F.R. Subt. A, Pt. 29 and Pt. 30 as an

105

available alternative employment practice that has less disparate impact and serves the employer's legitimate needs, 42 USC §§ 2000e–2(k)(1)(A)(ii) and (C).

596. The 1991 amendments to 42 USC § 2000e-2 (Title VII of the Civil Rights Act of 1964) is the same remedy the Percy Class sought in Case 73-cv-04279, was training and is seeking apprenticeship involving on-the-job-training ("OJT") coupled with related classroom instruction under the National Apprenticeship of 1937 ("the Fitzgerald Act"). The members of the Percy Class are ready, willing and able to work.

597. The State has interfered and continues to obstruct as well as continues to fail to abide by the Civil Rights Act of 1964, and specifically the 1991 amendment 42 USC § 2000e-2 and 42 USC § 2000d, and in breach of the conditions to contracts regarding funds from the United States of America, and of rights secured by the United States Constitution Amendments V, XIV, and 42 USC §§ 1981, 1983 and 1985.

598. The Alternative Employment Practice under the Fitzgerald Act of 1937 satisfies the requirement that the Alternative Employment Practice be in accordance with law as it existed on June 4, 1989 as set forth at 42 U.S.C. § 2000e–2(k)(1)(C).

599. The chain of funding begins with Federal congressional appropriation, then to the Executive Office of Budget & Management allocation, then to the Executive Cabinet Agencies, then to government agencies who distribute the funds, and finally to the local, state and federal agencies. The Defendant Government Agencies, Owners and Employers as stewards of the Federal Funding, are required to live up to the intent of the Civil Rights Act relating to the adoption of this Alternative Employment Practice.

600. The Alternative Employment Practice asserted here is covered under and is a part of workers' compensation coverage empowering disadvantaged persons to gain skills to enter the workforce at a level of skill and training which will permit them to rapidly move towards journeyperson status.

601. The Alternative Employment Practice does not require government subsidies to pay for itself, it is paid for by savings generated by savings to workers' compensation coverage managed and committed to on-the-job training, safety, technology education, risk management and loss control to reward the value of hard work.

602. Upgrading skills allows a disadvantaged person ready, willing and able to work, to compete based upon skill rather than the color of their skin or ethnicity, the vision of 42 U.S.C. §§ 2000(e)-2(a), is lawful affirmative-action and equal employment opportunity. Fewer young people are entering the skilled trades, Employers are struggling to find enough skilled workers to undertake the massive infrastructure projects which are sorely needed. With an expected workforce shortage of craft professionals and service members projected to leave the military over the next five years, it is the "Percy Program" as the Alternative Employment Practice.

603. Workers' compensation coverage is the framework for providing the Percy Program as an Alternative Employment Practice, providing the apprenticeship through safety, risk management in workers' compensation coverage and enrolling the new workforce to work alongside existing journeypersons, will grow the depth of skilled workers whose ranks are being diminished through age and attrition. Disadvantaged persons ready, willing and able to work, are given an opportunity and Employers build a reliable workforce to complete contracts competently and profitably. This workers' compensation-based program delivers diversity opportunities. The key is having broad work processes available for meaningful long-term opportunities.

604. Workers' compensation insurance is a required part of all employment and is an ideal mechanism within which to fit OJT apprentice training so as to foster equal employment opportunity.

605. The Percy Program as an Alternative Employment Practice can be funded by savings in workers' compensation costs resulting loss control and safety training, and safe work habits without costing Owners or Employers or diverting any of the funding for the public work facilities. This is accomplished by simply applying savings resulting from reduced losses due to the Percy Program and allocating those savings to pay for apprenticeship out of the premium paid for workers' compensation coverage.

606. The apprenticeship program portion of the Percy Program as the Alternative Employment Practice is ideally suited to train and create jobs for the Class as identified by Judge Lasker in Percy v. Brennan. The Apprentice Program as the Alternative Employment Practice is an outgrowth of a commitment to minimize loss and risk in the workplace by educating and training apprentices and journeypersons on safe and healthful practices, workers' safety is impacted in a positive manner resulting in greater control of risk reducing loss for Employers and their carriers.

607. Written assessment and performance verification will implement career pathways created and endorsed by both industry and education, perfect for service members with construction training and/or experience who are interested in taking the assessments.

608. The most beneficial and constitutionally correct solution that is certainly a less onerous alternative to address and correct the inequity and foster equal employment is for the Owners to require that the Employers provide paid OJT and continuing education for those ready, willing and able to work.

**Defendant Owner Operators have Violated and Continue to Violate 42 U.S.C. §2000e–2(k)(1)(A)(ii) and 2(k)(1)(C)**

609. The Defendant Employers have used unlawful employment practices of discrimination on grounds that the Plaintiff is able to meet its burden of production and persuasion proving that there was a less discriminatory alternative method of employment practice

available that the Employer could have adopted. Failing to adopt the alternative employment practice without valid justification is an unlawful employment practice violating 42 U.S.C. § 2000e-2(k)(1)(A)(ii) and (k)(1)(C) of the Civil Rights Act of 1964 as amended in 1991, and as a result the Court is warranted in providing relief to the complaining party Percy Class.

610. Lack of skills and know-how for sterilization, personal protective equipment, cleanliness, safety and emergency protocol and procedures for ventilator and other equipment operation, knowledge of Occupational Safety and Health Act ("OSHA") guidelines for handling bloodborne pathogens and Centers for Disease Control and Prevention ("CDC") Guidelines for disinfection and sterilization in healthcare facilities to address recognized health hazards likely to cause death or serious physical harm. Yet, these are basic reasonable and expectations from stewards of our loved ones. Intervention Pg. 10 Par 10.

611. Nursing homes must develop, maintain, and update an emergency preparedness plan. This plan must be a "facility-based and community-based risk assessment, utilizing an all-hazards approach. They must complete annual emergency preparedness training based on their plan, AG Report page 45, Plaintiff will show by statistics that the refusal to adopt the Alternative Employment Practice injures the Class of disadvantaged persons based on race and color. The evidence will show disparate impact.

612. New York state and federal laws and guidance require nursing homes to follow infection control protocols, which include obtaining sufficient infection control supplies such as PPE to provide to staff and residents to protect them from the risk of infection from transmissible disease, including COVID-19. Science, common sense, and OAG's preliminary findings following initial COVID-19 investigations indicate that a nursing home's lack of sufficient PPE and failure to comply with CDC and DOH guidance increased the risk that COVID-19 spread together residents and staff within the facility. Conversely, OAG's preliminary investigations indicate that residents had better health outcomes in nursing homes that had trained staff and plans in place to obtain sufficient PPE AG Report page 31.

613. The Percy Program (paragraphs 785-818, paragraphs 819-820, and paragraph 832 of this Complaint), presented as the Alternative Employment Practice, is delivered as a function of safety and training with workers' compensation under the covered payroll. The Percy Program is an Alternative Employment Practice, an element of a workers' compensation coverage. Apprenticeship is a function of safety training and loss control management of workers' compensation insurance, apprentices recruited and sponsored through employment or provided through a subcontract with apprentice training under the National Apprenticeship Act of 1937 occurring by three methods: (1) coordinated with joint apprenticeship labor-management counsel involving unions, (2) by sponsorship by an employer, or (3) by sponsorship by a trade association.

614. All employment is required to be covered by workers' compensation with the payment of benefits to cover injury and death while on-the-job as required under New York Workers' Compensation Law §10. The Alternative Employment Practice of apprentice training becomes covered as part of workers' compensation coverage as registered apprenticeship with risk-management, safety training and loss control.

615. The Plaintiff is able to meet its burden of production and persuasion proving that there was a less discriminatory alternative method of employment practice available that the Employer could have adopted, failing to adopt the Alternative Employment Practice without valid justification is an unlawful employment practice violating 42 U.S.C. § 2000e-2(k)(1)(A)(ii) and (k)(1)(C) of the Civil Rights Act of 1964 as amended in 1991.

616. The Alternative Employment Practice answers the need for the Class to obtain competitive skills by utilizing registered apprenticeship meeting the requirements of the Fitzgerald Act (29 U.S.C. § 50 commonly known as the National Apprenticeship Act of 1937, section 1 (29 U.S.C. 50) under U.S. Department of Labor's Office of Apprenticeship and Training (BAT) and 29 C.F.R, Subt. A, Pt. 29 and Pt. 30. Apprenticeship is the process of learning a skilled occupation through both on-the-job training (practical, paid experience) and learning the related technical knowledge in a classroom. Candidates must be 18 years old and possess a GED (the Alternative Employment Practice will help a candidate obtain a GED). Enrollment must be done openly under the procedures established by federal and state regulations for Minimum Qualifications Review and Eligibility List Ranking using for: educational achievement, work experience, seniority, job aptitude, oral interview, and general demographic inquiries to determine a score for ranking for eligibility to be enrolled in OJT and continuing education.

617. Apprentices can be paid a percentage of journeyperson wage. If a wage and benefit determination for the public work construction applies pursuant to section 220 of the New York State Labor Law and the federal Davis–Bacon Act USC 40 U.S.C. §§ 276a-276a-5, re-codified as 40 U.S.C. 3141-3148, the apprentice rate is scheduled.

618. Out of the savings on the apprenticeship wage paid as a percentage of the journeyperson wage, an emolument to journeypersons who undertake, train and mentor the apprentices' OJT, a 10% markup on such journeyperson's wages is available. The journeyperson must be assessed and qualified as a trainer to be eligible for the training emolument.

619. This is the same Program submitted by File 93100407 November 15, 1994, approved by the New York State Department of Insurance on December 8, 1994 and which remains today in full force and effect. This is the same Program governed by 29 U.S.C. § 1003 of ERISA as ratified by the DFS in a determination on October 5, 2015. Intervention Pg. 11 Par 13.

109

620. The denial of the Alternative Employment Practice is visited upon disadvantaged persons based upon race and color as permitted proof on a 42 U.S.C. 2000 e-2 action as allowed by the United States Supreme Court in Ricci v DeStefano 557 U.S. 557.

621. The members of the Class have been and are ready, willing and able to work, persistently wanting to work, but have been constantly deprived and denied work, damaging the members of the Class.

622. Plaintiff Percy and the Class he represents are entitled to injunctive relief as demanded and actual damages for lost wages, for lost opportunity and compensation as money damages for the families of the members of the Class, their children growing up in poverty significantly disadvantaged in education and skills, and struggling to get a job.

623. The Percy Sub-Class is entitled to injunctive relief as demanded and actual damages for lost wages against the Employer Defendants, for lost opportunity and compensation as money damages for the families of the members of the Percy Sub-Class, their children growing up in poverty, significantly disadvantaged in education and skills, struggling to get a job, entitled to compensation as money damages to be determined at trial in this litigation. Intervention Pg 123 Par 271.

624. The members of the Percy Sub-Class have been and are ready, willing and able to work, persistently wanting to work, but have been constantly deprived and denied work, damaging the members of the Sub-Class, and damaging the families of the members of the Sub-Class, their children growing up in poverty, significantly disadvantaged in education and skills, struggling to get a job, in an amount to be determined at trial. Intervention Pg 124 Par 272.

625. The acts of Defendant Government Agencies and their State Officer Defendants, the Owner Operator Defendants. And the Party-in-Interest Defendants, and each of them have violated the Civil Rights Act of 1964, 42 USCA § 2000e and d.

626. The Percy sub-class of "black or Spanish-surnamed persons who are capable of performing, or capable of learning to perform" in skilled occupations (herein the "Percy Sub-Class") is entitled to apprentice training and continuing education in safety and skills, united in interest with the class as certified in Percy v. Brennan reported at 384 F Supp 800 of November 8, 1974. Case 73-cv-04279 (the "Percy Class"). Intervention Pg. 97 Par 198.

627. Members of the Percy Class are undertaking to enforce the Percy Class Settlement in Case 73-cv-04279, now the "Alternative Employment Practice", an action against State of New York and others, for failure of settlement involving New York State Executive Order 45 (9 NYCRR 3.45) ("Executive Order 45"). Intervention Pg. 98 Par 200.

110

628. This Action is based on Percy the Sub-Class's ability to meet its burden of production and persuasion proving it has demonstrated a less discriminatory alternative method of employment practice ("Alternative Employment Practice") causing violation of 42 U.S.C. 2000e-2 by the Owner Operator Defendants for continuing discriminatory unlawful employment practices. The demonstration on behalf of the Percy Sub-Class is in accordance with the law as it existed on June 4, 1989 with respect to an Alternative Employment Practice, described in subparagraph (C) referred to by subparagraph (A)(ii) of 42 U.S.C. § 2000e-2(k)(1). The Owner Operator Defendants have refused to adopt such Alternative Employment Practice without valid justification, violating 42 U.S.C. § 2000e-2 of the Civil Rights Act of 1964 as amended in 1991. Intervention Pg. 98 Par 201.

629. Plaintiff Percy and the Class he represents have been constantly denied due to such acts in violation of the Civil Rights Act of 1964, 42 USCA § 2000e and depriving the Percy Class of opportunity, entitling the Percy Class to actual damages for lost wages, for lost opportunity and compensation as money damages, not limited to members of the Class, but also including members of the Percy Classes' children and families, significantly disadvantaged in education and skills, struggling to get a job, damaging the families of the members of the Percy Class, in an amount to be determined at trial.

## Local 1199 of the National Health Care Workers' Union

630. It was not until December 2020 that the Union 1199 woke up to the need for apprentice training and developed work processes for Certified Nurse Assistant and [others] to the New York State Department of Labor under the authority of the Bureau of Apprenticeship, training for the US Department of Labor. The officers and members of the New York State Department of Labor should have initiated the development of training programs for nursing and nursing assistants.

631. The Union has failed to implement the training. The Union made peace with the Owner Operator Defendants failing to pursue and implement apprentice training to provide the skill level and knowledge necessary to handle a communicable disease, such as COVID 19.

632. The union, in concert with the Owner Operator Defendants, never applied due diligence to develop and implement Apprentice training for nurses and nursing assistants, which could have occurred 25 years ago and is still able to be accomplished as an Alternative Employment Practice identified in this Complaint.

633. The Union Defendant was no help, failing to intervene on behalf of and to protect its members, some of whom are members of the employee Class Plaintiff who have now brought this Class Complaint to mandate action for which the Owner Operator Defendants have been paid for costs of benefits. These benefits never provided to the employee Class Plaintiff, are the very funds intended for such benefits that were diverted,

converted and embezzled by the Owner Operator Defendants, their Owner Operator Defendants, the Party-in-Interest Defendants, all the while and under color of law allowed by the failure of the State Officer Defendants to monitor, audit and manage the tens of millions of dollars paid by Medicaid/Medicare for the very costs of benefits incorporated into the per occupied bed rate paid by the State DOH.

634. The Union Defendant is part of the problem having failed in its duty to protect the interests of its members; the Union Defendant is part of the mess. The Union Defendant is part of the default in protecting the interests of the employee Class Plaintiff.

635. The Union Defendant induced the wrong and maintained it.

636. Everyone involved in the Union Defendant organization collaborated to induce sealing off access to the skill and knowledge to keep out members of the employee Class Plaintiff from gaining the skill and knowledge so as to limit access to better paying jobs and careers, keeping everyone else out; sealing it to a select group of Union members, keeping out others, others being the broader employee Class Plaintiff and others who would aspire to these occupations, restricting access to the occupations in concert with the Owner Operator Defendants, restricting access to members of Union Defendant. The goal of the Union Defendant to keep other non-union members from the skill and knowledge of the occupations of CNA, LPN, RN, a part of the scheme to restrict access to skills by the members of the Class Plaintiff.

**Precedent and Jurisdiction to Enforce the Alternative Employment Practice**

637. This action is grounded on the record in US SDNY Case 73-cv-04279, the case file archived as potentially of national significance in St. Louis, Missouri, the case file returned from St. Louis to the National Archives in New York City, returned upon the request on behalf of Mr. Percy, and certified by the National Archives to the United States District Court for the Southern District of New York, which record was then filed by ECF as the Docket on Appeal to the United States Second Circuit Court of Appeals in appeal 17-2273. Intervention Pg. 92 Par 184.

638. That action is grounded upon the final and enforceable Memorandum/Order ("Memorandum/Order") of Judge Lasker reported at 384 F Supp 800 of November 8, 1974. Case 73-cv-04279 was settled on May 4, 1977 by agreement accepting Defendant New York State's offer of Executive Order 45. The problem is that Executive Order 45 failed and the Sub-Class was never notified. Intervention Pg. 92 Par 185.

639. Liability is for violation of 42 U.S.C. §§2000e-2, rights secured to the Percy Class as the Complaining Party, liability of the Employer under the 5th and 14th Amendments to the United States Constitution, 42 U.S.C. §§§§ 2000e-2, 1981, 1983, 1985. Intervention Pg. 93 Par 186

640. The Alternative Employment Practice under the Civil Rights Act of 1964, and specifically 42 USCA §2000e-2 and §2000d as amended in 1991 (the "Civil Rights Act"), is delivered with workers' compensation coverage. All employment is required to be covered by workers' compensation. Intervention Pg. 93 Par 187.

## Damages for an illegal employment practice

641. Damage and injury has been caused to members of a class of persons injured on the job, injured primarily because of the negligent or intentional behavior of the Employers to conduct on-the-job training with related classroom instruction is a function of an alternative employment practice demonstrated and delivered to the Defendants as safety and loss management under the National Apprenticeship Act, demonstrated to have provided to the risk control manager of Defendants, for over 10 years, the Owner Operator Defendants failing to adopt this demonstrated employment practice.

642. The State of New York took overt steps to dismantle the Percy employment practice as described herein.

643. The Executive Branch of New York government, through its appointed Commissioner of Insurance, failed to acknowledge and give credit to the Percy Employment Practice demonstrated as provided through Workers' Compensation Insurance to the Owner Operator Defendants, causing egregious injury to the Class as a whole, and in particular, permitting an illegal employment practice with particular disparate impact upon the Percy subclass under color of law. the State of New York by the State Officer Defendants permitting this illegal employment practice under 42 U.S.C. 2000 e-2.

### NINTH CAUSE OF ACTION UNDER 42 U.S.C. §1983 FOR DAMAGES UNDER 42 U.S.C. §1981 AND 1985 AGAINST STATE OFFICER DEFENDANTS CONSPIRING WITH PARTY-IN-INTEREST DEFENDANTS TO VIOLATE 14TH AMENDMENT EQUAL PROTECTION CONSTITUTIONAL RIGHTS OF THE CLASS

644. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

645. The Defendant Government Agencies, individually and collectively, jointly and severally conspired and acted to frustrate the efforts of Percy limiting the effectiveness of the Percy Program in its support of the efforts to provide training to enable the Percy Class to compete for jobs which can lead to rewarding careers providing reliable and steady income and benefits for those workers and their families.

646. As a Government Agency of the State of New York, the DFS is delegated extensive powers from the State government office of the Governor.

647. The DFS Government Agency suspended the ability of the Percy Program to be in business by wrongfully exercising Insurance Law §1104(c) on June 30, 2004. The State's

wrongful suspension of the Percy Program on June 30, 2004 under Section 1104(c) some three years later on June 28, 2007, too little and too late to prevent serious, permanent and irreparable damage to the Percy Program. The State unilaterally lifted the June 30, 2004 Order of Suspension.

648. The DFS then issued an Order under 1310 of the Insurance Law on February 1, failing to recognize the approvals set forth herein, and failing to abide by the Stipulation and Judgment of 2007.

649. Special knowledge incorporated into the operation of the Percy Program, is singular to Carrier Defendant, and does not exist anywhere else.

650. The Government Agency actions threatens and discriminates against "blacks" and "Spanish-surnamed" persons as the Percy Class by means of regulatory actions and proceedings brought by and at the instance of the Defendant State, were brought in bad faith or were initiated with and animated by motives based on retaliation, harassment, that has the effect of discrimination on the basis of race, national origin or gender, or other illegitimate motives, the State has evidenced an intent going back 20 years where the Defendant State has abused its power attempting to eliminate the Percy Program.

651. The Percy Class suffers and will continue to suffer similar serious, permanent and irreparable economic injury, loss and damage as a result of actions by the Defendants preventing implementation of apprenticeship programs which continue the successful efforts of Oriska Corp and Oriska Insurance in developing and implementing those programs to develop marketable skills among disadvantaged workers on the way to success in a free and openly competitive marketplace.

652. The State, individually and collectively in concert with other still unidentified parties, cloaking themselves with the mantle of public service, utilized and are still utilizing all the power of the State in a malevolent effort to deny opportunities for the Percy Class, due to such wrongful and illegal acts as aforesaid depriving the Percy Class of opportunity, entitling the Percy Class to actual damages for lost wages, for lost opportunity but also including members of the Percy Classes' children and families, significantly disadvantaged in education and skills, struggling to get a job, damaging the families of the members of the Percy Class.

653. Demand is made to enforce the aforementioned Stipulation of accord and settlement and Judgment with the State by directing entry of a decree compelling specific performance of the terms of the Stipulation allowing the Percy Program to operate, and for other and further relief as to the court may seem just and proper to allow the operation of the Percy Program, and enter a declaratory judgment declaring that the acts of the Defendants and each of them to be in violation of the Percy Class' rights to equal employment and enjoin

114

the Defendants and each of them from further violation of such rights, declaring that damages must be stopped and rectified.

**DFS State Actions under Color of Law in Support of the Scheme**

654. Events took place involving the complicity of State Officers in the systematic failure by State Officers to apply justice as described here, they instead aided and abetted as part of the scheme. Nassau County Amended Complaint in Intervention[6] Pg. 80 Par 153, Pg. 80 Par 154, Pg. 80 Par 155, Pg. 80 Par 156.

655. On February 7, 2019, to cover the failure by the Owner Operator Defendants to pay funds to the Plan trust, Lipsius requested and received a letter from State Officer General Counsel Martha Lees, for the use of Lipsius to justify the Owner Operator Defendants not funding the Plan trust for benefits to the Class, a letter which implies that the policies are not enforceable because the policies issued to the Employers violated the Superintendent's Insurance Law 1310 Order. State Officer Defendant Lees acted under pretense and color of state law and in her individual and official capacity and within the scope of her employment and in deliberate indifference and/or intentional misconduct. As a direct and proximate result of the misconduct and abuse of authority, Plaintiff members of the Class sustained the damages herein alleged. Intervention Pg. 81 Par 157.

656. State Officer Lees' acts and part of the scheme are set forth at the Nassau County Amended Complaint in Intervention Pg. 81 Par 159, Pg. 82 Par 160, Pg. 82 Par 161, Pg. 83 Par 162, Pg. 83 Par 163, Pg. 84 Par 164, Pg. 85 Par 166, Pg. 85 Par 167, Pg. 86 Par 168, Pg. 87 Par 169, Pg. 87 Par 170, Pg. 87 Par 171, Pg. 88 Par 173, Pg. 88 Par 174, Pg. 89 Par 175, Pg. 89 Par 176.

657. State Officers aided and abetted and allowed misapplication of the State Superintendents Order of February 1, 2013 prohibiting new policies under Insurance Law 1310, by means and methods including, but not limited to, State Officer Lees providing a letter of February 7, 2019 to Lipsius, Lipsius seeking to avoid Employers funding for benefits to the Class, Lees writing to Lipsius that the 1310 Order remained in effect, despite that Oriska Insurance addressed the impairment identified in the Superintendents Order,

---

[6] Amended Complaint in Intervention in an intervention by Order of Justice Libert in Nassau County Action Index number 609877/2019, which was not appealed and is final, now removed to related Case 20-cv-06291.

To access the document in the link above you may need to register for a Free Pacer Account. https://pacer.psc.uscourts.gov/pscof/registration.jsf

115

addressed on November 30, 2014, and so notified to State Officer Masterson on December 1, 2014. Intervention Pg. 131 Par 312.

658. Michael Papa and the General Counsel for the Workers' Compensation Board ("WCB") requested of DFS General Counsel Martha Lees, word that the policies issued to the Employers were not in violation of law. Lees failed to and refused to issue the letter interpreting the Order of the Superintendent of February 1, 2013. Intervention Pg. 131 Par 313.

659. The State DFS has refused to respond to WCB Officer Papa on the propriety of the Policies, forcing the issue of termination of the policies to hearing before the WCB, resulting in the decision by a WCB Judicial Officer. Intervention Pg. 132 Par 314.

660. Carrier Defendant, then proceeded to hearing before the WCB, at which there was a ruling that the policies were fully enforceable. The WCB by Chief Appellant Judge of the WCB Madeline Pantzer by Order of October 2020, has determined that the Policies issued by Oriska Insurance to the Employers are fully proper, meeting all regulatory requirements of the WCL, an issue that the Councils Office of the DFS has deferred to the State Workers' Compensation Board. Intervention Pg. 132 Par 315.

**NYCIRB as an Arm of Government Agency DFS**

661. Previous to this attempt by the Owner Operator Defendants and Party-in-Interest Defendants to renounce obligations and liability on policies of the Carrier Defendant protecting the employees members of the Class Plaintiff, General Counsel Lees of the DFS was directly involved in a June 29, 2016 attempt to termination of the Carrier's access to membership in NYCIRB for failure to pay the fines demanded, a membership which is a necessary element of the Percy Program and the Alternative Employment Practice.

662. Effective November 9, 1994 Carrier Defendant was admitted into membership in NYCIRB and filing of the New York Retrospective Rating Plan Manual along with other manuals and plans and amendments thereof adopted by NYCIRB and approved by the NYSDOI was made by NYCIRB with the NYSDOI on behalf of Oriska pursuant to Insurance Law § 2306.

663. In order for the Carrier Defendant to maintain membership in NYCIRB, a quasi-Government Agency, data of coverage and claims was reported to NYCIRB. Much of this data was rejected by NYCIRB when changes occurred as a result of litigation and settlements that change the coverage and claims to a loss sensitive high deductible of the Program, reducing premium and shifting the retention of claims to the Employers identified in this lawsuit.

664. There was a change of initial policy information due to legal settlements, rewriting coverage, movement of claims from one employer to another, which necessitated a change in the policy applicable to the claims, causing adjustment in payrolls reallocating payroll between multiple coordinated policies to conform with audits which change the policies to which already existing claims are attached.

665. The Program was restructured coverage due to the settlements and judgments which the NYCIRB system rigidly fails to permit a change of policy information after an initial upload.

666. Attorneys on behalf of the Carrier Defendant repeatedly asked NYCIRB to delete the Carrier's original filings, which were made before settlement of multiple lawsuits, in order to allow the Carrier to reload the WCPOLS and WCSTAT files on policies beginning in 2010 in order for claims to correctly link to coverage rewritten as a result of settlements and judgments.

667. The Carrier Defendant had successfully and repeatedly uploaded to CDX Compensation Data Exchange, LLC website ACCCT.org ("CDX") the WCPOLS and WCSTAT files as required and approved by the vendor CDX or working for NYCIRB, only to find them rejected by NYCIRB. CDX notified of any deficiencies and upon fixing these, receives notification that the uploads to CDX were satisfactory, and the files are then passed to NYCIRB.

668. Whenever CDX pushes the Carrier Defendant WCPOLS and WCSTAT files to NYCIRB, a new set of errors issue upon which NYCIRB has assessed fines and penalties. These same errors repeatedly continue to be compounded, each with new NYCIRB fines and penalties (e.g., a first error of data that had already passed CDX might be a $50 NYCIRB fine for the first month, then for the second month it is another $50 fine, and so on and so forth.) The fine amounts pile up on the same errors, often amounting to thousands of dollars, it is fines compounded upon fines for the same "errors" initially issued by NYCIRB relative to filings passed by CDX.

669. The Program passes the CDX portal test, but then NYCIRB fails the submission as not meeting NYCIRB standards.

670. Because NYCIRB refused the reload, errors continue to propagate because of the old bad data, where current claim uploads were trying to link to old and corrupt data, continuing to error out, thereby causing the fines and penalties for which NYCIRB repeatedly and consistently refused to allow reload of data and insisted on payment of the fines  on penalty of termination of membership .NYCIRB demanded payment on pain of cancellation of the Carrier's Membership in NYCIRB.

671. The Carrier was been blocked from looking at the exchange of information in the internal relationship between CDX and NYCIRB, cloaked in secrecy and darkness, not open to intelligently assess and remedying data submission rejections.

672. Exactly what are the specifics with respect to the errors, fines and penalties serving as the basis for an incredible $1.4 million in fines and penalties, was shrouded in secrecy.

673. Jeremy Attie, Ziv Kimmel, and Vincent Licause, officers of NYCIRB, demanded fines and penalties from the Carrier Defendant even though the data upload problem resulted from a change of the initial policy information data submission due to legal settlements, rewriting coverage, movement of claims from one employer to another, which necessitated a change in the policy applicable to the claims, causing adjustment in payrolls reallocating payroll between multiple coordinated policies to conform with audits which change the policies to which already existing claims are attached.

674. Under protest, the Defendant Carrier paid fines of $1,319,245 on September 16, 2016.

675. State Officers conspiring with Parties-in-Interest Party-in-Interest Defendants, and Owner/Operator Defendants, failed or neglected to enforce State Laws violating 14th Amendment Equal Protection Constitutional Rights, in violation of 42 U.S.C. §1985, as applied to the States under the United States Constitution for the individual and collective personal, malicious, and unlawful violations under color of state law. Intervention Pg. 132 Par 316.

676. It is prayed that the State Officers be enjoined under 42 U.S.C. §1983 from conspiring to deny the Class Equal Protection of Laws under Color of Law, in Violation of the 14th Amendment to the US Constitution, and that the State Officers respond in monetary damages under 42 U.S.C. §1985, along with the Party-in-Interest Defendants, and Owner/Operator Defendants conspired with State Officers to deprive the Class of rights and privileges to deny equal protection of the laws under the 14th Amendment, and must respond in monetary damages returning the penalty extorted of of $1,319,245 and in other damages to be determined after trial. Intervention.

### TENTH CAUSE OF ACTION IS BROUGHT UNDER 42 U.S.C. §1983 TO ENJOIN STATE OFFICERS FROM PROHIBITING RIGHT TO ASSEMBLE BY THE CLASS AS PROTECTED BY THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

677. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

678. A seemingly separate scheme to deny constitutional rights to the sub-class of the Class occurred when the State Officers at SUNY Maritime College ("SUNY Maritime") barred members of the Percy sub-Class from assembling at the premises despite the fact that

proper permits and authorizations were in place and all permit fees were paid. Intervention Pg 133 Par 324.

679.  This lawsuit seeks to enjoin the wrongful denial of assembly of the Percy sub-Class for apprentice training and continuing education at SUNY Maritime College, unnecessarily abrogating the apprentice training and continuing education provided by Plaintiffs at the SUNY Maritime College in the Bronx. Intervention Pg 134 Par 325.

**State Officer Interference with Right of Assembly of the Percy Subclass at SUNY Maritime**

680.  The Percy Subclass in the operation of the Percy Program at the SUNY Maritime campus in the Bronx, New York, despite having valid contracts, having paid consideration, and State permits having issued to the Percy Program, have been subjected to a scheme culminating from years of efforts by State Officers trying to bar the Class and the Percy Program from the State premises, has reached a breaking point. Although this appears to be separate State incident, in fact this interference with the right of the Class to assemble and SUNY Maritime, is part of a coordinated effort to deny rights of the Class and the Percy Program rights protected by the First Amendment to the United States Constitution.

681.  Beginning in 1998, the SUNY Research Foundation described the apprenticeship of the Percy Program as a partnership. This luster is gone, replaced with State Officers conducting a "blue list" of persons under suspicion and scrutiny by the Office of the New York State Inspector General. now with interference with the rights of the Class and the Percy Program to assemble and learn. Intervention Pg. 90 Par 177.

682.  Now, State Officers Scott Dietrich and Peter Fountis with the State University of New York ("SUNY Maritime"), are barring assembly of the apprentices at the State properties for which the Percy program obtained a permit, a permit grudgingly accepted by the Percy Program after the contract that Percy had with the SUNY Research Foundation for more than 15 years jumped from $5,000 for a scholastic year in 2015 to $180,000 in 2018, later compromised to $30,000 with Percy being issued a Revocable Permit. Intervention Pg. 90 Par 178.

683.  Now under that Permit, SUNY Officers are refusing to acknowledge receipt of payment by the Percy Program for the 2020/21 classroom year, alleging SUNY did not receive the fully executed Permit from Percy, State Officers using this false pretense to bar Percy from assembling and conducting classes at SUNY Maritime, all the while ignoring that the Percy Class is committed to abide by the Governor's Orders that govern classes at the SUNY Maritime campus during the COVID-19 virus crisis. Intervention Pg. 90 Par 179.

684.  When on October 23, 2020, the State Officers, after receiving and accepting full payment from the Program for the Permit to conduct the Percy Program at the SUNY Maritime

119

campus, are now refusing to recognize the Permit. This is a culmination of efforts to terminate the Percy apprenticeship Program on the campus of the SUNY Maritime College.

## Replacement Training and Laboratory Facilities

685. Due to the recent un-welcome by the State Officers in responsible charge of the SUNY Maritime facilities, Percy searched for facilities to substitute that could be outfitted as a training laboratory with related classrooms. To stay within a meager non-profit budget, Percy was offered access to an abandoned wool felt mill.

686. Percy, when accepted as a volunteer, is eligible to receive substantial tax benefits and waiver of penalties associated with facilities contaminated by prior owners. Most contaminated sites are eligible for the BCP, even when contamination amounts are not great. The felt mill property is an eligible site for development or reuse which is complicated by the presence, or potential presence, of contaminants. Percy is proposing to remediate the felt mill property.

687. Percy is a Project Sponsor on a Brownfield Project under Article 8 of the Environmental Conservation Law ("SEQRA") and Part 617 State Environmental Quality Review, 6 NYCRR 617, covering an abandoned and blighted felt mill property which is the subject of this Cause of Action.

688. DEC is required to acknowledge and act in accordance with the Positive Declaration hereinafter set forth and respond with comments identifying the relevant areas of environmental concern in accordance with the State and Environmental Quality Review Act (SEQRA) in compliance with the Positive Declaration which covers the felt mill property.

689. Under ECL § 27-1405(b), Percy is a volunteer whose liability arises solely as a result of such person's ownership or operation of or involvement with the felt mill property subsequent to the disposal or discharge of contaminants, and has exercised appropriate care with respect to contamination found at the facility by taking reasonable steps to:(i) stop any continuing release;(ii) prevent any threatened future release; and(iii) prevent or limit human, environmental, or natural resource exposure to any previously released contamination.

690. Percy is participating in the DEC's voluntary cleanup program developed in the mid-1990s to encourage cleanup of sites not so contaminated that they belong on the State Superfund list, known as the Brownfield Cleanup Program (BCP). The BCP is a New York State program for cleanup of contaminated sites. The BCP was statutorily created to provide protections to property owners willing to redevelop contaminated properties, and incentives to remediate and redevelop properties whose productive reuse and redevelopment is impaired by environmental contamination.

691. The DEC is charged with implementing the legislatively created BCP pursuant to the procedure set forth at ECL § 27-1407, and in compliance with SEQRA.

692. SEQRA procedures require that the DEC assess the significance of effects of a proposed action upon the environment and report those comments or recommendations to the Lead Agency under SEQRA.

693. Percy, seeking to participate in this program, submitted a request to the DEC on the form provided by the DEC. The form included information to be determined by the DEC sufficient to allow the DEC to determine eligibility and the current, intended and reasonably anticipated future land use of the Waterbury Mill property, pursuant to ECL § 27-1415.

694. Percy is seeking to participate in the BCP but has had its application returned by DEC on grounds that the BCP is not currently funded, but that is not a proper rejection of a BCP application by the DEC as the BCP laws remain in full force and effect and have opportunities above and beyond funding.

695. Currently the principal inducement to enter the BCP is its generous tax benefits, even though there may not currently be funding for the BCP. Percy is the owner of a site eligible to receive tax credits not only for site cleanup, but also for site redevelopment, tax credits which may far exceed cleanup costs. Percy will also benefit from DEC signoff on the cleanup without having to endure the more onerous requirements of the State Superfund program.

696. An ECL § 27-1433 waiver of interest or penalties or other charges on BCP properties for which the Oriskany Commons Area is in process, will affect the damages and penalties alleged in this Complaint.

697. On January 18, 2017 it was resolved by the Oriskany Village Board of Trustees and its Planning Board that the Planning Board of the Village of Oriskany designate itself as lead agency (hereinafter the "Lead Agency"), and issued a Notice of Determination of Significance, Positive Declaration, pursuant to Article 8 of the Environmental Conservation Law, SEQRA, for the purposes of the Oriskany Commons Study area which encompasses the felt mill property at issue.

698. A Full Environmental Assessment Form, Part 1 (EAF-Part 1) formally commenced the SEQRA process.

699. The Lead Agency determined that the rehabilitation of the felt mill property may generate significant adverse environmental impacts and a draft Scoping Document was prepared and made available to involved and interested agencies, including but not limited to the DEC, and to members of the public for review and comment.

700. A public notice issued on January 30, 2017 for a Scoping Session to consider the draft Scoping Document.

701. The draft Scoping Document, the Notice of Public Scoping Meeting scheduling the meeting for February 28, 2017, the Positive Declaration designating the felt mill rehabilitation as a Type 1 Action, and Lead Agency designation letter were sent on January 26, 2017 to potentially involved and interested agencies, including but not limited to the DEC.

702. A legal notice was published on February 1, 2017 advising the public that the Lead Agency was conducting a public scoping session on February 28, 2017, stating that the purpose of the meeting was to allow all members of the public an opportunity to comment on the scope, that the action upon which notice was given involves the intended adoption and implementation of the Action prepared in accordance with the guidelines established by SEQRA.

703. The notification advised that, based upon review of the EAF Part 2, has the potential to result in one or more significant adverse impacts as identified in the Positive Declaration.

704. A public scoping meeting was held on February 28, 2017 where public input was heard with written comments to be received from the public until March 30, 2017.

705. At the public meeting held on February 28, 2017 all were notifies that the draft Scoping Document presented to those in attendance at the public hearing.

706. The Lead Agency adopted the Scoping Document that had been presented as a draft for comment at the Public Hearing.

707. The Positive Declaration encompassing the felt mill property.

708. The DEC is required to strictly comply with SEQRA's procedural and substantive requirements.

709. The DEC has failed to fulfill the strict procedural and substantive requirements of SEQRA and cannot proceed with this lawsuit because the DEC has not cleared SEQRA and cannot clear SEQRA until Positive Declaration in the Oriskany Commons Action is dealt with.

710. Adverse environmental impacts and proposed remedial action mandated the issuance of the Positive Declaration pursuant to SEQRA, pursuant to ECL § 8-0109, and the rules and regulations promulgated thereunder.

711. The DEC having ignored the Positive Declaration have clearly violated SEQRA, and the rules and regulations promulgated thereunder, including 6 NYCRR § 617.7(c)(2) in that DEC has not participated or even attempted to comply with the SEQRA process. The mission of the SEQRA plan was to have the real property designated a Brownfield to be

properly reclaimed under state and federal rules, regulations and statutes. The DEC refused a request for Brownfield designation to clean up and repair the former felt mill.

712. The DEC was fully apprised and in detail informed of the need for the premises for related classroom instruction on the Alternative Employment Practice. Now the possibility of a backup location for training, for laboratories and facilities, for classroom instruction and continuing education in support of the Alternative Employment Practice, has been thwarted.

713. The DEC refused and continues to refuse to allow the real property to be designated as a Brownfield for cleanup and reuse citing the continuing violation relating to contamination from the fuel tanks that were removed.

714. The SEQRA process stalled when the Lead Agency resigned, citing lack of expertise and unwillingness for the local municipality to join in and consent to the Brownfield designation.

715. The Felt Mill is now sitting, crumbling as an eyesore and blight on the local community because of the refusal of the DEC to allow the real property to be designated as a Brownfield, again citing the very same contamination that occurred decades ago, and in some aspects over a century ago, the exact purpose for a Brownfield designation.

716.

717. The DEC issues are occurring simultaneously with cancellation of the Percy Program partnership agreement with the Research Foundation, replacing the partnership with a Revocable Permit.

718. As of February 20, 2021, the Percy Class has been barred from assembling at SUNY Maritime, despite payment of consideration and issuance of valid permits to Percy to conduct classroom and laboratory instruction for apprentice training. Mr. Dietrich stated regardless of the fact that SUNY Maritime students are being allowed to return to in person classes, He stated that the Percy Class students would never be allowed to return, the animus stemming from the Percy litigation against the State.

719. Refusal to allow employees of the Program to assemble at Maritime College State property is not justified by the current COVID-19 pandemic, and warrants the Court declare that the Percy Program, which is the subject of this litigation, be allowed to exist, and enjoining the assault by State Officers in an effort to terminate the Program. Any doubt as to the motive behind these continuing assaults on the Percy Program, coupled with the actions of State Officers with the DFS as recited in this Complaint, are not just a coincidence. Intervention Pg. 91 Par 180.

720. It is not just a coincidence that several Government Agencies under color of law placed roadblocks to the Alternative Employment Practice.

123

721. It is not just a coincidence that a relationship that the Alternative Employment Practice has had with SUNY Maritime going back over 25 years, and other arms of State Government Agencies have blocked the viability of the Alternative Employment Practice.

722. Percy will not be dissuaded, and brings this action under the Klu Klux Klan Act of 1871, now referred to as 42 U.S.C. 1983 et seq, to assert denial of constitutional rights to property, not the least of which is the property right in skills and knowledge being denied to persons identified by Judge Lasker in Percy v. Brennan as a class of people wanting to work, but being denied the opportunity, an opportunity that was addressed by providing the solution by Governor Executive Order 45, but a solution that was declared unconstitutional, and enjoined because the Governor did not and has not for these many years, sought legislative approval.

### ELEVENTH CAUSE OF ACTION 42 U.S.C. §1981 FOR RACIAL, OR OTHERWISE CLASS-BASED INVIDIOUS DISCRIMINATORY ANIMUS BY THE PARTY-IN-INTEREST AND OWNER OPERATOR DEFENDANTS

723. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

724. This Complaint is also on behalf of a sub-class of the Class herein involving liability of the Owner Operator Defendants for unlawful discriminatory employment practices. Intervention Pg. 133 Par 319.

725. The Class Plaintiffs on behalf of the Percy sub-class states a claim of conspiracy pursuant to 42 U.S.C. § 1985(3), alleging that "racial, or otherwise class-based, invidiously discriminatory animus lay behind the defendants' actions, and has set forth facts from which a conspiratorial agreement between the defendants can be inferred." Intervention Pg. 133 Par 320.

726. 42 U.S.C. § 1985(3) creates a private right of action for recovery of damages "if two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons in the equal protection of the laws. . . ." Intervention Pg. 133 Par 321.

727. Failure to adopt the Alternative Employment Practice, while at the same time using the Plan whose purpose included employee benefits of apprentice training and continuing education as an Alternative Employment Practice develop skills, the Plan was used as a front to cover the Owner Operator Defendants diversion, conversion and embezzlement of funds intended for a Plan which is the alternative employment practice.

728. The Party-in-Interest Defendants and Owner Operator Defendants, aided by the State Officer Defendants, conspired to interfere with the Classes' property rights in skills and opportunities, rights and privileges in the Alternative Employment Practice, protected

124

by laws under the 14th Amendment, respond in monetary damages under 42 U.S.C. §1981, in an amount set forth at the First, Second, Third, Fourth, Fifth, Sixth and Seventh Causes of Action herein. Intervention Pg. 133 Par 322.

## TWELFTH CAUSE OF ACTION AGAINST THE PARTY-IN-INTEREST DEFENDANTS AND OWNER/OPERATOR DEFENDANTS CONSPIRING WITH STATE OFFICERS TO AID AND ABET BREACHES OF FIDUCIARY DUTIES AND OBLIGATIONS

729. All the allegations previously stated are re-alleged and incorporated herein.

730. The Owner Operator Defendants and Party-in-Interest Defendants knowingly induced and participated with the Employers in those breaches of fiduciary duties by providing substantial assistance to those Owner Operator Defendants and had actual knowledge of the breaches of fiduciary duties by Owner Operator Defendants. Intervention Pg. 134 Par 327.

731. To the extent that certain of the Owner Operator Defendants and Parties-in-Interest Defendants were not the primary violators with respect to particular acts and practices alleged as a basis for liability herein, they aided and abetted their co-Owner Operator Defendants who were the primary violators. Intervention Pg. 134 Par 328.

732. Each of the Parties-in-Interest, Defendants and Owner/Operator Defendants, conspiring with State Officers Defendants, enabled and assisted in the accomplishment of one or more of the breaches of duty and wrongs committed by the primary violators constituting the actionable wrong in each Cause of Action herein, and thereby substantially assisted in the wrongs, crimes, torts, statutory violations and unfair practices alleged herein. Intervention Pg. 134 Par 329.

733. Because of their aiding and abetting of each other's wrongs and illegal conduct, which contributed to the losses suffered by Class and to the injury of the employees, they are jointly and severally liable for all of the primary violations alleged herein that they knowingly and substantially assisted in accomplishing. By reason of the foregoing, the aiding and abetting of the breaches have proximately caused damages to the Class and must respond in monetary damages in an amount set forth at the First, Second, Third, Fourth, Fifth, Sixth and Seventh Causes of Action herein. Intervention Pg. 135 Par 330

## THIRTEENTH CAUSE OF ACTION AGAINST EMPLOYER DEFENDANTS AND PARTIES IN INTEREST PROHIBITED TRANSACTION DEFENDANTS FOR CONVERSION

734. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

735. Employer Defendants, the Owner Operator Defendants and Parties-in Interest Prohibited Transaction Defendants, and other participants known and unknown,

wrongfully converted to their own use funds stolen from trust through the fraudulent schemes herein set forth by wrongfully retaining that money and conspired to do so. Intervention Pg 124 Par 274.

736. The Plaintiff Class and the Trust have been injured as a result of unjust enrichment in the damages set forth in this Complaint. Intervention Pg 124 Par 275.

737. Ensure that nursing homes invest sufficiently in effective training so staff can fully comply with infection control protocols. Hold operators accountable for failures to have clinically appropriate policies in place and to effectively train staff to comply with them. Clearly, some facilities were not prepared to handle outbreaks through early and effective training or staffing. AG Report page 49.

## FOURTEENTH CAUSE OF ACTION AGAINST OWNER OPERATOR DEFENDANTS AND PARTIES IN INTEREST PROHIBITED TRANSACTION DEFENDANTS FOR UNJUST ENRICHMENT

738. All the allegations previously stated are re-alleged and incorporated herein.

739. Employers, the Owner Operator Defendants and Parties in Interest Prohibited Transaction Defendants, and other participants known and unknown, have held and continue to hold funds stolen from trust from the Plaintiffs without right thereto. Intervention Pg 124 Par 277.

740. The Class Plaintiff and the Trust Defendant have been injured as a result of unjust enrichment in the damages set forth in this Complaint. Intervention Pg 125 Par 278.

## FIFTEENTH CAUSE OF ACTION AGAINST OWNER OPERATOR AND PARTIES-IN-INTEREST DEFENDANTS FOR CONDUCTING AND PARTICIPATING IN THE AFFAIRS OF AN ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY VIOLATING 18 U.S.C. § 1962

741. Plaintiffs re-allege and incorporate all of the allegations above as if fully set forth herein.

742. This cause of action is brought against all the Defendants (collectively "the RICO Defendants"), alleging a cause of action under 18 U.S.C. § 1962 (c).

743. From at least 2002 up to and including June, 2018, the Defendants, being persons employed by and associated with the Enterprise described herein, did unlawfully, knowingly and intentionally conduct and participate, directly and indirectly, in the conduct, management, and operation of the affairs of the Enterprise described herein, which was engaged in, and the activities of which affected, interstate and foreign commerce, through a pattern of racketeering activity consisting of multiple acts of racketeering, indictable under 18 U.S.C. §§ 1343 (wire fraud), 18 U.S.C. § 664 (embezzlement from an employee benefit plan) and 18 U.S.C. § 1956 (money laundering), in violation of 18 U.S.C. § 1962 (c).

126

**The Enterprise**

744. The Defendants herein constitute an "Enterprise" as that term is defined in 18 U.S.C. §1961 (4), that is, a group of individuals and businesses associated in fact, which engaged in and the activities of which affected interstate commerce. Each Defendant participated in the operation and management of the Enterprise.

745. The Pattern of Racketeering Activity Wire Fraud (18 U.S.C. §1343)

746. It was a part of the pattern of racketeering that from at least 2002, and continuing until June, 2018, in the NDNY and elsewhere, Defendants knowingly and intentionally devised and intended to devise a scheme and artifice to defraud, and to obtain money and property from the Plaintiff, by means of false and fraudulent pretenses, representations, promises, and material omissions with a duty to disclose, and for the purpose of executing such scheme or artifice, did knowingly transmit and cause to be transmitted by means of wire communications in interstate commerce, certain writings, signs, signals, and pictures, that is, inter alia, DOH annual Cost Reports (Form RHCF-4), in violation of 18 U.S.C. § 1343.

747. It was part of the scheme to defraud that Employers operated a self-insured health, disability and workers compensation benefit plan, however, Carrier Defendant was defrauded in that Workmen's Compensation Insurance was not paid through to Carrier Defendant to be properly secured under NY Regulation 114 (11 NYCRR §126).

**Embezzlement from an Employee Benefit Plan (18 U.S.C. § 664)**

748. During the entire period of the Plan, the party in interest Defendants, in concert with State Officer Defendants, continued to wrongfully divert funds intended exclusively for the Plan to other purposes which had no relationship to the Program, although the diversions had personal significance to the party in interest Defendants who were allowed by the Owner Operator Defendants to divert the Plan assets. Intervention Pg. 9 Par 7

749. It was a part of the pattern of racketeering activity, that from at least 2012, up to December, 2017, the Defendants, did continuously embezzle, steal and unlawfully and willfully abstract and convert to their own use and the use of others in the approximate amount of $53 million, the moneys, funds, securities, premiums, credits, property and other assets of the Sentosa Plan, an employee welfare benefit plan, subject to Title I of the Employee Retirement Income Security Act of 1974, and of a fund connected with such plan.

750. The plan assets were converted to uses other than workers' compensation benefits, e.g., inter alia, personal and other business obligations of the Defendants.

127

751. Party-in-Interest Defendants diverted plan assets needed to cover workers' compensation in violation of their fiduciary duties to act solely in the interest of the plan participants and their beneficiaries and with the exclusive purpose of providing benefits to them, carry out their duties prudently and pay only reasonable expenses.

**The Trust Fund Scheme**

752. It was part of the scheme that from 2002 to 2018 the Defendants were not fully funding and were in fact diverting assets from the Program the entire time. Intervention Pg. 60 Par 59.

753. Various 114 Trusts under NY Regulation 114, 11 NYCRR §126 ("114 Trust") were established to receive Plan funding by the Employers to be held to secure payment of benefits. Trust Defendant Rashbi became the Administrator of the Plan set up a fiduciary New York Regulation 114 Trust. Intervention Pg. 60 Par 54, Pg. 60 Par 55, Pg. 60 Par 56, Pg. 60 Par 57, Pg. 60 Par 58.

754. It was the purpose of the 114 Trusts to receive loss fund payments from Employers and others into trust for reimbursement to Plaintiff for benefits paid on behalf of Employers, to hold funds as collateral paid in Trust on behalf of employees of Employers, jointly and severally pooling such funds to cover claims of employees of Employers. Intervention Pg. 60 Par 59, Pg. 61 Par 6, Pg. 61 Par 61, Pg. 62 Par 63, Pg. 62 Par 64, Pg. 62 Par 65.

755. The trust agreements were first submitted to the New York State Department of Financial Services ("DFS") in 2006 in order to obtain approval for the disposition of NDNY Federal Case No. 03-cv-01481, and to resolve the receivership brought against plaintiff in State Supreme Court on grounds that the Employers had not provided collateral in a form acceptable to secure benefit payments to employees. Intervention Pg. 61 Par 60.

756. It was a further part of the scheme to defraud that, despite the agreement to settle the lawsuit and establish a 114 Trust, the Defendants willfully continued to defraud the Class by underfunding and diverting assets from the 114 Trust.

757. It was a further part of the scheme to defraud that the Defendants made funds received from Medicaid, private pay, Medicare and insurance unreachable by Plaintiffs to reimburse claims paid on behalf of Employers' employees.

**In March 2013 the Trust Defendant took over as the settlor, became the administrator of a 114 Trust at IDB Bank of New York**

758. The Owner Operator Defendants breached their fiduciary duties under ERISA by failing to make or arrange for payment of benefits to the Class, by failure to maintain plan assets in a fiduciary capacity, by failing to have adequate policies and procedures in place to monitor the operation of their Plan, by negligently and with malicious ulterior motives described herein, the Owner Operator Defendants by cover of Isaac Muller for persons

128

to, diverted, converted and did hide Plan assets rather than place them in trust protection as required by the Program and ERISA. Intervention Pg. 79 Par 152.

759. The Owner Operator Defendants conspired as part of the scheme with Party-in-Interest Defendant Isaac Muller, causing Mr. Muller to fail to fund the 114 Trust from January 2012 until May 2013. Intervention Pg. 69 Par 112.

760. It was part of the scheme that the Defendant Isaac Muller/Broad Coverage Services was paid as a service provider to the Plan despite the failure of the Owner Operator Defendants to fund the 114 Trust from 2012 until May 2013. Intervention Pg. 62 Par 66.

761. Broad Coverage Services/Isaac Muller was removed from the TD Bank 114 Trust and the Plan Trust was re-established with IDB Bank of New York as the Custodial Trustee. Intervention Pg. 62 Par 67.

## The 2013 and Prior Theft of Plan Assets

762. This Complaint is made by the Class of employees denied benefits of the Plan under a Program that was approved by predecessors of the State Officer Defendants over 25 years ago to provide employee benefits compensating, educating, and training for the risks attendant to their employment, and compensating for nonoccupational and occupational injuries and illnesses, without requiring a determination of whether they are work or non-work related.

763. Beginning in February 2012 the Owner Operator Defendants stopped funding the loss sensitive program, causing the Carrier Defendant to cancel coverage on May 22, 2012. The Owner Operator Defendants obtained a restraining order from Supreme Court Kings County, Index Number 10608/12 stopping the cancellation of coverage. Intervention Pg. 65 Par 88.

764. It was a part of the scheme that Defendants failed to fully fund the 114 Trust, including substantial unreimbursed claims from the 2002-2008 period, and continued the same failure to fund from February 2012 through May 1, 2013, and then only partially funded, intermittently and anemically resulting in the shortfall in funding of their Plan and Program. Intervention Pg. 65 Par 89.

765. A part of the scheme arose out of a settlement in September 2013, of lawsuits in State Supreme Court in summer of 2012 involving the Program, which is the basis of their Plan, the Owner Operator Defendants agreed to fund a loss settlement trust (the New York Regulation "114 Trust"). Intervention Pg. 69 Par 109.

766. It was then that the trust was established at IBD Bank of New York in 2014 with Rashbi as the Administrator as part of the settlement of Oneida County Supreme Court lawsuits brought in 2012. Intervention Pg. 69 Par 110.

767. It was the purpose of the 114 Trusts to receive fund payments from Employers into trust for benefits paid on behalf of Employers, to hold funds as collateral paid in trust to cover the liability of the Employers, jointly and severally pooling such funds to cover employee benefits. Intervention Pg. 69 Par 111.

**Renunciation of Obligation to pay for Benefits Required by their Plan.**

768. As part of the scheme, all under color of law in complicity with State Officers, specifically Martha Lees, over six years after issuance of coverage and acceptance by the Owner Operator Defendants, after the Carrier Defendant Oriska Insurance was terminated by the Employers on May 1, 2018, the Owner Operator Defendants on September 19, 2019 abruptly renounced and disavowed the coverage provided by Oriska Insurance, claiming the policies were illegal, null, void and of no force and effect. The Owner Operator Defendants refused to secure benefits to the Class, relying principally upon a February 7, 2019 letter to Lipsius from State Officer General Counsel of the DFS Lees. Intervention Pg. 77 Par 140.

769. It was further a part of the pattern racketeering activity that the Defendants for the purpose of executing, attempting to execute, and in furtherance of the above- described wire fraud scheme, from 2010 through June, 2018, knowing the funds they received from the DOH were proceeds of the scheme to defraud which constituted unlawful activity, the Defendants and other participants known and unknown, conducted and attempted to conduct certain financial transactions affecting interstate commerce that were intended to promote the carrying on of the unlawful activity, by repeatedly depositing those funds in financial institutions, including but not limited to, Bank of America and JP Morgan Chase Bank, all of which are financial institutions engaged in, and whose activities affect interstate commerce, and by repeatedly making interstate payments to the aforesaid Defendants and participants in the scheme with proceeds from the same, in violation of 18 U.S.C. § 1956.

770. Between 2010 and until the present, as detailed herein, the Owner Operator Defendants, Party-in-Interest Defendants, furthered the wire fraud and money laundering scheme by means of investing the proceeds from the unlawful activity in, inter alia, purchases of real estate, business loans and the establishment of a new insurance company (S&P).

771. From May to November 2017, as detailed herein, the Defendants furthered the wire fraud and money laundering scheme by seeking to license S&P as an insurance company in New York State. As part of the application process, the Defendants submitted to DFS through the U.S. Mail a Proof of Funds report which stated that the source of capitalization of S&P was solely from certain family partnerships, when, in truth and in fact, the source of the capitalization of S&P was partially derived from the proceeds of the unlawful activity described herein.

772. The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961 (5).

773. Plaintiffs request that this court enter judgment against the Defendants as follows: actual damages, treble damages and attorneys' fees.

774. Plaintiffs re-allege and incorporates all of the allegations above as if fully set forth herein.

775. This cause of action is brought against all of the Defendants (collectively "the RICO Defendants"), alleging a cause of action under 18 U.S.C. § 1962.

**Investing Income from Racketeering Activity in the Enterprise**

776. State Officers aided and abetted as part of the scheme, in a financial examination by the New York State Department of Financial Services, on licensing Standard and Preferred Insurance Company ("S & P") to become licensed as a New York domestic property and casualty insurance Company, which is evidenced by trace to the source of funding determinable by State Officers that the source was from the Employers from funds that should have been in trust, easily identified by the examining State Officers that failed, intentionally or otherwise, to identify with due diligence the capitalization of S & P, stopping at the escrow account provided by Calamari. Intervention Pg. 127 Par 293.

777. In fact, the capitalization was from Plan assets funded by prohibited transactions by the Owner Operator Defendants previously identified herein. Intervention Pg. 127 Par 294.

**S & P Insurance**

778. In November 2017 State Officers finished their examination of S & P Insurance and certified that the capitalization from the Philipson Trust and the Schlesinger Trust were legal in accordance with Article 15 of the Insurance Law. State Officers failed to identify the source of capital to be the Parties-in-Interest from diverted funds. Intervention Pg. 75 Par 132, Pg. 75 Par 133, Pg. 76 Par 134, Pg. 76 Par 135, Pg. 76 Par 136 Pg. 76 Par 137.

779. State Officers authorized issuance of licenses to S & P Insurance, based on capital that belongs in trust for the Program, a plan that involved the very same insureds and Rashbi Trust known to State Officer Masterson on and before December 1, 2014. Intervention Pg. 77 Par 138.

780. The Employee Class and the Rashbi Trust have been denied the funding to their Plan under color of State law, State rules and regulations used to ratify the scheme, achieving the goal to divert Program funding from their Plan and Trust in prohibited transactions. S & P Insurance received Plan assets, either directly or indirectly traceable to and from the Employers, funds that should be in trust to secure to collateralize benefits and must be forfeit and disgorged to trust. Intervention Pg. 77 Par 139.

131

**Judgment on this RICO Cause of Action**

781.    Plaintiffs request that this court enter judgment against the Defendants as follows: actual damages, treble damages and attorneys' fees in the amount of .

**THE PERCY PROGRAM**

**THE PERCY PROGRAM, REFERENCED HEREIN (DOCUMENT #6, ATTACHMENT 21 IN EDNY CASE NO. 21-CV-01366)**

**History of Apprenticeship in the Percy Program**

782.    The Percy Program was developed with the assistance of predecessors of Defendant State DFS officers: former Chief Deputy Frank Donohue, and former General Counsel Morty Greenspan, who worked tirelessly to shepherd the development of the Percy Program. Oriska's singular mix of tools provides training and working environments that exists nowhere else. Such rich benefits under the Percy Program results in retention of well trained, competent and safety conscious workers for Employers who participate in the Percy Program.

783.    It happens that 90% of the persons accessing the Percy Program have been disadvantaged by natural selection, meaning that the disadvantaged have a difficult time being accepted into organized labor OJT apprenticeship programs. The Percy Program can work with unions utilizing union journeypersons for OJT apprenticeship of Percy apprentices, providing jobs to union members and apprentices, benefiting all.

784.    The Percy Program began in 1984, and for 25 years has provided apprenticeship to hundreds in the skilled trades. The Percy Program moved from upstate New York to the Bronx in 1999 to accomplish the same substantial and permanent good that was accomplished upstate.

785.    In 1998, Percy began the Apprenticeship Programs in the New York City area at SUNY Maritime College in the Bronx. The Percy Apprentice Training Program is an integral part of Percy's safety training and loss control for workers' compensation insurance coverage and employee benefit insurance coverages designed specifically to comply with prevailing wage and supplement benefit requirements for the construction industry. The related classroom instruction part of apprenticeship training was designed to comply with requirements of the New York State Departments of Labor and Education. Since 1999, the Percy Program, in partnership with State University of New York Maritime College ("SUNY Maritime"), has trained skilled trade persons through the OJT Apprentice Program.

786.    The Percy Program works under the delegation of authority by the Federal Bureau of Apprenticeship Training to the NYS Departments of Education and Labor. The Percy

132

Program works under the guidance, authorization and regulation of the New York State Departments of Education and Labor.

787. Workers' safety is affected positively utilizing the Percy Program, resulting in greater control of risk, reducing loss for Employers and injuries and illnesses to employees, through instruction in safe and healthful practices.

788. The length of apprenticeship varies from two to five years, depending on the occupation. The Program works especially well in public works construction where the federal Davis-Bacon law and the NYS Labor Law Article 8 keep wages in the skilled trades high. The apprentice is paid a percentage of the journeyperson rate while in apprenticeship as part of the workforce working under the guidance of more experienced workers called journeypersons.

789. Successful completion of all requirements results in award of a NYS Department of Labor Certificate recognized by the Federal Bureau of Apprenticeship Training verifying journeyperson competency.

**Worker Assessment**

790. All workers undergo a complete series of entry- and journey-level assessments as part of the Percy Program. These assessments evaluate the knowledge of an individual and provide a prescription for upgrade training when needed. All assessments are based upon curriculum developed in conjunction with subject matter prevalent in the covered industry. The assessment and certification are in compliance with existing federal, state and local employment laws.

791. Assessment tests assess an individual's skill level. Performance verifications are administered by a qualified objective performance evaluator.

**Hazards in the Workplace OSHA Application**

792. Occupational Safety and Health Act of 1970 Section 5(a)(1), "General Duties Clause", recognizes hazards in the workplace that are causing or are likely to cause death or serious physical harm, including from airborne infectious diseases.

793. OSHA requires the Owner Operator Defendants to comply with safety and health standards and regulations promulgated by OSHA to provide their employees with a workplace free from recognized health hazards likely to cause death or serious physical harm taking steps to reduce workers' risk of exposure to the coronavirus, among other exposures. The Owner Operator Defendants have refused the Alternative Employment Practice which includes an infectious disease preparedness and response plan under the Alternative Employment Practice incorporated into a welfare plan to protect and take action in this time of extreme emergency because of the COVID-19 pandemic. Intervention Pg. 97 Par 199.

133

794. The Alternative Employment Practice includes training in OSHA mitigation is by engineering and administrative controls, and by safe work practices described here:.

- Personal protective equipment (PPE, including goggles, face mask, gowns) as may be necessary, to assist medications, including IV, oxygen monitoring, and administration of bathing, personal care in hospitalization, home health care and nursing home settings.

- Engineering controls include mechanical methods of separating an employee from a workplace danger, air filtration systems or physical barriers, as sneeze guards.

- Administrative controls changing human behavior to reduce exposure to a hazard, encouraging sick employees to stay home, keep workers six feet apart from each other and reducing unnecessary travel to locations with coronavirus outbreaks.

- Safe work practices provide disinfecting products so employees can clean their work surfaces.

- Working in personal protective equipment (PPE) including masks, gloves, hard hats, eye protection and respirators, and nurses working triage in hospitals.

- Apprentices and journeyperson employees will receive various work experiences listed below (customized to the needs of specific employers, local requirements and specific care settings). The apprentice will learn and practice the competencies working with a mentor at a work site.

- Each Apprentice and journeyperson employee must be instructed in safe and healthful work practices and shall ensure that apprentice(s) are trained in facilities and environments in cleaning, decontamination and disinfection, area specific safety standards, OSHA/blood borne pathogens, microbiology, mold, viruses, bacteria (e.g. cross contamination, chain of infection, microbial transmission, infection prevention, safety awareness standards (e.g. safety data sheets (SDS)) by regulatory agencies and professional associations).

795. Work areas covered include decontamination, correct cleaning agent or chemicals for cleaning process, supplies needed (e.g. brush, towels, location of restock):

- equipment (e.g. washer disinfector, ultrasonic, cart washer, leak tester), determine and prepare chemicals following the manufacturer's IFU (e.g. dilution, equipment), check and replenish chemicals in equipment, determine the correct chemicals for the equipment, testing the functionality of light and magnification devices, clean sink strainer/drains (e.g. frequency), quality tests, efficacy testing process for washer/disinfector, efficacy testing process for ultrasonic, efficacy testing process for automated endoscope reprocessor (AER),

- efficacy testing process for cart washer, frequency of quality tests (e.g. washers,

134

ultrasonic, AERs, cart washers), document and interpret quality test results (e.g. quality assurance testing program), maintenance and troubleshooting of equipment, interpret the manufacturer's IFU (e.g. operator's manual, locate), identify, respond and report malfunctions and/or alarms, clean equipment strainers/drains, Identification of outlets (e.g. on/off, regular, emergency), chemical feed line functionality (e.g. identifying detergent dosage), clean and test spray arms, check washer manifolds and baskets, identification and separation of reusable and disposable items, sorting reusable and disposable items (e.g. laparoscopic tips, linens, drapes, third-party recycling vendors, sustainability), dispose of sharps and non-reprocessed items (e.g. biohazards vs non-regulated trash, sharps container), preparing items for decontamination, identify manual and/or mechanical cleaning according to the manufacturer,

• proper opening and positioning of instruments, disassemble instruments, what goes in each sink (e.g. two or three sink method), soak process (e.g. water temperature, dilution), brushes (e.g. selection, size and care, single use vs reusable), prevention of aerosols,

• use of high-pressure water and air gun/hose (e.g. critical water), visual inspection of bioburden removal (e.g. magnifying devices), properly load items into the equipment, selection of appropriate wash cycle, methods for reducing the risk of toxic anterior segment syndrome (TASS), special precautions for Creutzfeldt-Jacob Disease (CJD) instruments, selecting and using appropriate disinfectant, disinfectant family (e.g. Quats, Halogens, Aldehydes), three levels of Spaulding classification (e.g. non-critical, semi-critical, critical),

• identifying, selection and use the appropriate chemicals (e.g. exposure times, rinsing), documentation of chemical testing (e.g. temperature, minimum effective concentration (MEC)),

• correction for failed quality tests (e.g. temperature, MEC), high level disinfection (HLD) process, safety measures when using HLD (e.g. PPE, spill kit, ventilation), dilution requirements (e.g. concentration, expiration, end of use date, labeling),

• rinsing requirements (e.g. critical water), proper documentation (e.g. technician information, patient information, exposure time and solution temperature, lot control number), are, handling and storage (e.g. drying, expiration date), proper disposal methods (e.g. neutralizer),

• transporting guidelines (e.g. closed container, clean labeling), transferring items to preparation area, maintain appropriate air flow (e.g. negative pressure, positive pressure), prevent cross-contamination (e.g. point of use cleaning and decontamination prior to IUSS), performing a visual check for cleanliness, preparation and packaging, area specific safety standards, area specific safety awareness (e.g. hot carts, wet floors,

135

hot trays), sharps safety (e.g. skin hooks, k-wire, towel clips), equipment operation (e.g. heat sealers, insulation testers, scope inspectors), where to find Safety Data Sheets (SDS), chemical safety and handling (e.g. interpreting the manufacturer's instructions for use (IFU) and SDS, disposal),

- ergonomics (e.g. work-flow, proper body mechanics), traffic flow, hand-hygiene, temperature and humidity of the work environment, standards for temperature, standards for humidity, recording and documenting temperature and humidity (e.g. frequency), corrective actions taken if not within parameters (e.g. who to notify), preparing work area for packaging, dress code, supplies needed (e.g. indicators, tip protectors, tray liners, tape), work area requirements (e.g. cleaning requirements, lighting, magnification), receiving items for preparation, unload equipment (e.g. instrument, cart washers), accept manually cleaned items (e.g. pass-through window), identify and sort items (e.g. service, facility, loaner),

- inspecting items for cleanliness and functionality, check for cleanliness and functionality, proper testing tools and process for checking functionality of items (e.g. sharpness testing), process of handling broken and/or damaged instrumentation (e.g. dull, misaligned, documentation), lubrication of items (e.g. according to the manufacturer's IFU, when and lubricate), assemble, test and disassemble items according to the Manufacturer's IFU, identifying correct contents for assembly, utilizing count sheets, peel pack lists, tray lists, identify items (e.g. catalogs, product number, computers, tape, etching, cross-referencing),

- sizing and measuring items, assembling contents for packaging, instrument protection devices (e.g. tip protectors, foam, mats, tray liners), proper instrument placement (e.g. facilitate sterilization, protect instruments), instrument organizers (e.g. stringers, racks), class/type and appropriate use of chemical indicators/integrators (e.g. proper placement, intended cycle),

- weighing limits and weight distribution, packaging method, types of packaging method (e.g. flat wrap, peel pack, container, size, packaging weight, sterilization method/cycle to be used, external indicators (e.g. locks, tape), inspecting packaging (e.g. wrap, rigid containers),

- closing methods (e.g. tape, locks, heat seal, self-seal, proper packaging methods (e.g. peel packs, rigid containers, wrap (simultaneous vs sequential)), proper wrapping techniques (e.g. square fold, envelope), labeling method, approved writing instrument,

- placing of labeling and writing (e.g., write on plastic side of peel pouch, write on tape not wrapper), proper label information (e.g. missing items, tray information, technician identification, storage destination), special information identifiers (e.g. implant, loaners, sterilization methods/cycle), date of sterilization/date of expiration

136

(e.g. event-related vs time), transferring items to appropriate area, proper item handling (e.g. stacking, rough handling (sliding), package integrity),

• prioritizing for rapid turn-around, ergonomics (e.g. workflow, body mechanics), track items (e.g. manual, computer), documentation and record maintenance, record maintenance, record keeping (e.g. policy and procedure, what needs to be kept, type of records, record location, quality test results), purpose of record keeping (e.g. standards, legal documents), environmental condition monitoring and corrective action, appropriate air exchanges and pressures for all work areas, corrective action plan for environmental conditions out of compliance (e.g. temperature, humidity, air flow, regulatory bodies).

796. Covered are:

• sharps safety, equipment operation, chemical safety and handling (e.g. spill kit, interpreting the manufacturer's instructions for use (IFU) and SDS, disposal), Location, operation and testing of eyewash station and shower, ergonomics (e.g. work-flow, proper body mechanics), Traffic flow, contain, transport and receive soiled items into decontamination or soiled utility rooms (e.g. inspecting for and reporting inadequate point of use cleaning), Hand-hygiene (e.g. frequency), Personal Protective Equipment (PPE), what type of PPE to use, donning and doffing PPE, When to change and dispose of PPE, temperature and humidity of the work environment, standards for temperature, standards for humidity, recording and documenting temperature and humidity (e.g. frequency), corrective actions taken if not within the parameters (e.g. who to notify),

• employee education, safety and risk management, accident/incident reporting policy (e.g., patient tracing procedure, in event of needle stick, cut), orientation (e.g. health care facility, state and federal regulations, disaster plan, risk management and safety management policies), personnel monitoring (e.g. exposure control plan, badges), education and training record requirements (e.g. certification, competencies, continuing education, new equipment and processes),

• cleaning equipment (e.g. according to the manufacture, drains, chamber), checking equipment functionality (e.g. error codes, printer, incubators), sterilizer tests, leak tests, bowie dick/air removal tests, biological tests (e.g. high and low temperature, cycle changes), when to perform tests (e.g. repair, construction, malfunction, routine), sterilization methods and cycles, high temperature (e.g. steam, dry heat), low temperature (e.g. gas plasma, vaporized, ethylene oxide, liquid chemical), anatomy and phases of the high and low temperature sterilizers, different types of cycles (e.g. gravity, dynamic, standard, advanced),

• pre and post-sterilization package integrity, what compromises integrity (e.g. moisture, holes, filters, broken locks and seals), filter placement, locks, seals and external

137

indicators, load sterilizer, load configuration (e.g. metal, wrapped, rigid container, peel pouch), sterilization method verification (e.g. high vs low temperature), biological tests/process challenge devices (e.g. selection, placement), identify appropriate use of external indicators (e.g. sterilization method, placement), operating and monitoring sterilization equipment, sterilizer component checks (e.g. according to manufacturer, door gaskets, drains, carts, incubator temperature verification), select and change cycle for high and low temperature sterilizers (e.g. exposure, dry, temperature), replace and dispose of empty cartridges/tanks/cassettes, cycle parameter verification, interpret the printout (e.g. temperature, time and pressure exposure, cycle type),

797. Verification procedures to ensure accountability include the following:

- unloading sterilizer, what compromises sterility (e.g., cooling time, temperature, handling, equipment failure), traffic flow (e.g. cart placement), test results, proper handling and incubation of the biological tests/process challenge devices, quarantine (e.g. implants, early release),

- interpreting and document test results, potential process failures, identify a process failure (e.g., wet packs, color change, failure to meet sterilization parameters), procedure for follow-up after process failure (e.g. recall, documentation, contact), load control (lot) number, required information for a load control (lot) number, documenting sterilization load contents, how and what to record (e.g. computer or manual load log sheet), rationale for documentation (e.g. recall, traceability),

- customer relations, customer relations, communication etiquette (e.g. phone, email, text, active listening), decision-making skills (e.g. prioritizing, critical thinking), communication types (e.g. formal, informal, service recovery skills), medical terminology (e.g. anatomy and physiology, surgical terminology, instrumentation), teamwork and work groups, types of work groups (e.g. quality, cross-functional), decision making and accountability (e.g. identify roles and responsibilities), task prioritization (e.g. reading the schedule, turnover, anticipating customer needs),

- sterile storage and inventory management, area specific safety standards, area specific safety awareness (e.g., traffic flow, hand-hygiene, safety data sheets (SDS)), ergonomics (e.g. work-flow, proper body mechanics), temperature and humidity of the work environment, standards for temperature, standards for humidity, recording and documenting temperature and humidity (e.g. frequency), corrective actions taken if not within the parameters (e.g. who to notify),

- preparing the work area for storage, dress code, supplies needed (e.g. carts (closed, open), rack system (closed, semi-closed, open)), work area requirements (e.g. cleaning requirements), ordering and inventory replenishment, inventory replenishment and distribution systems (e.g. periodic automated replenishment, exchange cart system,

138

requisition systems), the ordering process (e.g. computerized vs manual), identify the product (e.g. catalog numbers, item number, descriptions), unit of measure (e.g. each, box, package, case), handle inventory deficiencies (e.g. outages, substitutes, communication),

• receiving and inspecting inventory, proper break-out area (e.g. corrugated cardboard, external shipping containers), inspecting for integrity (e.g. what and when to check), expiration and manufacturing dates (e.g. symbols, what and when to check), stocking and rotating inventory, location of supplies (e.g. shelf/cart location, sterile supplies), shelf life policy (e.g. expiration, event-related), process for rotating inventory (e.g. first in first out (FIFO)), proper storage requirements (e.g. height, weight, distance from wall/floor, shelving),

• distributing sterile and non-sterile items, distribution methods (e.g. just in time, exchange cart, case cart), proper handling of items (e.g. maintain sterility), transport guidelines (e.g. closed cart, bins, dust covers, off-site transport), monitoring and tracking items distributed, high dollar items, specialty carts (e.g. code carts, emergency carts, c-section), critical items (e.g. special order, non-stock items, doctor specials, patient specific items), vendor-owned items (e.g. loaner, consignment),

• items organization and tracking (e.g., manual, RFID, computerized), distribution to user departments (e.g. ER, OR, clinics, ICU), loss of sterile items, handle manufacturer product recalls, common causes of waste and loss (e.g. damaged, expired and obsolete items), patient care equipment, area specific safety standards, area specific safety awareness (e.g. OSHA/blood borne pathogens,

• personal protective equipment (PPE), electrical safety, hand-hygiene, regulatory agencies and professional associations), equipment operation and interpret the manufacturer's instructions for use (IFU) (e.g., operator's manual), temperature and humidity of the work environment, standards for temperature, standards for humidity, recording and documenting temperature and humidity (e.g. frequency),

• corrective actions taken if not within the parameters (e.g., who to notify), preparing the work area for distribution,

• supplies needed (e.g., sleeves, pads, equipment covers, clean labels/stickers), work area requirements (e.g. cleaning requirements, charging stations, plugs), receiving items for preparation, identifying types of patient care equipment, process for recording and tracking equipment (e.g. rental, loaned), the flow of patient equipment (e.g. one way flow),

• inspecting equipment for cleanliness and functionality, check for cleanliness, check for compliance with safety standards (e.g. frayed cords, preventative maintenance

139

label, damage), corrective action plan for equipment out of compliance (e.g. missing/expired preventative maintenance label, who to notify), equipment requiring charging or battery replacement, preparing equipment for distribution, assemble equipment for distribution (e.g. disposable components, manufacturer test equipment (e.g. per manufacturer), care and handling, location and proper storage of equipment (e.g. dry, clean), distributing and tracking equipment, systems used (e.g. manual, computer, hybrid), record and track distribution of patient care equipment, transport guidelines to end user departments (e.g. or, ed, labor and delivery),

• anatomy for central service technicians, cells, tissues and organs, body systems: skeletal, muscular, nervous, endocrine, reproductive, urinary and excretory, respiratory, digestive, and circulatory, anatomy and instrument names, microbiology for central service technicians, overview of microbiology, beneficial vs. dangerous microorganisms, how microorganisms are identified and classified, controlling and eliminating microorganisms, regulations and standards, regulatory agencies, professional associations, infection prevention, central service processes, principles of asepsis, personal hygiene and attire, managing the environment to manage the spread of bacteria, Occupational Safety and Health Administration (OSHA) 29 CFR 1910.1030,

• environmental concerns in central service areas, elements of transmission and the chain of infection, decontamination; point of use preparation and transport, goals of point-of-use preparation and transport, sources of contaminated items, point-of-use preparation: reasons and guidelines, transport of soiled items, off-site processing, education and training, cleaning and decontamination, introduction to the decontamination work area, mechanical cleaners, equipment testing, cleaning chemicals and lubricants, instructions for use,

• steps in the process of decontamination, decontamination, disinfection, introduction to disinfectants, types of disinfectants, safe work practices when performing manual disinfection, achieving disinfection using mechanical processes, quality assurance for disinfection, quality assurance testing for high-level disinfectants,

• surgical instrumentation, the important role of instrument selection and inspection, instrument manufacturing process, classification and overview of surgical instruments, postoperative care of surgical instruments, solutions that damage instruments, instrument sharpness testing and identification, instrument identification methods, instrument lubrication, tips to protect instruments from damage, complex surgical instruments,

• power surgical instruments, endoscopes, rigid and semi-rigid endoscopes, rigid and semi-rigid endoscope general guidelines for decontamination, rigid endoscopic instruments, endoscopic and robotic instrumentation, flexible endoscopes, cleaning and

140

processing flexible endoscopes, flexible endoscopic accessories, flexible endoscope regulations and guidelines,

- Infection prevention issues, flexible and rigid endoscope care and handling, endoscope camera care and handling, endoscopic repair,

- staff education, loaner instrumentation, assembly and packaging, assembly and packaging area, primary goal of pack preparation, general guidelines for preparation of pack contents, quality assurance measures - internal chemical indicators, basic packaging procedures, reusable packaging materials, disposable packaging materials, wrapping techniques, methods of packing closure, package labelling, special packaging concerns, point of use processing,

- use of steam sterilization, procedures for immediate use steam sterilization, quality control monitors for immediate use steam sterilization, point-of-use processing for heat-sensitive devices, high-temperature sterilization, factors that impact sterilization, advantages of steam sterilization, anatomy of a steam sterilizer, types of steam sterilizers used in central service, steam sterilizer cycles, conditions necessary for effective steam sterilization, basic work practices for steam sterilization, sterilization quality control, low temperature sterilization, low-temperature basic sterilization requirements, ethylene oxide, hydrogen peroxide systems, ozone sterilization,

- sterile storage and transport, storage considerations, receipt of sterile items into storage, event-related sterility, basic storage guidelines, cleaning, sterile storage professionals, transporting sterile items, transportation guidelines, monitoring and recordkeeping for central service, the importance of accurate records, general monitoring, decontamination area monitoring, high-level disinfection monitoring, sterilization monitoring, sterilizer specific monitoring, personal monitoring, staff education, quality assurance, quality in central service operations, components of quality, quality control indicators, analysis of quality concerns, quality program alternatives, quality central service procedures, quality in central service processing areas, managing inventory within the central service department,

- handling commercially sterilized items, item locator systems, loss of sterile items, transport of commercially-sterilized packages, distribution of supplies, sustainability, the role of central service in inventory management,

- role of central service in ancillary department support, identifying the central service department's scope of service, patient care equipment, procuring new and additional equipment, other patient care equipment concerns, procedural support, utensils and other medical equipment, communication and coordination is key, the role of information technology in central service, role of computer-based information systems, tracking systems for central service, features of instrument and equipment

tracking systems,

- safety and risk management for central service, risk management, common workplace safety hazards, general hazards, area specific safety concerns, other areas of concern, disaster preparedness, employee accidents and injury, patient accidents and injuries,

- employee information and training, employee preparedness, success through communication, need for effective communication and human relations skills, common communication barriers, central service technicians are professionals, basics of communication, human relations, central service technicians and teamwork, central service and diversity, customer service skills for central service technicians, setting priorities, avoiding work group comparisons, committing to patient care during disasters, personal and professional development for central service, personal development.

- standard precautions, and consumer education, apprentice learns about hand washing, using gloves, and mixing universal solutions, apprentice learns about disposal of wastes, use proper body mechanics at all times and incorporate safe transfer and lifting techniques, is knowledgeable about procedures in case of emergencies in the home, check equipment before use and notifies supervisor of any problems identified,

798. The Percy Program includes OSHA Certification Training providing health and safety certification programs to reduce occupational errors and promote protective measures, including OSHA classes, first aid, emergency planning, and fire safety, and OSHA's recently released guidance on classification of worker risk to potential exposure to the coronavirus.

799. The Percy Program works closely with employers and their employees, on education/training, consulting with employers and employees on safety, OSHA regulations, hazardous material handling and health safety evaluation, airborne infectious diseases, lead abatement, asbestos blood borne pathogens, mold and other hazardous materials and fire, traffic control, fall protection, trench safety, drilling and blasting safety, hot and cold weld precautions, heavy equipment safety operation, scheduling and working height safety protection, incorporated into teaching programs. The Percy Program includes on-site safety inspections and risk assessment. creating safe work environments necessary to help to control the workplace and increase safety awareness and loss prevention. Loss prevention includes risk evaluation, pre-inspection, of sites includes loss history, nature of risk, safety practices and program compliance recommendations for implementation of safety programs.

## OSHA 10 and 30 Hour Courses

800. The 10- and 30-Hour course provides instructions on various industry safety and health standards. It introduces workers to safety standards and makes them able to recognize hazards, avoid dangerous situations and prevent accidents, includes intro to OSHA, fall protection, electricity, personal protective equipment, handling, storage, use and disposal of tools.

## OSHA 10 Confined Space Entry

801. An OSHA 10 Permit is utilized for training to recognize, evaluate, control and abate safety and health hazards associated with permit-required confined space entry. The course focuses on the specific requirements of OSHA 29 CFR 1910.146, recognition of confined space hazards, basic information about instrumentation used to evaluate atmospheric hazards, and general permit space ventilation techniques.

## OSHA Ergonomics

802. An OSHA ergonomics course covers the use of ergonomic principles to prevent musculoskeletal disorders. Topics include anthropometry, video display terminals, work physiology, musculoskeletal disorders and risk factors such as vibration, temperature, material handling, repetition and lifting and transfers in health care. The course features industrial case studies covering analysis and design of workstations and equipment, laboratory sessions in manual lifting and coverage of current OSHA compliance policies.

## OSHA Excavation

803. OHSA standard and on safety aspects of excavation and trenching, practical soil mechanics and its relationship to the stability of shored and un-shored slopes and walls of excavations, various types of shoring (wood timbers and hydraulic) are covered.

## OSHA 7600 Disaster Site Worker

804. Employees participate in drills making them aware of safety and health hazards that may be encountered at a natural or human made disaster and contamination spread. The importance of respiratory and other personal protective equipment and proper decontamination procedures that may be used to mitigate the hazards are emphasized. Participants support the use of an Incident Command System through the safe performance of their job responsibilities. They will be able to show awareness of effects of traumatic incident stress that can result from working conditions and measures to reduce stress. Participants perform the following specific tasks:1) inspection of an air purifying respirator; 2) donning and doffing of an air purifying respirator; and 3) respirator user seal check; using skilled support services (e.g., utility, demolition, debris removal, or heavy equipment operation) or site cleanup services in response to a disaster.

## OSHA 2225 Respiratory Protection

805. Covers the requirements for the establishment, maintenance, and monitoring of a respirator program, OSHA standards, NIOSH certification and medical evaluation recommendations. Course highlights include laboratories on respirator selection, qualitative fit testing and the use of a large array of respiratory and support equipment for hands on training (Included Respiratory Medical Clearance Test and Respiratory Mask Fit Test)

## OSHA 3110 Fall Arrest Systems

806. Provides participants with an overview of state-of-the-art technology for fall protection and current OSHA requirements, including the principles of fall protection, the components of fall arrest systems, the limitations of fall arrest equipment, and OSHA policies regarding fall protection. Course Objectives: Identify various types of fall protection and their components; Recognize fall hazards and identify abatement methods for fall hazards; Define the proper use of fall protection equipment and personal fall arrest systems and selection of proper standards for citation purposes.

## Safety and Emergency Preparedness

807. The safety and emergency preparedness is designed to give a clear understanding of the codes and rules, site requirements and safety requirements, fire alarm systems; emergency procedures; training requirements; fire suppression systems; other building systems; maintenance; recordkeeping and knowledge of rules as they pertain to fire safety.

## American Heart Association First Aid, CPR with AED

808. Procedures for CPR and choking, heart attacks, strokes, Automated External Defibrillator (AED) introduction, as well as topics such as bleeding, shock, fainting, poisoning, epilepsy, diabetic emergencies, allergic reactions, burn accidents, heat and cold emergencies, head and neck injuries, and musculoskeletal injuries, is certified, good for 2 years.

## Enforcement of smoking prohibitions

809. Inspection for accumulation of rubbish, location and use of fire extinguishers, and fire alarm pull stations when required; Information of the extent of the out-of-service condition; location of hazardous materials that are stored, handled or used in the building including fuel oil storage tanks; the means available for the fire guard to make required notification.

144

## Environmental Training Lead - Renovation, Repair and Painting Class

810. The U.S. Environmental Protection Agency (EPA) Renovation, Repair and Painting (RRP) Rule, developed under the Toxic Substances Control Act, imposes requirements for contractors, property Owners and managers, who renovate, repair or prepare surfaces for painting in pre-1978 rental housing or space rented by childcare facilities for lead safe work practices, learning lead laws that apply regarding certification and lead safe work practices.

## Mold and Bacteria Remediation

811. Facts associated with mold, interpretation of data and the current general status of mold-related litigation, legislation, licensing, and certification, are covered.

## Blood Borne Pathogens

812. Covered are exposure control plans and workplace practices that will minimize risks, OSHA standard universal precautions, personal protective equipment, safe work practices and engineering controls; decontamination; housekeeping; labels and signs.

## Lead Worker EPA

813. Lead hazard control activities including elevated blood level (EBL), health department ordered projects, USHUD grant programs, public and Indian housing abatement programs and military abatement projects, include: health effects of lead poisoning and sources of lead exposure, testing for lead-based paint, worker protection, abatement, clean-up, clearance testing, disposal of abatement debris, regulation, guidelines and recourses for lead testing and abatement, risk management, hazard control strategies, waste disposal.

## Asbestos Handler

814. Employees on an asbestos project whose duties involve removal, encapsulation, application or enclosure of any asbestos material, or the disturbance of friable asbestos, medical surveillance, personal protective equipment, preparing the working area and setting up the decontamination unit, usage of negative pressure air filters, air monitoring and hazard communication regulations, EPA, OSHA and relevant state and local regulations, New York State Industrial Code Rule (12NYCRR56) and Federal USEPA and USOSHA regulations, waste disposal and recordkeeping requirements, air bulk sampling and glove bag techniques, confirming and minimizing airborne fibers, and on-site safety, are covered.

815. Air Sampling covering air sampling techniques, inspections and procedures, regulations and emergency response, becoming familiar with the methodology for representative quality assurance for both personal and area sampling for phase contrast microscopy (PCM) and transmission electron microscopy analysis (TEM) are included.

145

## COMPONENTS OF THE PERCY PROGRAM

816. The Percy Program on which we seek declaratory judgment relief against the Defendant Government Agencies on the enforceability of the Percy Program, includes apprenticeship and health, disability and workers' compensation benefits offered to employers.

The Benefit Program includes the following:

- Health Insurance

- New York Statutory Disability Insurance

- Short-Term Disability

- Long-Term Disability

- Contract Bonding, including Bid, Performance and Payment Bonds

- Apprenticeship under the National Apprenticeship Act of 1937 as approved by the NYSDOL

- Workers' Compensation Insurance

817. Gaining control of workers' compensation costs is essential. Health care providers under intense pressure from health care programs, find it all too convenient to shift costs to workers' compensation coverage. This can raise the medical cost for any claim by a factor of 100 - 400%. To help alleviate this crushing burden, the Program offers a singularly unique 24-hour protection portfolio jointly administering workers' compensation, health, and disability coverages. Delivery of workers' compensation services and traditional health care reduces costs while providing employees with a simple, state-of-the-art system of health care delivery, combining care for injured and ill workers.

Oriska Insurance is the sole provider of a fully insured 24-Hour Coverage Program of employee benefits (the "24-Hour Coverage Program") offered by Oriska as a domestic New York insurance carrier. The 24-Hour Coverage Program seamlessly provides instant care through a workers' compensation carrier that is also a licensed health carrier, specializing in workers' compensation, health and disability. Oriska is so singularly licensed, licensed for health in its P & C licensing, even though health coverage is normally the purview of a life carrier. This gives Oriska the ability to provide immediate care regardless if the injury is work-related or not in a cost-efficient manner. No other U.S. company is so specially licensed.

The unusual licensing of Oriska for health, disability and workers' compensation insurance within the same carrier enables Oriska to provide immediate care under its health coverage, returning injured employees to work, avoiding long term worker compensation benefit costs. Employees receive the same medical attention whether the

injuries are work or non-work related.

The necessary licenses for the business of accident and health, disability and workers' compensation as specified in paragraphs 3 and 15 of Section 1113(a) of the New York Insurance Law, are required for the loss sensitive 24-Hour Coverage Program. These licenses were granted by the State to Oriska in 1993. The licenses required rating and form approvals by the DFS pursuant to Insurance Law §2307 and were first approved by the DFS for Oriska in 1994, and were revised and ratified in 2003, 2005 and 2007. Carrier Defendant's membership in the New York Compensation Insurance Rating Board ("NYCIRB"), credentialed with the New York Workers Compensation Board ("WCB"), recognized by New York State by the issuance of licenses under paragraphs 3 and 15 of Section 1113(a) of the New York Insurance Law, were necessary to legally operate this 24-Hour Coverage Program, intellectual property specifically approved for Carrier Defendant's individual use and identity.

This loss sensitive program of 24 hour work-related and non-work related coverage is accomplished by endorsing standard policies to provide coverage offered as a portfolio of coverages with basic required pieces that the insured must agree to take and participate in, a basic program that the insured agrees to by its Adoption Agreement. There are additional coverages that are added to enhance the program as the insured chooses.

The basic coverage is workers' compensation as shown on the Information Page of the Policy.

A first aid emergency treatment, well care coverage rider and preventative care is added for claims which are not immediately accepted as work related in order to provide immediate medical care and treatment. If there is a C2 First Report of Claim alleging a work-related incident, the Carrier so notifies the Workers Compensation Board but continues to pay as a non-work-related incident until a claim has been established by decision of the Workers Compensation Board.

In addition, a rider for Enhanced Statutory Disability shall apply for lost wages as an enhancement to supplementing Statutory Disability overage issued by the Carrier or to enhance Disability coverage provided by another carrier [upon renewal of the Program adopted by the Insured, the Carrier shall provide Statutory Disability Coverage at rates in place with another carrier at the time of the initial adoption of the Program, and thereafter at rates calculated by the Carrier for the experience of the Insured. If upon renewal of the Program the insured opts not to purchase its Statutory Disability Coverage from the Carrier, the Carrier has the option to non-renew the Program in its sole discretion].

The Program includes first aid emergency treatment, well care, safety, risk

147

management, loss control, education and continuing education, and apprenticeship. If an insured fails to participate in these aspects of the Program, the Carrier has the option to nonrenewal in its sole discretion.

Oriska reports as a Large Deductible Discount below Standard Premium covering:

- Return to Work Incentive
- Drug Free Workplace
- Scheduled Deductible Credit
- Managed Care
- Work Place Safety
- Apprenticeship
- Premium Discount

The Program coverage is as a trade association covering all of the employees of multiple-coordinated subsidiary policies issued to insureds. The maximum amount that a multiple-coordinated insureds are required to pay is annual standard premium as shown on the Information Page of its policy adjusted by audit, there is no override for the extra benefits provided under the Program.

Assessment (assessments and taxes charged by the State) are paid directly to the State.

From the Annual Premium paid in this loss sensitive Program a deductible premium is retained by Oriska as mutually agreed with the insureds, and the balance paid as a deductible discount to a loss fund to cover actual benefit obligations incurred during the period the Program is in effect, providing an incentive to the insureds to emphasize safety and loss control activities. The deductible discount paid into the Loss Fund are funds that are restricted to the payment of the obligations of the Program as to the time and manner of payment out of the loss fund. When the loss fund balance exceeds 110% of the obligations as defined by the trust, the overage can be distributed as reduction in premium on renewal.

The Program is funded by the flow of revenue from the multiple coordinated policyholders. The Carrier Oriska pays to the Loss Fund consisting of an imprest account and a trust for the reimbursement to Oriska Insurance for obligations of the Program (claim payments, loss adjustment expenses, reserves, safety training and risk management, and Bank and trust fees) to fund the obligations.

All claims of injured or ill employees within the deductible covered under the Program are reimbursed from the Loss Fund either out of the imprest account or the Trust administered by the Administrative Trustee.

After the aggregate limit as agreed between the parties the risk belongs to the

Oriska.

The 24 HR Program Discount for the loss sensitive program is agreed to by "mutual agreement" on a portfolio of coverages and attributes defined within the Program for managed care, loss control, safety training, risk management, continuing education, first aid emergency treatment, well care, apprenticeship, and aspects of the Program as added from time to time by mutual agreement.

## REGULATORY APPROVALS OF PERCY PROGRAM

818. The following is a summary of the regulatory approvals obtained by Oriska Insurance and Oriska Corporation for the Percy Program.

819. The Apprentice Program was first certified by the New York State Department of Labor and Department of Education in 1990. In 1999 the Apprentice Program moved to the Bronx.

820. The endorsements subsequent to 1994, both by direct approval by the DFS or by adoption of NYCIRB policy endorsements, constitute modifications and/or additions to the 1994 Memorandum which initially detailed the workers' compensation coverage approved by the DFS.

821. DFS File 93100407-408 Memorandum, November 15, 1994

822. Approval of Workers Compensation, Accident and Health, and Disability loss sensitive program.

- The Program is offered under Insurance Law 4235, Insurance Law 3443 and Insurance Law 2307.

- Described as a Program of multiple coordinate policies to insureds who have adopted the Program through an Administrative Trustee and have elected coverage through the Program.

- The loss sensitive program endorses standard policies to provide coverage offered as a portfolio of coverages with basic required pieces that the Insured must agree to take and participate in.

- Provides for a Large Deductible Discount.

- The policyholder is the Administrative Trustee or the Professional Employer Organization licensed under Article 31 of the New York Labor Law.

- The maximum amount multiple-coordinated Insured policyholder is obligated to pay Carrier Defendant is the full audited Annual Final Premium plus Assessments.

- The Program is funded by the flow of revenue from the multiple-coordinated policyholders. The Annual Premium is divided into two (2) parts, the first is the

149

Deductible Premium as a percentage of Annual Standard Premium which is as mutually agreed and which is retained by Carrier Defendant; and the second, the balance is the Deductible Discount to reimburse obligations.

- From the annual premium paid in this loss sensitive program the agreed deductible premium is retained by Carrier Defendant as mutually agreed with the Policyholder and the balance paid as a Deductible Discount to a Loss Fund to cover actual Obligations incurred.

- It is not until the balance in the Loss Fund balance exceeds 110% of the coverage Obligations, can there be a return of a portion of annual premium to insureds.

- The Loss Fund consists of an imprest account and a trust for the reimbursement of Carrier Defendant for obligations of the Program (claims payments, loss adjustment expenses, reserves, safety training and risk management).

- Carrier Defendant requires collateral for the credit risk associated with the Deductible Credit.

823. 1996-09-26; NYCIRB LRRO Mutual Agreement Approval by DFS

- Modification approval to 1994 Memorandum to eliminate the NY Large Risk Rating Option limitations and allow the individual large risk.

- Revised the premium eligibility requirement to estimate annual standard premium in excess of $500,000.

824. 2002-11-02; WC Large Deductible Filing DFS Approval

- This is a significant modification to the 1994 Memorandum. Not only were there major changes to the "Program" per the 1994 Memorandum, File 93100407-408 Memorandum, November 15, 1994, the changes to the 1994 Memorandum were incorporated into a policy endorsement.

- 2003 -02-13; Workers Compensation Large Deductible Plan Filing Approval OIC Final is the Department of Financial Services approval of the policy endorsement significantly modifying the 1994 Memorandum.

- Essentially a change from Large Risk Rating Option to Workers' Compensation Large Deductible Plan [Deductible Endorsement (WW 99 06 01 (2002)].

- Requires named insured must sign a copy of the endorsement acknowledging responsibility to reimburse the program and confirming he/she understands the possible economic effects of being responsible for loss adjustment expenses.

- The Plan is designed as an alternative to self-insurance.

- Provides the Explanatory Memorandum and Operational Rules.

- Solvency of insurer is protected by requiring collateral to secure reimbursement.

- Range of deductible amounts.

- Basis for computing Deductible Premium.

- Allows participation by Professional Employer Organizations.

- Provides underwriting guidelines.

- Deductible Endorsement.

- Establishes each named insured is jointly and severally liable for all deductible amounts under this policy.

- Prototype Trust Agreement to be used in lieu of a letter of credit to satisfy the security requirement in the endorsement for the related credit risk.

- Security of the employees is preserved because insurer has primary responsibility to pay claim liabilities to injured employees.

825.  2003-02-13; Workers Compensation Large Deductible Plan Filing DFS Approval

The DFS approval letter of Endorsement WC 99 06 01 (2002).

826.  2005-02-15 Approval of WC Large Deductible Filing DFS Approval

Large Deductible Program Endorsement approval [WC 99 06 01 B (01/05) NY] was obtained from the Superintendent of Insurance to increase the deductible to the greater of $1 million each occurrence/claim or 200% of audited standard premium.

Amendments as Endorsements to the Policy form were approved as to how the deductible applies, miscellaneous definitions, and provisions for PEOs. A new paragraph I was added on Joint and Several liability.

827.  2007-12-05; NYSID Endorsement DFS Approvals

Approval of Endorsement – WC 31 040 03A and WC 31 06 16A were obtained from the DFS, also approved was Endorsement WC 99 01 01 pertaining to the acceptable calculation of the assessment and premium tax. The revised Professional Employers Organization Deductible Endorsement – WC 99 06 01 C and the Deductible Program Endorsement – WC 99 06 020 were also approved effective 2007.

828.  Certain provisions in the 1994 Memorandum were superseded and are referenced in the endorsements that were approved by the DFS. It is significant to note that effective 2002, to ensure named insureds give informed consent, the rights and responsibilities of the named insureds are encapsulated in the endorsement which is part of the policy they receive. Use of the endorsement not only ensures insured are informed of critical aspects of the coverage such as the pooling arrangement and joint and several liability caveats,

151

but that they also received the most current terms and conditions. The 2007 endorsement (WC 99 06 020) details the most current rights and responsibilities of the insured and is applicable to the examination period.

829. The originally approved document, the 1994 Memorandum, still contains relevant administrative information and in particular is the governing document that authorizes the administrative trustee, the creation of a trust and imprest account and details how the multiple coordinated policy coverage works.

## EXIGENT CIRCUMSTANCES

830. Apprenticeship, foreseen by Lincoln 155 years ago as the way to restore our society, a large portion of society out of the economic mainstream, if we continue to fail to heed the Lincoln advice in the Prelude, the crisis will only get worse. Unpreparedness by the Percy Class by lack of skills and competency in all jobs and careers, will most certainly further endanger workers, especially first responders, the communities they serve and the general public.

831. The current, disturbing, almost outrageous national emergency has propelled this action. This crisis was made worse by lack of knowledge, skills and training of staff needed to perform basic jobs well.

## RELIEF

The Class Plaintiff prays for:

Issuance of an order permitting this litigation to proceed as a class action as previously certified in Case 73-cv-04279 under Federal Rules of Civil Procedure 23(a) and (b)(3) and order prompt notice to all class members that this litigation is pending; and a

Declaration that the Defendants are precluded, under the doctrine of collateral estoppel, from denying the standing and class certification by the Memorandum/Order at Document #6, Attachment and Order Memorandum/Order ("Memorandum/Order") of Judge Lasker reported at 384 F Supp 800, (Document #6, Attachment 3 and Document #6, Attachment 2 of EDNY Case No. 21-cv-01366).

A judgment on the First Cause of Action against the State Officer Defendants and the Government Agencies under 42 U.S.C. §1983 enjoining and prohibiting them from denying rights protected by the 14th Amendment Equal Protection of Constitutional Rights of the Class to the benefit of 42 U.S.C. §2000e-2 Alternative Employment Practice under Color of Law by conspiring with the Owner Operator Defendants and Party-in-Interest Defendants;

A judgment on the Second of Cause of Action against identified Owner Operator Defendants of Employers identified in related EDNY Case 21-cv-01366, for $53 million diverted, converted, and embezzled Plan assets, admitted by certain Employer Defendants in EDNY Case 21-cv-01366;

A judgment on the Third Cause of Action against Party-In-Interest Defendants for $68 million to Recover Plan assets diverted By Parties-in-Interest in Prohibited Transactions;

A judgment on the Fourth Cause of Action against the Owner Operator Defendants for $68 million identified EDNY related Case 21-cv-01366;

A judgment On the Fifth Cause of Action of $30,155,137 for benefits paid to members of the employee Class which the Employers in related EDNY Case 21-cv-01366 failed to reimburse, $77,370,613 dollars to be paid to the Trust Defendant to cover future benefits as actuarily projected and set forth in related EDNY Case 21-cv-01366, and $77,370,613 dollars to he paid to the Trust Defendant to cover future benefits as actuarily projected and set forth in related EDNY Case 21-cv-01366; for which the Owner Operator Defendants, Party-in-Interest Defendants and the State Officer Defendants all are jointly and severally liable;

A judgment on the Sixth through the Fourteenth Cause of Action for $500 million in consequential damages and pain and suffering to the members of the Class Plaintiff, these damages expected to grow to more than $1 billion as events are unfolding and more evidence is available to be quantified at the time of trial, expected to be paid to a fund to be administered by a master for distribution to those members of the Class applying to the fund and qualifying for compensation in accordance with processes and rules as established by the Court for distribution, jointly and severally the liability of all of the Owner Operator Defendants, Party-in-Interest Defendants, and State Officer Defendants;

A judgment on the Fifteenth Cause of Action against the Owner Operator Defendants, Party-in-Interest Defendants and the State Officer Defendants of $210 million by the RICO enterprise liability as described in this Complaint to be treble damages;

A Declaration that the Government Agencies and State Officers Defendants violated and continue to violate the Memorandum/Order and Order by Defendants having failed to implement the settlement in Case 73-cv-04279 by regulations and executive orders in Case 73-cv-04279, and the settlement in Case 73-cv-04279;

Award to the Class Plaintiff actual damages for lost wages, for lost opportunity and compensation as money damages to be determined at trial in this litigation;

Award to the Class Plaintiff liquidated damages to be determined;

Award to the Class Plaintiff pre- and post-judgment interest at the statutory rate;

Award to the Class Plaintiff attorneys' fees, costs, and disbursements;

Entry of an order in the nature of a mandamus enjoining Defendants to provide an accounting of their acts;

Treating this as a Private Attorney General Action under 42 U.S.C. 1988 insofar as may be necessary to provide the relief requested in this Complaint together with reimbursement of attorneys fees, expert fees, costs and disbursements;

ALL together with such other and further relief as shall seem just and proper under the circumstances.

Dated: March 17, 2021

KERNAN PROFESSIONAL GROUP, LLP

26 Broadway, 19th Floor,
New York, New York 10004
Phone:(212) 697-9084
Fax (212) 656-1213
jkernan@kernanllp.com

154